# 𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals

*for the*

# 𝔗hird 𝔠ircuit

---

Case No. 22-2647

---

JERYL TURCO,

*Appellant,*

– v. –

CITY OF ENGLEWOOD, NEW JERSEY,

*Appellee.*

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY IN CASE NO. 2-15-CV-03008
HONORABLE SUSAN D. WIGENTON, U.S. DISTRICT JUDGE

---

### BRIEF AND APPENDIX FOR PLAINTIFF-APPELLANT
### Volume I of III (Pages Appx1 to Appx26)

---

JAY ALAN SEKULOW**
JORDAN SEKULOW**
STUART J. ROTH*
AMERICAN CENTER FOR LAW
    AND JUSTICE
201 Maryland Avenue, N.E.
Washington, D.C. 20002
Tel.: 202-546-8890

EDWARD L. WHITE III*
AMERICAN CENTER FOR LAW
    AND JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007

* Admitted to Third Circuit Bar
** Not admitted in this jurisdiction

FRANCIS J. MANION*
    *Lead Counsel*
GEOFFREY R. SURTEES**
AMERICAN CENTER FOR LAW
    AND JUSTICE
6375 New Hope Road
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

Appellant Jeryl Turco is not a corporate entity and therefore does not have responsive information to disclose under Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Rule 26.1.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF ISSUES ....................................................................3

STATEMENT OF RELATED CASES ..................................................3

STATEMENT OF THE CASE...............................................................3

    I.    Relevant facts ...........................................................................3

          Englewood's Buffer Zone Ordinance .........................................4

          Jeryl Turco's Sidewalk Counseling ...........................................5

          Invalidation and Restoration of the Ordinance ..........................9

          The Burden on Turco's Free Speech ..........................................7

          Englewood's Reason for Enacting the Ordinance ...................11

          Englewood's Response ............................................................12

          The Record Evidence of the Chronology of the City's Response ...................................................................................15

          Englewood Applies the Buffer Zones Throughout the City ...................................................................................16

    II.    Procedural History.................................................................17

    III.    Rulings Presented for Review ...............................................17

SUMMARY OF ARGUMENT ..............................................................18

STANDARD OF REVIEW ...................................................................19

ARGUMENT .........................................................................................20

    I.    Applicable Constitutional Standard ....................................20

    II.    The City's Interests ...............................................................22

III.   The Ordinance Burdens Turco's Core Speech Activities in a Traditional Public Forum ....................................................25

IV.   Least Restrictive Means .......................................................32

    A.   The Far-Reaching, Overinclusive nature of the Ordinance is Contrary to the Demands Of Narrow Tailoring .................................................................33

    B.   The District Court Erred in Accepting the City's Excuses for Not Pursuing Alternatives to Silencing Speech .....................................................................37

       1.   Injunctions Not Pursued ...................................37

       2.   Other Laws Not Considered ............................39

       3.   Enforcing Existing Laws .................................40

          a.   Finances and Volunteer Police Officers...............41

          b.   Fear of Reprisal .....................................45

V.   The Ordinance Fails Under the Overbreadth Doctrine .......................48

VI.   Remaining Constitutional Claims ........................................53

CONCLUSION ...................................................................54

CERTIFICATION OF ADMISSION TO BAR .................................55

CERTIFICATE OF COMPLIANCE.........................................56

CERTIFICATE OF FILING AND SERVICE ...............................57

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008) ..........................................................53

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987)......................................................................52

*Bible Believers v. Wayne Cty.*,
  805 F.3d 228 (6th Cir. 2015) .........................................................43

*Bruni v. City of Pittsburgh*,
  824 F.3d 353 (3d Cir. 2016) ...................................................*passim*

*Bruni v. City of Pittsburgh*,
  941 F.3d 73 (3d Cir. 2019) .....................................................*passim*

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
  657 F.3d 936 (9th Cir. 2011) .........................................................36

*Cutting v. City of Portland*,
  802 F.3d 79 (1st Cir. 2015)............................................................36

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)...................................................................25

*Doe v. Gov. of New Jersey*,
  783 F.3d 150 (3d Cir. 2015) ..........................................................32

*Fed. Election Com. v. Mass. Citizens for Life, Inc.*,
  479 U.S. 238 (1986)......................................................................48

*Free Speech Coal., Inc. v. AG United States*,
  787 F.3d 142 (3d Cir. 2015) ....................................................19, 24

*Frisby v. Schultz*,
  487 U.S. 474 (1988)......................................................................35

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005) ..........................................................19

*Hague v. C.I.O.*,
  307 U.S. 496 (1939)......................................................................44

*Hill v. Colorado*,
   503 U.S. (2000) .......................................................................*passim*

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995) ................................................................... 19

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ................................................................*passim*

*NAACP v. Alabama*,
   377 U.S. 288 (1964) ................................................................... 49

*Palmer v. Thompson*,
   403 U.S. 217 (1971) ................................................................... 42

*Reynolds v. Middleton,*
   779 F.3d 222 (4th Cir. 2015) ..................................................... 36

*Riley v. National Federation of Blind of N.C., Inc.*,
   487 U.S. 781 (1988) .............................................................. 21, 41

*Schneider v. State*,
   308 U.S. 147 (1939) .......................................................... 40, 42, 43

*Thompson v. W. States Med. Ctr.*,
   535 U.S. 357 (2002) ................................................................... 35

*Turco v. City of Englewood*,
   2017 U.S. Dist. LEXIS 189042 (D.N.J., Nov. 14, 2017) ................................ 6

*Turco v. City of Englewood*,
   935 F.3d 155 (3d Cir. 2019) ...................................................*passim*

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ................................................................... 23

*United States v. Gregg*,
   32 F. Supp. 2d 151 (D.N.J. 1998) ................................................. 13

*United States v. Stevens*,
   559 U.S. 460 (2010) .............................................................. 48, 52

*United States v. Williams*,
   128 S. Ct. 1830 (2008) ............................................................... 53

iv

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
    763 F.3d 273 (3d Cir. 2014) ........................................................................19

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)....................................................................................20

**Statutes and Other Authorities:**

U.S. Const., amend. I ..........................................................................*passim*

28 U.S.C. § 1291 .........................................................................................2

28 U.S.C. § 1331 .........................................................................................2

28 U.S.C. § 1367 .........................................................................................2

42 U.S.C. § 1983 .........................................................................................2

Englewood City Code § 307-4........................................................................4

N.J.S.A. § 26:2H-2.....................................................................................34

N.J.S.A. § 39:4-34........................................................................................8

N.J.S.A. § 40:55D-66.2...............................................................................35

N.J.S.A. § 47:4-1........................................................................................47

## INTRODUCTION

In late 2013, the City of Englewood was faced with a problem. A new and readily identifiable group of anti-abortion protestors had begun appearing on the public sidewalks and streets outside of a local abortion clinic. This new group threatened the peaceful coexistence between clinic supporters and opponents that had prevailed at the site at least since the issuance of an injunction in the late 1990s following a series of sit-ins and blockades of the clinic. The tactics of the new group—described as "harassing," "confrontational," "physically threatening," "obstructionist"—contrasted markedly with the approach of long-time sidewalk counselors like Plaintiff-Appellant, Jeryl Turco, who, by all accounts, sought merely to speak with clinic patients in a calm, quiet, personal manner and give them pamphlets about alternatives to abortion.

Both clinic supporters and opponents, including Turco, agreed that the new group posed a problem that needed to be addressed. But instead of addressing the problem by enforcing existing laws, enacting new laws modeled on the federal Freedom of Access to Clinic Entrances Act ("FACE"), or, best of all, pursuing injunctive relief targeting the specific individuals and groups that were causing the problem—an approach that the City knew from recent experience actually worked—Englewood chose an "easier" solution. It enacted a buffer zone law, based on the law unanimously struck down by the Supreme Court in *McCullen v. Coakley*, 573

U.S. 464 (2014), that carved up the traditional public forum at 40 Engle Street into a series of six "no-speech" rectangles and arcs that force people like Turco to navigate an obstacle course to engage in what the Supreme Court has held are "classic forms of speech that lie at the heart of the First Amendment." *Id.* at 489.

The City's decision to silence speech instead of pursuing bad actors, and its choice not to legislate in a narrowly tailored fashion, is based on excuses, excuses that the district court accepted based on clear factual errors and incorrect conclusions of law. This Court should reverse the ruling of the court below and hold, as did the Supreme Court in *McCullen*, that the challenged Ordinance fails narrow tailoring, or in the alternative, to hold that the Ordinance fails under the overbreadth doctrine.

## STATEMENT OF JURISDICTION

The subject matter jurisdiction of the district court was based on 28 U.S.C. § 1331 because Appellant's claims arise under 42 U.S.C. § 1983. The district court had supplemental jurisdiction over Appellant's state constitutional claim pursuant to 28 U.S.C. § 1367.

This Court's appellate jurisdiction is based on 28 U.S.C. § 1291, as the Judgment and Order of the district court entered on August 12, 2022, was a final judgment. Appx1. Appellant timely filed a Notice of Appeal from the final judgment on September 2, 2022. Appx24.

**STATEMENT OF ISSUES**

Did the district court err in holding that the City of Englewood's Ordinance, which bans non-exempt speech within buffer zones outside health care facilities and transitional facilities, does not burden Turco's constitutional rights to engage in free speech activities? Appx15-18.

Did the district court err in holding that the City's Ordinance is narrowly tailored under governing decisional law of the United States Supreme Court and this Court? Appx18-19.

Did the district court err in holding that the City's Ordinance satisfied overbreadth? Appx20-22.

**STATEMENT OF RELATED CASES**

Counsel is unaware of any pending or related cases.

**STATEMENT OF THE CASE**

**I.    Relevant facts**

The trial of this case consisted of the submission by the parties of a Stipulation of Undisputed Facts (78 in number), live trial testimony of Jeryl Turco, five witnesses for the City, deposition testimony of two additional witnesses who were not present at trial, and various exhibits put in evidence by the parties. Following the trial, the parties submitted Proposed Findings of Fact and Conclusion of Law.

*Englewood's Buffer Zone Ordinance*

This case is a First Amendment challenge to the constitutionality of an Ordinance enacted by the City of Englewood in 2014. The Ordinance is nearly a carbon copy of the statute that would be struck down just a few months later by the unanimous Supreme Court in *McCullen*. It creates multiple overlapping buffer zones outside all Englewood health care and transitional facilities. Non-exempt individuals who enter or remain within the zones are subject to fines and/or imprisonment.[1]

The measure was adopted in response to the activities of identifiable individuals associated with a group of protestors who had begun protesting in late 2013 in the vicinity of the Metropolitan Medical Associates (MMA), a clinic where abortions are performed, located at 40 Engle Street. Appx526 (Parties' Stipulation of Undisputed Facts, ##1–5) ("PSUF").

At the MMA location, the Ordinance excludes Plaintiff and others similarly situated from approximately twenty-four feet on either end of the clinic, or forty-eight feet in total of the public sidewalk outside the clinic by virtue of two different sets of three overlapping arcs and rectangles painted on the public sidewalk. Appx8 (Opinion). Hence, the MMA location has *six* separate overlapping "eight-foot buffer zones," not one. *Turco v. City of Englewood*, 935 F.3d 155, 159 (3d Cir. 2019).

---

[1] Englewood City Code § 307-4, *available at* https://ecode360.com/13859122?highlight=&searchId=28674626487347934#13859122.

In addition, and despite the absence of evidence of problems at any location other than 40 Engle Street, Appx258 (Dacey, 186:18–21), the Ordinance also sets up buffer zones at every other health care and transitional facility in Englewood. Shortly after its adoption, the city began marking out buffer zones at these facilities, including six referred to in an email from the police chief to the City Manager, Timothy Dacey. Appx526 (PSUF, #8), Appx258-259 (Dacey, 186:13–187:1).

### *Jeryl Turco's Sidewalk Counseling*

Jeryl Turco is a retired nursing home administrator. In her retirement, Turco works 25 hours a week as the director of a nonprofit foundation that provides funding and services for abused, exploited, and neglected children, homeless and mentally ill women in India, medical missions in Nigeria, and antipoverty programs in Newark. Appx80-81 (Turco, 8:2–9:16). In addition, Turco has, since 2007, engaged in sidewalk counseling on the public sidewalk in front of the MMA abortion clinic. She does this because of her belief that all human beings are created in the image and likeness of God and are, thus, worthy of great reverence. She is there to try to speak with women and girls as they approach the clinic to offer them alternatives to abortion, material and spiritual support and help in a caring, quiet, and non-confrontational manner. Appx81-82 (Turco, 9:24–10:21), Appx529-530 (PSUF, ##15–16).

Until the enactment of the Ordinance at issue in this case and the painting of the six overlapping 8-foot buffer zones excluding her from some 48-feet of public

sidewalk,[2] Turco was not restricted in any way when approaching clinic patients on the public sidewalk. As she described it at trial: "I would walk directly on the sidewalk." No matter from which direction clinic patients were arriving, Turco "would be able to speak with them and walk down the sidewalk to the main entrance, even be able to speak with them in front of the main entrance." Even if they were dropped off in front of the main entrance, Turco could speak to them "even right in front of the door." Sometimes she would stand by the front door. Appx85-87 (Turco, 13:19–15:1).

In her testimony, Turco stressed the importance of being able to walk with clinic patients for as long as possible, even up to the door of the clinic. "We try to make a connection first, speak, you know, softly and make a connection . . . we need to let them know that there [are] services . . . we let them know we are praying for them . . . they can change their mind." Appx87 (Turco, 15:7–20). Turco has "absolute very minimal time to try to get that information across." Appx87 (Turco, 15:21–23).

That Turco's method of counseling is to calmly approach women entering the clinic and try to engage them in peaceful, nonconfrontational conversations is

---

[2] In *Turco v. City of Englewood*, 2017 U.S. Dist. LEXIS 189042 (D.N.J., Nov. 14, 2017), in a finding not disturbed on appeal, nor revised in the district court's Trial Opinion, the court wrote of the effects of the Ordinance: "Plaintiff and others similarly situated are excluded from approximately twenty-four feet on either end of the Clinic, or forty-eight feet in total of the public sidewalk outside the Clinic."

undisputed. Appx529-530 (PSUF, ##14–19). In fact, the co-founder of MMA's volunteer clinic escort program and certainly an ideological foe of Turco, Ashley Gray, described Turco as "a quiet, respectful person, and testified about how she "has referred patients to Jeryl," including an incident in which a patient was unsure about whether she wanted to have an abortion where, Gray testified, she "essentially delivered the patient to Jeryl." Appx305-306 (Gray, 233:16–234:1).

### *The Burden on Turco's Free Speech*

Turco's testimony about the impact of the buffer zones on her ability to sidewalk counsel was largely accepted by the district court. For instance, the court found as fact that, if Turco is standing to the south of the MMA doorway area and seeks to converse with a patient approaching from the north beyond the driveway, "she must walk around the radius arc to the left of the doorway, sidestep to the street to avoid the rectangular zone in front of the doorway, hurry to the next rectangular zone by the driveway, and sidestep that zone by going into the street, before she can try to engage the patient." Appx11 (Opinion). Then as the court found as fact, "[w]hile trying to converse with that patient on the way back toward the clinic door, Plaintiff must sidestep to avoid the driveway radius arcs and rectangular area, and then reconnect with the patient who has likely continued walking in a straight line. If successful, Plaintiff must then stop at the radius arc to the north of the door or at the doorway rectangular zone." Appx11-12 (Opinion).

In addition, the district court found as fact that, while Turco has been able to speak with *some* patients, *some* of the time, both before and after the enactment of the Ordinance, "the Ordinance has resulted in 'some obstruction' and 'some difficulty' in Turco's ability to share her message with patients "'at least 50 percent of the time.'" Appx12 (Opinion). The court further found that "[t]he difficulty involved with navigating the buffer zones, and *being forced to go out into the street*,[3] is compounded by the presence of cars, delivery trucks, and sometimes snow." Appx12 (Opinion) (emphasis added).

The district court gave undue attention to what Turco has been able to do *in spite of* being excluded by the Ordinance from a substantial part of the public sidewalk. But, as Turco explained, at least part of the reason she sometimes finds herself forced to run to patients as they approach the clinic is the presence of the obstacle course created by the Ordinance itself. Appx113-114 (Turco, 41:11–42:4).

The district court also mischaracterized the import of the deposition testimony of another sidewalk counselor, non-party Rosemary Garrett. While Garrett did say she was "not bothered" by the Ordinance, it is highly misleading to suggest that Garrett's sidewalk

---

[3] The district court downplayed Turco's "being forced to go out into the street." But in addition to exposing Turco to the perils of entering a busy city street to exercise her First Amendment rights, such conduct is illegal under New Jersey law, which provides that "[w]here sidewalks are provided," as is the case at 40 Engle Street, "it shall be unlawful for any pedestrian **to walk along** and upon an adjacent roadway." N.J.S.A. § 39:4-34 (emphasis added).

counseling efforts were not affected by the Ordinance. Appx13 (Opinion). Garrett testified that, since adoption of the Ordinance, she is *only* able to still communicate with people "if I'm down at the opposite corner . . . if I'm down on the corner far away from the building, abortion clinic." Appx472-473 (Garrett, 31:19–32:2).[4]

In addition to quiet, caring, one-on-one conversations, an integral part of Turco's communicative efforts is pamphlet distribution. She testified that the buffer zones have significantly restricted her ability to do that. For instance, should she be positioned at the edge of the left doorway area buffer zone's radius arc, it is physically impossible for her to reach across the approximately 24 feet of space between her and a patient approaching the edge of the right radius arc to hand her a pamphlet. Appx104-105 (Turco, 32:18–33:16).

The penalties for Turco for violating the Ordinance, should she choose to "enter or remain" within any of the areas demarcated by the buffer zone lines are steep, including a fine of up to $1,000, up to 90 days in jail, or both, *plus* a minimum mandatory fine of $1,000. *See supra*, at n.2.

### Invalidation and Restoration of the Ordinance

After the district court invalidated the Ordinance in 2017, Turco's ability to sidewalk counsel in the way she had done before the buffer zones appeared was restored.

---

[4] Garrett also testified that the existence of the buffer zone had not lessened the Bread of Life group's harassment of patients in any way. In fact, according to Garrett, things were worse. Appx477-478 (Garrett Testimony, 38:17–39:9).

She testified that, once again, she "was able to walk down the sidewalk, I did not have an obstacle course, I can go right to the door and talk to the girls as they were going in." She explained, "[W]ith the buffer zone, I'd have to go into the street and back and then into the street. So now [referring to the time during which the Ordinance was invalidated] I can go straight down the sidewalk, which is less time, because time is critical." Appx100-101 (Turco, 28:19–29:3). Indeed, Turco emphasized that she has "very little time to communicate," and she described the extra "10 or 15 or 20 seconds" she had when the Ordinance was invalidated as "extra precious." Appx101 (Turco, 29:3–5).

Once the Ordinance was reinstated by this Court in 2019, however, the obstacle course that previously made Turco's speech efforts more difficult by "at least 50 percent," was back. Appx100, 101 (Turco, 28:7–11, 29:6–13). In fact, upon reinstatement of the buffer zones, the obstacle course was "even worse" than before because of the proliferation on the sidewalk in front of 40 Engle St. of various objects such as planters, a decorative rock structure, tables, chairs, and a valet station. Appx101-105, 107-110 (Turco, 29:14–33:16, 35:23–38:15). She estimated that these objects—the property of the restaurant next to MMA, but present with City approval—take up "probably half the sidewalk you could use." Appx111 (Turco, 39:17–24). And as the district court noted, even one of Englewood's witnesses, Andrea Long, admitted that the restaurant's objects now occupy "maybe half" of the available sidewalk in front of MMA. Appx12 (Opinion, n.7).

Regarding this now even narrower space available for Turco to engage in speech, the district court found "the objects do add to the difficulty of trying to communicate with patients." Appx12 (Opinion, n.7).

### Englewood's Reason for Enacting the Ordinance

There has never been any dispute about the reason Englewood enacted the challenged Ordinance. The City was trying to address complaints about aggressive antiabortion protestors who first appeared on the scene in late 2013. These protestors were associated with a group called "the Bread of Life." Unlike Turco, who loathed the Bread of Life group's tactics, and was, in fact, harassed by the group's members because of her religion, the Bread of Life people engaged in "extremely aggressive, loud, intimidating, and harassing behavior." Appx526 (PSUF, ##1–5).

Beginning in December 2013, Ashley Gray, the head of the clinic escort team, sent weekly "escort reports" to, among others, City Council President, Lynn Algrant, about the activities of the Bread of Life group, which Gray dubbed "our problem group." Appx307, Appx647-48 (Gray, 235:15–20, Emails). These reports contained detailed descriptions of, among other things, the following conduct: "Blocking access to the clinic door"; "Blocking patients and escorts on the sidewalk"; "Shouting into the clinic when the door is opened"; and "Creating tripping hazards" Appx638-641 (Emails), as well as, "Repeated physical assault of escorts"; "Screaming directly into [patients'] faces"; and "Videotaping [patients],"

11

making them "hysterical." Appx645 (Emails). In addition to written reports, Gray was also sending to Algrant photo and video evidence of the "physical intimidation and interference," "tremendous chaos," and "repeated physical assaults" being committed by the "problem group." Appx210-212 (Algrant, 138:20–140:8).

The MMA clinic itself maintained security cameras that monitored and recorded at least some of the activity taking place on the sidewalk in front of 40 Engle Street. Appx328 (Gray, 256:17–22). Timothy Dacey, the City Manager, was aware of this as well as the existence of the escorts' video evidence of "offensive, outrageous and, in some cases, unlawful" activity of the Bread of Life group. Appx259 (Dacey, 187:9–18).

Using basic internet research tools (Google), Ashley Gray was able to learn the names of six of the members of the Bread of Life group, as well as the location of their church, which she forwarded to Algrant. Appx338 (Gray, 266:8–14).

### *Englewood's Response*

As the district court found—it was not disputed in any case—in response to this sudden, well-documented onslaught of harassing, threatening, violent behavior by identified perpetrators whose acts were videotaped, Englewood failed to: 1) prosecute the Bread of Life protestors for violating laws already on the books, such as those prohibiting harassment, disorderly conduct, and simple and aggravated assault; 2) enact "a local version of the FACE Act or a buffer zone law like

12

Pittsburgh's which (as eventually interpreted by the Third Circuit) would have addressed the patrolling, picketing, and demonstrating of the Bread of Life group, but allowed sidewalk counselors to engage in one-on-one communications"; 3) "pursue injunctive relief against bad actors caught on photo or video"; 4) and failed to even try to ascertain "whether any of the protestors were already subject to an injunction against certain MMA protestors" issued in *United States v. Gregg*, 32 F. Supp. 2d 151, 161–62 (D.N.J. 1998). Appx19 (Opinion, n.10).

The City's excuses for failing to do any of these things include lack of police resources and the reluctance of victims to file complaints. Appx19 (Opinion). However, these excuses—assuming *arguendo* that they would even be sufficient to carry Englewood's burden under *McCullen* (they would not)—were unsupported by anything other than conclusory statements of City officials lacking a single page of budgetary documentation or cost analysis or were flatly contradicted by the undisputed evidence that the escorts were, in fact, filing complaints throughout the relevant period.

For example, the former City Manager, Timothy Dacey, who for the first time in this seven-year-old case, came up at trial with a figure of $100 an hour as the cost of stationing a police officer at MMA for the four hours every other week when the protests were happening, provided no written or verbal budget figures from which a trier of fact could determine whether such a figure would have been affordable for

Englewood. Appx241-242 (Dacey, 169:12–170:9). He also admitted at trial that in his deposition in 2017, he had testified that he *never* did even an informal dollars and cents calculation of what the cost would have been, and would not have even considered paying for an officer to be stationed on the public sidewalk at 40 Engle Street because that would have been against city policy regarding having taxpayers pay "to protect a private business." Appx255-257 (Dacey, 183:14–185:21).

As for the reluctance of Bread of Life victims to file complaints, the trial record contains ample evidence of victims and witnesses filing complaints. Appx181-182 (Algrant, 109:5–110:19); Appx364-365 (Taylor, 292:17–293:6) (three complaints filed); Appx397 (Long, 325:3–12) (called police twenty times and filed five complaints).

As for Dacey's trial recollection that in 2013 the city talked to MMA doctors about possibly getting an injunction, any suggestion that this was seriously considered as a way of addressing the City's problem is contradicted in the record by the Defendant's interrogatory answers, provided by and sworn to by Dacey in 2015. Responding to an interrogatory that asked the City to identify every measure or action it "considered or undertook" to address the Bread of Life problem before enacting the buffer zone Ordinance, Dacey listed six measures. Missing from his list is any mention of discussing, let alone, seeking, an injunction. Appx608-610 (City's Answers to Interrogatories).

***The Record Evidence of the Chronology of the City's Response***

The record is clear, as noted above and acknowledged by the district court, that the City did not pursue any actions similar to those suggested by the *McCullen* Court for addressing the same problem Englewood faced. Appx19 (Opinion, n.10). Instead, the contemporaneous written record, unvarnished by the City's witnesses seven-years-after-the-fact recollections, shows the following chronology:

- On October 8, 2013, the issue of the Bread of Life group's activities at MMA was first brought to the Englewood Council's attention. Appx661-669 (City Council Minutes).

- On November 12, 2013, Police Chief Arthur O'Keefe addressed the City Council on the matter for the first time regarding the Bread of Life problem, opining that current city ordinances needed revision. Appx670-677 (City Council Minutes at 676). O'Keefe believes that he was the one who "came up with the idea of a buffer zone." Appx505 (O'Keefe, 25:8–18).

- In December 2013, Council President Algrant received from an attorney with the City of New York a copy of the First Circuit's decision in *McCullen v. Coakley* affirming the validity of Massachusetts' buffer zone law. Appx633 (Emails). Algrant replied, "This is a great idea." Appx216 (Algrant, 144:1–4); Appx631-633 (Emails).

- On January 31, 2014, Algrant wrote to the MMA clinic escort team informing them that Englewood would be adopting a buffer zone ordinance. Appx 636 (Emails).

Thus, from the first notice of a problem to Chief O'Keefe's proposal of a buffer zone ordinance: one month. From O'Keefe's proposal of a buffer zone ordinance to Council President Algrant's receipt and review of the "great idea" of enacting an Englewood version of the Massachusetts statute (good law at the time): one month. From Algrant's endorsement of the Massachusetts statute to her informing the clinic escorts that Englewood would be enacting its own Massachusetts-style ordinance: one month.

In the meantime, the record contains no evidence of *any* ordinance or regulation—other than the challenged Ordinance—being considered during the relevant time period. No prosecutions of the easily identifiable bad actors for their documented bad acts. No injunctive relief sought or discussed by the Council. No cost analysis for stepping up police presence. Nothing but the soon-to-be-struck-down *McCullen* statute.

### Englewood Applies the Buffer Zones Throughout the City

As noted above, the district court was simply mistaken in finding that Turco submitted no evidence of the City's application of the buffer-zone Ordinance to any location other than 40 Engle Street. Appx21 (Opinion). On the contrary, *both*

16

Plaintiff *and* Defendant submitted such evidence in the form of stipulated, undisputed facts. Appx528-529 (PSUF, #8) (stating that after enactment of the Ordinance, City officials had "marked out buffer zones at several of the medical facilities in town" . . . and "would continue to identify the other medical facilities and mark out buffer zones"). In addition, Dacey, who could "not recall" reports of any problems at any other facility other than 40 Engle Street, Appx258 (Dacey, 186:18–21), testified that the Ordinance was intended to reach all health care and transitional facilities because "protests can pop up any day for any reason anywhere." Appx251 (Dacey, 179:5–6).

## II.    Procedural History

Turco filed suit on April 29, 2015. (ECF 1.) On November 14, 2017, the district court entered summary judgment in Turco's favor. (ECF 50.) That decision was reversed by this Court on August 19, 2019. *Turco v. City of Englewood*, 935 F.3d 155 (3d Cir. 2019). After a two-day bench trial beginning on February 23, 2022, the district court entered judgment in favor of the City on August 12, 2022. Appx23. Turco filed a timely notice of appeal on September 2, 2022. Appx24.

## III.    Rulings Presented for Review

The ruling presented for review is the district court's Order and Judgment of August 12, 2022.

## SUMMARY OF ARGUMENT

The district court erred as a factual and legal matter in holding that the Ordinance, which imposes no-speech zones in traditional public forums, does not burden Plaintiff Jeryl Turco's free speech activities that this Court and the Supreme Court have held are entitled to maximum protection. The buffer zones painted on the public sidewalk at 40 Engle Street, where Turco has engaged in sidewalk counseling for over 15 years, make it more difficult for her to speak one-on-one with clients and to hand them literature. In making these activities more difficult, the Ordinance imposes an especially significant burden.

The district court also erred in holding that the City could not pursue alternatives to silencing speech in furthering its interests because of excuses—excuses that included a lack of financial resources and a general fear of reprisal. It is the constitutional obligation of municipalities to restrict speech in a narrowly tailored fashion, not to come up with excuses for failing to do so. If the City's excuses are sufficient to avoid the clear teaching of the Supreme Court in *McCullen*, speech has been sacrificed for efficiency.

Finally, the district court erred in rejecting that substantial overbreadth exists in this case. The Ordinance goes well beyond addressing the problems that gave rise to its legislation. It prohibits speech outside all health care and transitional facilities

within the City, even though problems occurred at one abortion clinic. Such overbreadth, in this case, is a vice, not a virtue.

## STANDARD OF REVIEW

Typically, on appeal from a bench trial, this Court "reviews a district court's findings of fact for clear error and its conclusions of law de novo." *VICI Racing, LLC v. T-Mobile USA, Inc*., 763 F.3d 273, 282–83 (3d Cir. 2014) (citation omitted). With respect to mixed questions of law and fact, this Court applies the clearly erroneous standard, "except that the District Court's choice and interpretation of legal precepts remain subject to plenary review." *Id*. (quoting *Gordon v. Lewistown Hosp*., 423 F.3d 184, 201 (3d Cir. 2005)).

However, in a free speech case, where "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," this Court is obliged to "make a fresh examination of crucial facts" and an "independent examination of the whole record" to ensure that there is no "forbidden intrusion on the field of free expression." *See Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 567–68 (1995) (internal quotation marks omitted). In other words, "'[i]n the First Amendment context, reviewing courts have a duty to engage in a searching, independent factual review of the full record' to the extent any factual findings are relevant to the First Amendment constitutional standard." *Free Speech Coal., Inc. v. AG United States*, 787 F.3d 142, 151 (3d Cir. 2015) (citation omitted).

As argued herein, applying the foregoing standard of review to this case yields one conclusion: the facts adduced at trial demonstrate that the challenged Ordinance burdens Turco's speech and the Ordinance fails narrow tailoring and overbreadth.

## ARGUMENT

### I.    Applicable Constitutional Standard

The First Amendment standard governing this case is clear: "[f]or a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). While a content-neutral restriction on speech "need not be the least restrictive or least intrusive means of" serving the government's interests, the government must "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. (citations omitted).

This standard is no rubber stamp. "To meet the requirement of narrow tailoring, the government **must demonstrate** that alternative measures that burden substantially less speech **would fail** to achieve the government's interests, not simply that the chosen route is easier." *Id*. at 495 (emphasis added). *See also Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016) (*Bruni I*) ("[T]he City cannot burden [speech] without first trying, or at least demonstrating that it has seriously

considered, substantially less restrictive alternatives that would achieve the City's legitimate, substantial, and content-neutral interests").

"Where certain speech is associated with particular problems," as in this case, "silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen*, 573 U.S. at 486 (quoting *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).

Sacrificing speech for efficiency is exactly what the City did in this case. Instead of seriously pursuing one of several non-speech-silencing options to address problems at one location taking place for a short period of time one day of the week, the City chose the easy way out by squelching speech in traditional public forums throughout the City.

While the district court correctly held that intermediate scrutiny is the correct standard to adjudge Turco's Plaintiff's First Amendment free speech claim, it erred in its conclusions of law. Specifically, the court erred in holding that (1) the Ordinance does not burden Turco's free speech activities, (2) that the Ordinance satisfies that less restrictive means test of intermediate scrutiny, and (3) that the Ordinance survives overbreadth.

## II.    The City's Interests

Before discussing the lower court's erroneous application of intermediate scrutiny, the district court's articulation of the City's asserted interests must first be addressed. Relying on this Court's decision in *Turco v. City of Englewood, New Jersey*, 935 F.3d 155 (3d Cir. 2019), and that decision's reliance on *Hill v. Colorado*, 503 U.S. 703 (2000), the district court held that the Ordinance serves health and safety interests of the City by "creating an unobstructed pathway for patients to enter the MMA clinic without confrontation." Appx14 (Opinion). It also held that the "clearly marked zones" provide enforcement officials a bright line to avoid having to determine what constitutes harassing behavior or not. Appx14 (Opinion).

There are three things to be said about the court's characterization of the City's interests. First, while Turco concedes that unimpeded access to health care facilities can certainly constitute a legitimate governmental interest—just as in *McCullen*, 573 U.S. at 487—the City produced no evidence of obstruction or confrontation outside any health care facility other than at 40 Engle Street. The City Manager testified that during the time the Ordinance was being considered, he did not recall "any reports of any problems at any other facility other than 40 Engle Street." Appx258 (Dacey, 186:18–21).

Second, the district court does not explain what *legitimate* government interests are served by the creation of buffer zones around transitional facilities,

which include "[c]ommunity residences for the developmentally disabled and community shelters for victims of domestic violence." Appx7 (Opinion, quoting the Ordinance). At trial, City Council President Lynn Algrant testified that because there is a need for transitional housing in the area, she did not "want anybody to feel like I don't want this in my neighborhood and I am going to protest around this place and make it difficult for people to get in out and out of the place that would be their home." Appx197 (Algrant, 125:13–16). Dacey similarly testified that buffer zones were needed at both health care and transitional facilities because "protests can pop up any day for any reason anywhere." Appx251 (Dacey, 179:3–11). In Dacey's words, the City "anticipated that somebody might have an issue against another facility, so we'd just broadly cover everybody." Appx251 (Dacey, 179:6–8).

While the Supreme Court in *Hill* noted "the unique concerns that surround health care facilities," 530 U.S. at 728, the City did not demonstrate how the same could be said of transitional facilities. Creating buffer zones outside transitional facilities because of the mere possibility of a protest does not just fail narrow tailoring, *see infra*, it cannot possibly serve as a legitimate government interest in the first place. "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must . . . demonstrate that the recited harms are real, not merely conjectural." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 646 (1994) (internal citations omitted).

Third, and finally, the notions that the Ordinance (1) serves the interests of helping women avoid confrontation with a message they may not like, and (2) makes it easier for law enforcement to do their jobs contradict the teachings of the Supreme Court in *McCullen*.

In *McCullen*, the Court observed that the Massachusetts law, upon which Englewood's Ordinance was modeled, "would not be content neutral if it were concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech." 573 U.S. at 481 (internal quotation marks omitted). On the contrary, the Court praised public streets and sidewalks as "venues for the exchange of ideas" given that, in these forums, "a listener often encounters speech he might otherwise tune out." *Id*. at 476. In fact, the Court noted, "[t]his aspect of traditional public fora," the Court continued, "is a virtue, not a vice." *Id*.

With respect to the interest of ease of enforcement, *McCullen* is again on point: making a police officer's job "much easier" is "not enough to satisfy the First Amendment." 573 U.S. at 495. "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id. See also Free Speech Coal., Inc.*, 787 F.3d at 156 ("ease of enforcement is not the touchstone for narrow tailoring") (citing *McCullen*).

The conflict between *McCullen* and *Hill* on these points cannot be squared. In light of the facts, however, that (1) *McCullen* did not rely on *Hill* in its analysis of a

law that served as the model for the Ordinance, and (2) a majority of the Supreme

Court has observed that "[t]he Court's abortion cases have . . . distorted First

Amendment doctrines," *Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228,

2275–76 (2022) (citing two dissenting opinions in *Hill*), this Court should defer to

*McCullen*, the latest Supreme Court decision to weigh the constitutionality of buffer

zones.

## III.    The Ordinance Burdens Turco's Core Speech Activities in a Traditional Public Forum

On the issue of whether the Ordinance burdens Turco's free speech activities

(one-on-one communication and leafletting in a traditional public forum), the district

court ruled that "the burden on Plaintiff's speech is not substantial because the

overall impact of the Ordinance on Plaintiff's ministry has been relatively small."

Appx15 (Opinion).

That conclusion is not supported by the facts of the record or decisional law.

This Court, relying on *McCullen*, has spoken clearly as to what constitutes a

burden in the free speech context: "while the First Amendment does not guarantee a

speaker the right to any particular form of expression, some forms—such as **normal**

**conversation and leafletting on a public sidewalk**—have historically been more

closely associated with the transmission of ideas than others." *Bruni I*, 824 F.3d at

366–67 (quoting *McCullen*, 134 S. Ct. at 2536) (emphasis added). *McCullen*

continues: "[w]hen the government makes it **more difficult** to engage in these modes

of communication, **it imposes an especially significant First Amendment burden**." *Bruni I*, 824 F.3d at 367 (quoting *McCullen*, 134 S. Ct. at 2536) (emphasis added). *See also Turco*, 935 F.3d at 172 (same).

According to this Court, measuring a burden on speech requires a consideration of the *scope* and *size* of the speech restriction. *Bruni v. City of Pittsburgh*, 941 F.3d 73, 95 (3d Cir. 2019) (*Bruni II*), As to *scope*, i.e., "the type of speech" the Ordinance prohibits, *id*., the Ordinance does not just ban conduct such as patrolling, demonstrating, and picketing within the zones it creates, as did Pittsburgh's ordinance in *Bruni II*. Englewood's Ordinance also bans the two speech activities involved with "sidewalk counseling," i.e., "one-on-one normal conversation and leafletting," that *McCullen* and this Court have held are "entitled to the maximum protection afforded by the First Amendment." *Id*. at 85 (cleaned up).

The *Bruni II* court held that Pittsburgh's buffer zone ordinance was narrower in scope than the Massachusetts law unanimously struck down in *McCullen* because "it limits only congregating, patrolling, picketing, and demonstrating within a fifteen-foot buffer zone"—conduct the court construed as **not** including sidewalk counseling. *Bruni II*, 941 F.3d at 90. In other words, the Pittsburgh ordinance, unlike Englewood's, did not "sweep in the 'one-on-one communication,' including 'normal conversation and leafletting,' that *McCullen* emphasized 'have historically been

more closely associated with the transmission of ideas.'" *Id.* (quoting *McCullen*, 573 U.S. at 488). In fact, the *Bruni II* Court specifically noted that if Pittsburgh wanted to amend its ordinance to restrict "one-on-one conversations," it would have to satisfy the narrow tailoring demands as articulated in "*McCullen* and *Bruni I*." *Bruni II*, 941 F.3d at 95 n.22. (Those demands are discussed *infra*.)

With respect to the *size* of a buffer zone imposed by the government, this Court has emphasized that "smaller buffer zones are not always better." *Bruni I*, 824 F.3d at 368. What matters are the distinct factual records of each case, "not a difference in real estate." *Id.* "*McCullen* emphasized the 'serious burdens' that the law imposed on speech by 'compromis[ing] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *Id.* (quoting *McCullen*, 134 S. Ct. at 2535).

As explained in the Statement of Facts, *supra*, the Ordinance creates "three overlapping buffer zones at any qualifying facility," *Turco*, 935 F.3d at 159, and in the case of 40 Engle Street, six overlapping zones because of MMA's entrance and driveway. Those six zones carve out forty-eight feet of the public sidewalk—a traditional public forum—where Turco is forbidden to engage in close, interpersonal conversations and hand out literature.

As noted by the district court itself, the Ordinance has "resulted in 'some obstruction' and 'some difficulty' in her ability" to sidewalk counsel 'at least 50

percent of the time.'" Appx12 (Opinion). This difficulty involved "navigating the buffer zones, and being forced to go out into the street . . . compounded by the presence of cars, delivery trucks, and sometimes snow." *Id*. As further explained in the Statement of Facts, *supra*, the fixed zones—combined with protestors, cars, snow, fixed objects on the sidewalk, etc.—cost Turco "extra precious" seconds in trying to share her message and distribute her literature. She must repeatedly interrupt her close conversations with women to navigate the numeorus do-not-cross lines painted on the public sidewalk, in addition to other objects. As in *McCullen*, the buffer zones undeniably "compromise [Turco's] ability to initiate the close, personal conversations that [she views] as essential to 'sidewalk counseling.'" *McCullen*, 573 U.S. at 487.

The district court's statement that there "was no testimony that the eight-foot buffer zones prohibit Plaintiff from engaging in the one-on-one conversations that are central to her sidewalk counseling," is incorrect. Appx16 (Opinion). Turco testified at length how the "obstacle course" imposed by the six zones at 40 Engle Street creates difficulties that negatively impact and hamper her sidewalk counseling 50 percent of the time. The difference in her ability to sidewalk counsel when the zones are not in place and when they are is clear, and that difference easily demonstrates how the zones make it more difficult for her to engage in speech activities that should be afforded "maximum protection."

28

In trying to make this case more akin to the facts of *Hill*, instead of those in *McCullen*—which this Court in *Turco* correctly noted is identical to the law struck down in *McCullen*, save for the size of the zones imposed—the district court goes seriously astray.[5]

*Hill* did **not** involve a fixed eight-foot *buffer* zone flatly banning all speech, including core-protected speech. *Hill*, rather, involved an eight-foot *bubble* zone—within a 100-foot zone—that prohibited individuals from knowingly approaching another person within eight feet of that person to pass a leaflet, counsel, or hold a sign unless that person consents. 530 U.S. at 707–8. The Colorado law created an 8-foot restriction on an *unwanted* physical approach to a person accessing a health clinic. *Id*. at 707. The Ordinance, however, creates an *absolute ban* on non-exempt speech within the boundaries of buffer zones. In other words, and unlike the buffer zones created by the Ordinance, Colorado's bubble zone could be "pierced," as it were, when the listener consented, or the speaker stood in one place and was approached by the listener. *Id*. at 708 (noting that the Colorado bubble zone did "not require a standing speaker to move away from anyone passing by."). *Hill* repeatedly emphasizes that the Colorado statute only prohibited approaches to unwilling listeners, allowing communications with willing listeners to proceed. *See, e.g*., *id*. at 715–16, 718.

---

[5] It should be noted that *McCullen* did not rely on *Hill* in any part of its legal analysis.

In contrast to the operation of the law in *Hill*, Turco cannot cross into a buffer zone imposed by the Ordinance to continue speaking one-on-one with a patient, **even if the patient wishes to hear what Turco has to say**. Moreover, though the Court in *Hill* suggested that sidewalk counselors "might easily stand on the sidewalk at entrances" to hand out literature, 530 U.S. at 730, Turco is not permitted to do that under the Ordinance, as entrances, including the one at MMA, are at the heart of the no-speech zones. In addition, the distance in *Hill* is always—and never more than— 8 feet, and, if consent given, no feet at all. Here, the distance is always at least 8 feet, and more often than not, 16 feet, or 24 feet, depending on where on the sidewalk Turco and the client happen to be standing in relation to the building.

Despite these differences, the district court rejected the proposition that the Ordinance is more burdensome than the statute at issue in *Hill*. It held that Turco could still speak with patients outside the six zones that riddle the sidewalk at 40 Engle Street, and if a patient wants to accept literature from Turco, the patient can simply step out of the zone. Appx18 (Opinion).

These two assertions are legally irrelevant, if not incorrect.

While the 8-foot zone in *Hill* might have allowed "the speaker to communicate at a 'normal conversational distance'" in *that* case, Appx17 (Opinion) (citations omitted), Turco testified in *this* case, that "8 feet is definitely a difficult thing to do to have a conversation with someone walking down the street." Appx50 (Turco,

50:16–18). When asked whether an 8-foot distance would afford her "the ability to speak to patients in a conversational tone," Turco responded, "[n]ot always." Appx121 (Turco, 49:20–24). *Hill*'s statement about the ability to have a conversation at an 8-foot distance is not a legal holding; it was a factual observation that does not ring true in this case. The fact that Turco could sometimes effectively counsel patients with the buffer zones in place, doesn't change the fact that there are times when the buffer zones interfered with her ability to do so. Even under the 35-foot buffer zone in *McCullen*, where the Court held that the law burdened the speech of sidewalk counselors, Eleanor McCullen was still able to persuade "about 80 women not to terminate their pregnancies." *McCullen*, 573 U.S. at 487.

For these reasons, "[i]t is . . . no answer to say that [Turco] can still be 'seen and heard' by women within the buffer zones," *McCullen*, 573 U.S. at 489. The buffer zones hamper Turco's ability to do what she was able to do before the enactment of the Ordinance: accompany patients in a close, intimate way on a public sidewalk all the way to the doors of MMA.

The district court also attempts to downplay the significant burden on Turco by saying that patients always could step towards her to receive Turco's literature. Appx18 (Opinion). The law in *Hill* placed no such burden on patients to change or alter their path if they wanted to hear what a sidewalk counselor had to say. *Hill* allowed for the very counseling Turco engages in when the patient consents. Not so

31

here, where the Ordinance not only burdens Turco's ability to share her message through the written and spoken word, but patients who want to hear what Turco has to say. *Cf. Doe v. Gov. of New Jersey*, 783 F.3d 150, 155 (3d Cir. 2015) ("[T]he First Amendment protects both the speaker and the recipient of information.").

As Justice Scalia correctly observed, the natural inclination of a passerby is "not to seek out" literature being distributed. *Hill*, 530 U.S. at 758 (Scalia, J., dissenting). Few pedestrians "are likely to walk over in order to pick up a leaflet." *Id.*

In sum, there is an important difference in kind between a categorical ban on all speech by all speakers within fixed zones, as the Ordinance creates, and a ban on uninvited speech within a bubble zone, as in *Hill*. Because the buffer zones at 40 Engle Street make it "more difficult" for Turco to engage in one-on-one conversations and to hand out her literature, the Ordinance imposes an especially significant First Amendment burden." *Bruni I*, 824 F.3d at 367 (quoting *McCullen*, 134 S. Ct. at 2536). *See also Turco*, 935 F.3d at 172 (same). It was erroneous, as a matter of law, for the district court to conclude differently.

## IV.    Least Restrictive Means

The City's burden to demonstrate narrow tailoring under intermediate scrutiny is not an easy one to carry. The "sovereign [must] justify its regulation of political speech by describing the efforts it had made to address the government interests at

stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'" *Bruni I*, 824 F.3d at 371 (citation omitted).

The City, like Massachusetts in *McCullen*, exclaims, "We have tried other approaches, but they do not work." 573 U.S. at 494. The district court should have given that excuse as much weight as the Supreme Court gave it in *McCullen*: none.

In light of *McCullen*, which unanimously struck down the Massachusetts law that served as the model for the Ordinance at issue in this case, the district court erred in ruling that the Ordinance is narrowly tailored. *McCullen* struck down the buffer zone law because the state had ample alternatives to further its interests without silencing speech. That is precisely the case here. The City "did not avail itself" of any of the less burdensome approaches set out in *McCullen*, Appx19 (Opinion), and its excuses for failing to do so are simply untenable. The district court erred legally in concluding otherwise.

### A.    The far-reaching, overinclusive nature of the Ordinance is contrary to the demands of narrow tailoring

Even before considering the alternative measures the City might have taken without burdening core protected speech, the Ordinance fails on the grounds of its overinclusiveness alone.

In *McCullen*, the Court held that even if other, more narrowly tailored approaches would have been ineffective in furthering the state's interests, the

Massachusetts buffer zone faced "another" serious constitutional problem. 573 U.S. at 493. The record before the Court pertained "mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings." *Id.* Nothing in the record revealed that "individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access." *Id.* The Court held that "[f]or a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is **hardly a narrowly tailored solution**." *Id.* (emphasis added).

The same holds true here. The Ordinance was adopted to deal with "the untenable and dangerous situation which had begun to develop at [one] site," i.e., the public sidewalk at 40 Engle Street. Appx607. And that "dangerous situation" would only take place for a few hours on one day of the week: Saturday. Appx529 (PSUF, #10). Additionally, the City Manager could not recall "any reports of any problems at any other facility other than 40 Engle Street." Appx258.

But the Ordinance does not just apply to 40 Engle Street, nor is it limited to Saturdays. Unlike the Massachusetts law, which applied only to "a place, other than within or upon the grounds of a hospital, where abortions are offered or performed," 134 S. Ct. at 2526, the Ordinance applies broadly to both "health care facilities," as broadly defined in N.J.S.A. 26:2H-2, and "[c]ommunity residences for the developmentally disabled and community shelters for victims of domestic violence

as those terms are defined in N.J.S.A. 40:55D-66.2." In other words, the Ordinance does not just apply to a facility where abortions are offered or performed. Nor does it apply solely to the site, i.e., 40 Engle Street, that gave rise to the Ordinance in the first place. It applies, in a sweeping, prophylactic fashion, to numerous locales throughout the City.

If the Massachusetts law was not narrowly tailored because it authorized buffer zones around numerous reproductive facilities within the state, despite problems only at one facility on one day of the week, *see McCullen*, 573 U.S. at 493, the Ordinance is *a fortiori* even less tailored than the Massachusetts law.

In fact, the City Council President admitted in her testimony that the City specifically rejected narrowly tailoring the Ordinance to address problems only at MMA, testifying that it would "seem[] very narrowly focused," if the Ordinance "singl[ed] out an abortion clinic and the protestors that it would attract." Appx196 (Algrant, 124:1–7). But if the City "could achieve its interests in a manner that does not restrict speech, or that restricts less speech, [it] must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002).

A regulation of speech is narrowly tailored only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Thus, even assuming problems at 40 Englewood Street required a solution beyond the enforcement of already existing laws, the Ordinance,

which authorizes no-speech zones within traditional public fora at innumerable locations in Englewood, "is hardly a narrowly tailored solution." *McCullen*, 573 U.S. at 493. *See also Reynolds v. Middleton,* 779 F.3d 222, 231 (4th Cir. 2015) ("Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance [banning solicitation within all county roadways] burdens more speech than necessary, just as the statute in *McCullen*—a statewide statute aimed at a problem in one location—burdened more speech than necessary."); *Cutting v. City of Portland*, 802 F.3d 79, 89 (1st Cir. 2015) (citing *McCullen*, 573 U.S. at 493) (holding that a city-wide ban on lingering on median strips was "geographically over-inclusive" because of a lack of evidence of a city-wide problem); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) ("The Ordinance is also geographically overinclusive. The Ordinance applies citywide to all streets and sidewalks in the City, yet the City has introduced evidence of traffic problems only with respect to a small number of major streets and medians.").

Based on the Ordinance's overinclusiveness alone, without even considering more narrowly tailored approaches the City could have and should have undertaken to achieve its interests, the Ordinance substantially burdens more speech than necessary and is unconstitutional.

**B.    The District Court Erred in Accepting the City's Excuses for Not Pursuing Alternatives to Silencing Speech**

The district court correctly held that the City did not avail itself of any alternatives like those in *McCullen* that would have addressed the obstruction issues at MMA. According to the district court, however, that didn't matter. The court noted that while the City "considered some of these alternatives" it "ran into the same problems that would render all of the *McCullen* alternatives less effective," i.e., the City's financial problems; getting off-duty officers to volunteer to monitor MMA; that the Bread of Life protestors were peaceful when the police arrived; and that persons were afraid to file complaints for fear of reprisal. Appx19 (Opinion).

**1.    Injunctions Not Pursued**

In *McCullen*, the Court emphasized "the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures." 573 U.S. at 492. The virtue of injunctive relief is that it "focuses on the **precise individuals** and the **precise conduct** causing a **particular problem**." *Id.* (emphasis added). The Court held that "the [Massachusetts] Act, by contrast, categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." *Id.*

Just as in *McCullen*, so too here. The City could have sought an injunction against individuals or groups who have purportedly engaged in unlawful activities, instead of imposing a broad, prophylactic measure that sweeps into its reach the

peaceful sidewalk counseling of persons like Turco. Unlike the Ordinance, which bans all non-exempt speech within its zones, injunctive relief in this case would have limited the conduct of bad actors and allowed the City to achieve its goals of safety and access, while at the same time allowing Turco and others to engage in free speech.

As the district court correctly noted, beginning in December 2013, the head of MMA's clinic escort team, Ashley Gray, began sending weekly "escort reports" to Algrant about the conduct of the Bread of Life group. Appx5 (Opinion). These activities included: "blocking access to the clinic door"; "blocking patients and escorts on the sidewalk"; "shouting into the clinic when the door is opened"; "creating tripping hazards"; "repeated physical assault of escorts"; "screaming directly into [patients] faces"; and "videotaping [patients]," making them "hysterical." Appx5 (Opinion). In addition to these narratives, Gray included "photographic and video evidence of these activities." Appx5 (Opinion). Finally, as the district court stated, Gray was able to identify six of the Bread of Life members using the internet, information she sent to Algrant. Appx5 (Opinion).

This documentation could have been used to pursue injunctive relief. It was not. It was used instead to justify legislation that silences speech. But as *McCullen* observed: "If Commonwealth officials can compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why

they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law." 573 U.S. at 495.

In fact, former Police Chief O'Keefe testified that after a series of past protests—which included protestors "chaining themselves to the front door, back doors, and linking arms, blocking the roadway," Appx488—a court issued an injunction limiting the location of protestors. Appx489-490. After the injunction, and until the Bread of Life protestors arrived in the fall of 2013, "[t]here was no police interaction or intervention at that point because thing[s] ha[d] quelled a bit." Appx490-491.

In other words, even though the City knew that an injunction against bad actors, at the very site of MMA, had worked in the past, it chose not to pursue this alternative, even in light of the voluminous evidence gathered by Ashley Gray.

## 2.    Other Laws Not Considered

*McCullen* suggested that one way the government could prove narrow tailoring would be to demonstrate that "it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'" *Bruni I*, 824 F.3d at 371 (quoting *McCullen*, 134 S. Ct. at 2539).

Nothing in the record shows that the City did anything of the kind. Instead, in December 2013, Algrant received from Senior Counsel for the New York City Law Department a copy of the First Circuit decision in *McCullen v. Coakley* affirming

the validity of Massachusetts' buffer zone law. Appx527 (PSUF, #9). Algrant replied, "that is a great idea." Appx216 (Algrant, 144:1–4); Appx631-633 (Emails). And she later wrote to the MMA clinic escort team informing them that Englewood would be adopting a buffer zone ordinance. Appx636 (Emails). In short, the City produced no evidence of any other ordinance or regulation that was considered for adoption from the time the issue was first brought to its attention in October 2013 up to the adoption of the challenged Ordinance in March 2014.

Even assuming "the situation at MMA required urgent action," Appx19 (Opinion), the Ordinance is not etched in stone. The City offered no testimony why, after *McCullen* was decided—unanimously striking down the law upon which the Ordinance was based—it could not have gone back to the drawing table to craft a law akin to FACE or similar legislation. It offered no testimony why, after *Bruni II* was decided, it could not have crafted a law to limit the activities of patrolling, demonstrating, and picketing (activities engaged in by the Bread of Life), while leaving sidewalk counseling (engaged in by Turco) protected.

### 3.    Enforcing Existing Laws

The most effective way to de-escalate and combat crime is—obviously enough—to arrest and prosecute those who engage in crime. *See Schneider v. State*, 308 U.S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the

streets."); *Riley v. National Fed'n of Blind*, 487 U.S. 781, 795 (1988) ("North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it."). Suppressing protected speech on a public sidewalk that is unrelated to crime is to apply a sledgehammer to a problem where a scalpel is necessary. *See id.* at 801. ("'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'") (citation omitted).

It is undisputed that police presence outside MMA would alleviate the concerns of ensuring access into MMA, and the City did not identify one prosecution of any one person—including members of the very public and vocal Bread of Life group—for violating the previous ordinance (which prohibited obstruction) or any other law prohibiting activities such as harassment, disorderly conduct, or simple and aggravated assault at the location of the clinic.

Instead, of pursuing bad actors, however, the City made excuses: that finances, a lack of volunteer officers, and fears of reprisal would not allow them to do so. None of these excuses accepted by the district court, many of which are premised on clear factual errors, hold up as a matter of law.

### a.    Finances and Volunteer Police Officers

While this Court has held that a police department's resources and a city's financial restraints are relevant to the narrow tailoring analysis, *Bruni II*, 941 F.3d

73, 90 n.21 (quoting *Turco*, 935 F.3d at 167) those factors do not weigh in the City's favor here for at least two reasons: (1) the City never undertook an actual cost analysis of what it would have cost the City to keep the peace at MMA, and (2) the City Manager testified he never would have considered doing that in the first place, as doing so would "contravene public policy."

Before discussing those, it should be noted that the assertion that the City did not have the manpower to enforce laws against harassment, assault, etc. is an excuse that Massachusetts did not even attempt to make in *McCullen*. And for good reason.

> Municipal authorities, as trustees for the public, **have the duty** to keep their communities' streets open and available for movement of people and property . . . **[s]o long as** legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature.

*Schneider*, 308 U.S. at 160 (emphasis added). That duty extends beyond keeping traditional public forums free of obstructions; it applies to keeping people safe within those forums. While it may have been difficult for the City to pay the cost of keeping the peace at one location, on the morning of one day of the week, there is no reason why Turco must pay the cost of her First Amendment liberties. *See Palmer v. Thompson*, 403 U.S. 217, 226 (1971) ("Citizens may not be compelled to forgo their constitutional rights because officials . . . desire to save money").

In *Schneider*, where the Supreme Court struck down ordinances that prohibited the distribution of flyers on public streets, the Court noted, "[a]ny burden

imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press." *Id*. at 162. That same principle applies here. As the Sixth Circuit correctly observed:

> In a balance between two important interests—free speech on one hand, and the state's power to maintain the peace on the other—the scale is heavily weighted in favor of the First Amendment. **Maintenance of the peace should not be achieved at the expense of the free speech.**

*Bible Believers v. Wayne Cty.*, 805 F.3d 228, 252 (6th Cir. 2015) (en banc) (internal citation omitted) (emphasis added).

The problem with the money excuse put forward by the City at trial is that the excuse is based on nothing more than mere assertion—an assertion not good enough as a matter of law to justify suppressing First Amendment activities in a traditional public forum. While the City Manager, Timothy Dacey, testified at trial that it "would have cost 'about $100 an hour' per officer to increase the police presence at MMA," Dacey also testified, that he never "figure[d] out [in] dollars and cents what it would cost to have a police officer stationed" at MMA for "three hours on a Saturday morning." Appx256-57. According to Dacey, "we did not do a formal cost analysis." Appx257.

Why? In the words of Dacey, "I never did a formal cost analysis because I would not have considered placing them there. If they [MMA] wanted police officers, they could have hired off-duty police officers." Appx258 (Dacey, 186:5-8).

43

Dacey stated "it would contravene public policy" for the City to ensure that police officers keep the peace on the public sidewalk outside MMA. Appx257 (Dacey, 185:20-21).

This, of course, is untenable, and hardly an excuse to choose not to pursue the one remedy that clearly would have served the City's interests without stifling speech. Keeping the peace on a city-owned, public sidewalk that serves as a traditional public forum for discussion and debate is hardly the equivalent of providing private security service to a business. *See, e.g.*, *Hague v. C.I.O.*, 307 U.S. 496, 515-516 (1939) (since "ancient times," the use of public streets "for purposes of assembly, communicating thoughts between citizens, and discussing public questions" has "been a part of the privileges, immunities, rights, and liberties of citizens."). The City cannot avoid its responsibility to protect the rights of patients and employees of the clinic, the escorts, the sidewalk counselors, and, yes, even aggressive protestors, in a traditional public forum, by claiming that this is a matter of purely private concern for a business. Thus, whether the City's money excuse is premised on prohibitive cost (a conclusion not supported by any "formal cost analysis") or the alleged private nature of the problem (a conclusion which has no basis in law or common sense), it is certainly insufficient as a matter of law. Moreover, the City cannot say that it "seriously considered" a specific remedy—

increased police presence at the clinic—where Dacey said flat out, "I would not have considered placing [police officers] there." Appx258 (Dacey, 186:5-8).

Finally, if the City does not have the resources to enforce laws against harassment, violence, etc., how does the City have the resources to enforce the Ordinance? Like any other law, the Ordinance does not enforce itself but requires those charged with enforcing the law to do it. Any argument that buffer zones are easier to enforce than laws against harassment, for example, was rejected by the Supreme Court in *McCullen*: "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." 573 U.S. at 495.

### b.    Fear of Reprisal

The last excuse adopted by the district court in excusing the City from not pursuing any alternatives similar to those set forth in *McCullen* is that "patients, companions, volunteer escorts, and MMA physicians and staff were all generally afraid of filing complaints against Bread of Life protestors because of the risk of reprisal." Appx19 (Opinion).

This holding is factually erroneous in several respects, and, in any case, legally irrelevant as to whether the City could have adopted an approach to deal with the conduct of protestors without suppressing free speech.

First, the idea that MMA physicians were afraid to file complaints against Bread of Life protestors is belied by the fact that Dr. Bruce Tisch, a doctor at MMA,

"read a prepared statement to the Council regarding 'escalating incidents' at 40 Engle Street, and requested that the Council address the issue." Appx529-527 (PSUF, #6). After that, "three of the physicians employed at MMA submitted to Council separate, signed written statements complaining of Bread of Life group activities." Appx527 (PSUF, #7). It betrays common sense to think that physicians at MMA would be hesitant to file complaints about illegal behavior when they publicly identified themselves complaining about the Bread of Life group.

Second, any suggestion that the patients or escorts would **never** file complaints for fear of reprisal by protestors is not supported by the record. As the district court itself noted, "prior to the enactment of the Ordinance, at least four individuals filed complaints with the police about the actions of the Bread of Life group," and after the "the enactment of the Ordinance, Ms. Taylor has filed three complaints and Ms. Long has filed five complaints." Appx6 (Opinion).

In fact, the ability of escorts to file complaints without using their personal address was addressed by Algrant, who was able to ensure that escorts could use the MMA address on any complaints. Appx6 (Opinion).

While protestors may have "targeted" Ashley Gray personally, by "showing her pictures and a video of her that they had found on the internet, which she found '[v]ery intimidating,'" Appx6 (Opinion), there is nothing to suggest that this amounted to illegal behavior, even if their conduct might be described as uncivil or

46

obnoxious. Ashley Gray identified herself in a certification filed with the court below that she knew would be part of the public record. Appx326-327 (Gray, 254:16-255:5).

Finally, while New Jersey may not have allowed for the filing of anonymous complaints at the time the Ordinance was adopted, New Jersey Governor Murphy subsequently signed into law a statewide program that provides a legal substitute address for victims and survivors of domestic violence, stalking, sexual violence, and reproductive health patients and providers. N.J.S.A. 47:4-1 *et seq.* One of the clinic escorts, Andrea Long, wrote an opinion piece thanking the governor for signing the legislation because "reproductive health clinic patients, staff and volunteers will be able to file a complaint with the police without having to make their home address available to the alleged harasser or abuser. This legislation impacts me directly because I am an abortion clinic escort." Appx795 (Article).

As previously mentioned, laws do not enforce themselves. If prophylactic, speech-restricting laws could be justified based on persons fearing reprisal for filing a complaint against bad actors, this would invite governments to freely apply broad speech-repressive laws to public sidewalks near any sensitive locations—not just abortion clinics but also furriers, butcheries, and other subjects of controversy to some. Moreover, if existing ordinances could not be enforced, for lack of complaints, before the enactment of the Ordinance, how then could an additional ordinance

(creating buffer zones) be enforced? Why would an individual (patient, escort, doctor, etc.) be more willing to file a complaint with the police about someone crossing a painted line on a sidewalk than about being assaulted? The enforcement mechanism of the Ordinance is **exactly the same**: a complaint brought by a victim or witness to its violation.

The "government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." *Fed. Election Com. v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 265 (1986). Turco's core protected speech activities are not what gave rise to the Ordinance; it was the conduct of the Bread of Life protestors. But the City did not narrowly tailor its efforts to deal with the problems of protest by regulating conduct, like picketing or congregating. It chose to silence speech in the very place where speech should be afforded the maximum protection. The district court erred in holding that the Ordinance is narrowly tailored.

## V.    The Ordinance Fails Under the Overbreadth Doctrine.

The Ordinance is not just unconstitutional on account of its lack of narrow tailoring. It is unconstitutional, as well, as being facially overbroad. "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bruni I*, 824 F.3d at 374 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). The

overbreadth doctrine prohibits laws that "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964) (internal citations omitted).[6]

As explained *supra*, the Ordinance does not just apply to MMA, or even just to facilities that perform abortions. Nor does the Ordinance apply just to health care facilities. It applies as well to "transitional facilities." The reasons why transitional facilities were included have also been explained. Algrant testified that it would seem "very narrowly focused," if the Ordinance singled out "an abortion clinic and the protestors that it would attract." Appx196 (Algrant, 124:1–7). She further testified did that she did not "want anybody to feel like I don't want this in my neighborhood and I am going to protest around this place and make it difficult for people to get in out and out of the place that would be their home." Appx197 (Algrant, 125:13–16). Dacey testified that buffer zones were needed at both health

---

[6] It is important to note that there is a difference between a law that fails narrow tailoring because it is overinclusive, and one that fails to satisfy constitutional scrutiny under the overbreadth doctrine. In *McCullen*, as discussed, the law's scope—applying to all reproductive facilities in the state even though problems were to be had at only one location—was overinclusive and therefore "hardly a narrowly tailored solution." 573 U.S. at 493. Because the *McCullen* Court found that the law was not narrowly tailored, it did not need to consider the petitioners' overbreadth challenge. *See Turco*, 935 F.3d at 170 (citing *McCullen*, 573 U.S. at 496 n.9). Similarly, if this Court holds that the Ordinance fails narrow tailoring, it need not address whether the Ordinance fails on overbreadth grounds.

care and transitional facilities because "protests can pop up any day for any reason anywhere." Appx251 (Dacey, 179:3–11).

Despite the breadth of the Ordinance—suppressing all non-exempt speech outside all health care and transitional facilities within the City because of the mere possibility of protests—the district court held that Turco failed to demonstrate that "substantial overbreadth exists." Appx21 (Opinion). Relying on this Court's decisions in *Turco* and *Bruni II*, which in turn relied on *Hill*, the district court noted that when "'a buffer zone broadly applies to health care facilities' to include buffer zones at non-abortion related locations,' we may then 'conclude the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive.'" *Id*. (citations omitted).

The district court's overbreadth analysis is erroneous as a matter of fact and law.

While the district court correctly noted that the Ordinance "broadly applies to all health care facilities and transitional facilities in Englewood," and crafted the Ordinance that way so that protestors couldn't make "it difficult for people to get in and out of transitional facilities," Appx20 (Opinion),  it erred, as a factual matter, in holding that "Englewood's Ordinance **has been applied only at the MMA clinic**, given the unique history of harassment and violence at that site." Appx21 (Opinion) (emphasis added).

That statement is not just unsupported by the record, the record flatly contradicts it. As the following paragraph from the Parties' Stipulation of Undisputed Facts makes clear:

> Pursuant to the Ordinance, and shortly after it was adopted in March 2014, city officials began **marking out buffer zones** in front of **covered facilities throughout the City**. In an email from the Chief of Police, Larry Suffern, to Dacey, Suffern wrote, "We have marked out buffer zones at several of the medical facilities in town. **We will continue to identify the other medical facilities and mark out buffer zones**." In that same email, Suffern forwarded an email to Dacey indicating that buffer zones had been marked out at six locations within Englewood, including at 40 Engle Street.

Appx528-529 (PSUF #8) (emphasis added). *See also* Appx258-59 (Dacey, 186:22–187:1).

The district court's factual errors lead to its erroneous legal conclusion. Unlike in *Bruni II*, where "Pittsburgh had only enforced its ordinance at 'two facilities, both of which [had] suffered from violence and obstruction in the past,'" Appx21 (Opinion) (citations omitted), Englewood began the process of marking buffer zones "throughout the City," without any evidence of any problems at any location other than at MMA. Indeed, Dacey testified that during the time the Ordinance was being considered, he did not recall "any reports of any problems at any other facility other than 40 Engle Street." Appx258.

In addition, the Ordinance does not just ban patrolling, demonstrating, and picketing, as in *Bruni II*, which according to this Court's narrowing construction of

the Pittsburgh ordinance allowed sidewalk counseling to continue within the buffer zones. It does not just ban approaching unwilling listeners, as in *Hill*, which did "not require a standing speaker to move away from anyone passing by." 530 U.S. at 708. Instead, the Ordinance thus "purports to create a virtual 'First Amendment Free Zone'" on public sidewalks not only near facilities that perform abortions, but all health care and transitional facilities throughout Englewood. *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc*., 482 U.S. 569, 575 (1987).

Indeed, like the law in *Jews for Jesus*, which banned "First Amendment activities" in an airport terminal, the Ordinance "does not merely regulate expressive activity . . . that might create problems such as congestion or . . . disruption"; it outlaws all non-exempt speech in buffer zones in traditional public forums. *Id*. at 574. Even "talking and reading, or the wearing of campaign buttons or symbolic clothing," is banned if one is within a zone and has the purpose of being at that location. *Id*. at 575. These activities "are presumptively protected by the First Amendment but . . . remain subject to the criminal sanctions of" Englewood's Ordinance. *Stevens*, 559 U.S. at 481.

For these reasons, *Hill*'s remark that "the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive," simply does not apply here. *Turco*, 935 F.3d at 171 (quoting *Hill*, 530 U.S. at 731). The statute in *Hill* applied only to health care facilities, while

the Ordinance goes well beyond health care facilities to include transitional facilities—a fact not noted by the *Turco* Court in its overbreadth discussion. It also bans *all* speech within the zones it creates, not just conduct unrelated to core protected speech. The City's only reason for including transitional facilities is because of possible protests. Taken to its logical extreme, a logic employed by the court below, *Hill*'s remark would give a green light to a municipal law imposing buffer zones on all places of businesses with front doors that adjoin a public sidewalk. After all, in the words of Dacey, as quoted by the district court in its overbreadth discussion, "protests can pop up any day for any reason anywhere." Appx20 (Opinion). While "comprehensive," such a measure would hardly be a legislative "virtue."

It is true that "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *ACLU v. Mukasey*, 534 F.3d 181, 206 (3d Cir. 2008) (quoting *United States v. Williams*, 128 S. Ct. 1830, 1828 (2008)). Nonetheless, given the clear and sweeping breadth of the Ordinance, the district court erred in not prescribing that medicine in this case.

## VI.    Remaining Constitutional Claims

The district court is correct that the standard for adjudging Turco's First Amendment free speech claim applies to Turco's remaining claims, i.e., her First Amendment free assembly claim and her free speech claim under the New Jersey

53

Constitution. Appx22 (Opinion). Accordingly, should this Court reverse the district court's ruling on Turco's First Amendment claim it should also do so with respect to her two other claims.

## CONCLUSION

For the foregoing reasons, Jeryl Turco respectfully asks the Court to reverse the order and judgment of the court below.

Dated: November 22, 2022

Respectfully submitted,

*/s/ Francis J. Manion*

By:  FRANCIS J. MANION*
   *Lead Counsel*
   GEOFFREY R. SURTEES**
   AMERICAN CENTER FOR LAW
      AND JUSTICE
   6375 New Hope Road
   New Hope, Kentucky 40052
   Tel.: 502-549-7020
   Email: fmanion@aclj.org

JAY ALAN SEKULOW**
JORDAN SEKULOW**
STUART J. ROTH*
AMERICAN CENTER FOR LAW
   AND JUSTICE
201 Maryland Avenue, N.E.
Washington, D.C. 20002
Tel.: 202-546-8890

EDWARD L. WHITE III*
AMERICAN CENTER FOR LAW
   AND JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007

* Admitted to Third Circuit Bar
** Not admitted in this jurisdiction

## CERTIFICATION OF ADMISSION TO BAR

I, Francis J. Manion, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: November 22, 2022

Respectfully submitted,

*/s/ Francis J. Manion*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,949 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: November 22, 2022

Respectfully submitted,

*/s/ Francis J. Manion*

56

## CERTIFICATE OF FILING AND SERVICE

I, Noel Reyes, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

November 22, 2022, the foregoing Brief and Appendix Volume 1 of 3 for Plaintiff-

Appellant was filed through the CM/ECF system and served electronically.

Dated: November 22, 2022

Respectfully submitted,

*/s/ Francis J. Manion*

"APPENDIX I"

i

# TABLE OF CONTENTS

**Page**

**Volume I**

Trial Opinion, dated August 12, 2022........................  Appx1

Order and Judgment, dated August 12, 2022.............  Appx23

Notice of Appeal. dated September 2, 2022 ..............  Appx24

**Volume II**

U.S. District Court Docket Entries  ..........................  Appx27

Verified Complaint for Damages and Declaratory
   and Injunctive Relief, dated April 29, 2015...........  Appx38

Answer to Verified Complaint and Separate
   Defenses and Jury Demand, dated June 25, 2015 .  Appx57

Transcript of Trial Proceedings held before the
   Honorable Susan D. Wigenton, dated
      February 23, 2022.................................................  Appx73

Transcript of Trial Proceedings held before the
   Honorable Susan D. Wigenton, dated
      February 24, 2022.................................................  Appx292

**Volume III**

**Joint Exhibits:**

     J-1 - Diagram of Sidewalk at 40 Engle Street.... Appx447

     J-2 - Deposition Readings of Rosemary
     Garrett, dated January 26, 2016 ........................ Appx449

     J-3 - Deposition Readings of Arthur O'Keefe,
     dated January 30, 2017 ...................................... Appx480

     J-4 - Stipulation of Undisputed Facts................. Appx525

**Plaintiff's Exhibits:**

     Pl. Ex. 1 - Photo of 40 Engle St. ........................ Appx542

ii

Page

Pl. Ex. 2 - Certification of Ashley Gray, for
Defendant, in Opposition to Plaintiff's Motion
for Preliminary Injunction, dated August 3,
2015, with Exhibits 1-11 .................................... Appx545

Pl. Ex. 3 - Defendant's Answers to
Interrogatories, dated October 14, 2016 ........... Appx594

Pl. Ex. A - Text of Ordinance #14-11, § 307-3 .. Appx618

Pl. Ex. B - Text of Previous Englewood City
Code Ordinance #14-11, § 307-3 ...................... Appx620

Pl. Ex. E - Photo of 40 Engle St......................... Appx623

Pl. Ex. M - Statement of Dr. Bruce Tisch, dated
November 12, 2013........................................... Appx625

Pl. Ex. N - Statement of Physicians, dated
October 8, 2013................................................. Appx627

Pl. Ex. P - E-Mail from Jane Gordon to Lynne
Algrant, dated December 23, 2013 .................... Appx630

Pl. Ex. Q - E-Mail from MMA Escort Team to
Lynne Algrant, dated January 31, 2014  ............ Appx635

Pl. Ex. X - E-Mail from MMA Escort Team to
Russ Kotopoulos, dated January 13, 2014 ......... Appx637

Pl. Ex. AA - E-Mail from MMA Escort Team
to Russ Kotopoulos, dated February 2, 2014..... Appx642

Pl. Ex. BB - E-Mail from MMA Escort Team
to Russ Kotopoulos, dated February 24, 2014... Appx644

Pl. Ex. CC - E-Mail from Ashley Gray to
Lynne Algrant, dated December 22, 2013 ......... Appx646

Pl. Ex. DD - E-Mail from Ashley Gray to
Lynne Algrant, dated December 23, 2013 ......... Appx649

Pl. Ex. EE - E-Mail from Ashley Gray to
Lynne Algrant, dated January 19, 2014 ............. Appx651

iii

**Page**

**Defendant's Exhibits:**

Def. Ex. C - October 8, 2013, City Council
Meeting Minutes ................................................. Appx661

Def. Ex. D - November 12, 2013, City Council
Meeting Minutes ................................................. Appx670

Def. Ex. E - March 18, 2014, City Council
Meeting Minutes ................................................. Appx678

Def. Ex. H - Article from NorthJersey.com
entitled "Englewood Expands Buffer Zone for
Protests At Medical Facilities," dated
March 27, 2014 ................................................. Appx696

Def. Ex. P - Photo of Plaintiff ............................ Appx699

Def. Ex. Q - Plaintiff's responses to
Defendant's Interrogatories, dated
October 12, 2016................................................. Appx701

Def. Ex. R - Plaintiff's responses to
Defendant's Requests for Admissions, dated
October 14, 2016, with Exhibits A-C................. Appx715

Def. Ex. T - Metropolitan Surgical Associates
Terms of Employment of Clinic Escorts............ Appx733

Def. Ex. U - Metropolitan Surgical Associates
Escorting for the MMA Clinic in Englewood,
New Jersey ....................................................... Appx735

Def. Ex. V - Executive Order No. 150............... Appx744

Def. Ex. W - Englewood Resolution
implementing Executive Order 150, dated
June 9, 2020 ..................................................... Appx754

Def. Ex. Z - Buffer Zone: Snapshots from an
Abortion Clinic Escort ...................................... Appx762

Def. Ex. AA - Opinion piece by Andrea Long,
dated August 26, 2019........................................ Appx793

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JERYL TURCO,

                Plaintiff,

v.

CITY OF ENGLEWOOD, NEW JERSEY,

                Defendant.

Civ. Action No. 15-3008 (SDW) (LDW)

**TRIAL OPINION**

August 12, 2022

**WIGENTON**, District Judge.

       This Court held a bench trial for two days in this matter regarding Plaintiff Jeryl Turco's ("Plaintiff" or "Turco") claims against Defendant City of Englewood, New Jersey ("Defendant," "Englewood," or the "City") for alleged violations of her civil rights. This Court has jurisdiction over the matter pursuant to 28 U.S.C § 1331, and venue is proper pursuant to 28 U.S.C. § 1391. Based on the testimony and evidence presented at trial, this Trial Opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons stated below, this Court finds in favor of Defendant on all claims.

I.      <u>**PROCEDURAL HISTORY**</u>

       Plaintiff brought this action in April 2015, challenging the constitutionality of an ordinance adopted by Englewood in March 2014 (the "Ordinance") to create buffer zones around certain types of health care facilities, including Metropolitan Medical Associates ("MMA"). (D.E. 1.) MMA is an abortion clinic where Plaintiff regularly approaches patients outside to dissuade them from obtaining an abortion. (*See id.* ¶¶ 4, 17–22.) Plaintiff brings this suit pursuant to 42 U.S.C. § 1983 and claims that the Ordinance violates her rights to freedom of speech and freedom of

assembly and association under the First Amendment of the U.S. Constitution, as well as her right to free speech under the New Jersey Constitution. (*See id.* ¶¶ 2, 69–80.)

On November 14, 2017, this Court issued an Opinion and Order granting Plaintiff's Motion for Summary Judgment and denying Defendant's Cross-Motion for Summary Judgment. (D.E. 49, 50.) On appeal, the United States Court of Appeals for the Third Circuit reversed and remanded the case for further proceedings. *Turco v. City of Englewood, New Jersey*, 935 F.3d 155 (3d Cir. 2019). Consistent with the Third Circuit's opinion, this Court held a virtual bench trial on February 23–24, 2022, and the parties subsequently submitted post-trial briefs with proposed findings of fact and conclusions of law. (D.E. 91, 92.)

## II.    <u>FINDINGS OF FACT</u>

This Court, writing primarily for the parties, adopts the Parties' Stipulation of Undisputed Facts ("PSUF"), (Joint Ex. J-4),[1] and makes additional findings of fact as stated below:

### A.    **Defendant's Efforts**

In late 2013, militant activists and aggressive protestors associated with a religious organization called the Bread of Life began to gather outside MMA on Saturday mornings. (*See* PSUF ¶¶ 2–3, 10.) The Bread of Life protestors engaged in extremely aggressive, loud, intimidating, and harassing behavior towards patients, their companions, and even other anti-abortion groups. (*Id.* ¶ 5.) Following reports and statements to the Englewood City Council from an MMA lawyer and several physicians, as well as news coverage, Lynne Algrant visited the MMA site at 40 Engle Street to observe the situation firsthand. (*See* PSUF ¶¶ 6–7; Algrant, T1, 86:6 – 90:5, 92:23 – 95:21.)[2] Ms. Algrant had been a member of the Englewood City Council

---

[1] References to trial exhibits are to Plaintiff's Exhibits, Defendant's Exhibits, and Joint Exhibits. References to trial transcripts, (D.E. 93, 94), identify the witness, volume ("T1" or "T2"), and page: line.

[2] The activities of the Bread of Life were first brought to the attention of the City Council at its meeting on October 8, 2013. (PSUF ¶ 6.) Dr. Bruce Tisch, an MMA physician, read a prepared statement to the Council regarding

since 2010 and was President of the Council in 2014 and 2015.  (PSUF ¶ 20.)  She observed a group of men surround a young woman coming onto Engle Street and scream in her face, until an escort volunteering with the MMA was able to help her push through the crowd and to the clinic.  (*See* Algrant, T1, 86:6 – 93:22.)  Ms. Algrant herself was also surrounded by men yelling at her and women trying to push things into her hands.  (*See id.* at 93:23 – 95:6.)

After this experience, Ms. Algrant spoke with other City officials, including Business Manager Tim Dacey, Police Chief Arthur O'Keefe, and Counsel William Bailey, about what could be done to ensure patient safety.  (*See id.* at 96:3–20.)  Ms. Algrant spoke to Chief O'Keefe about hiring volunteer off-duty Englewood police officers to be present at MMA on Saturday mornings (which MMA agreed to pay for in accordance with City policy).  (*Id.* at 97:18 – 98:2.)  However, Chief O'Keefe advised that the City's off-duty police officers did not want the particular work, since there was a substantial difference between being in a squad car while someone paves a street and confronting hostile protestors.  (*See id.* at 98:3–17.)  Ms. Algrant then asked Chief O'Keefe to list the opportunity with the Teaneck and Tenafly Police Departments, but that did not succeed either.  (*See id.* at 98:18–25; *see also* Dacey, T1, 166:13 – 167:2.)

Ms. Algrant also asked Chief O'Keefe to arrange patrol cars to go by the clinic more often on Saturday mornings when the Bread of Life protestors would be there, and either change or speed up the route to create more of a presence.  (*See* PSUF ¶ 53; Algrant, T1, 99:1–7.)  She reached out to Deputy Police Chief Larry Suffern on Wednesdays when she expected a Bread of

---

escalating incidents at 40 Engle Street.  (*Id.*)  The statement was signed by Tisch and other physicians on behalf of "a large group consisting of business owners, employees," and City residents.  (Pl. Ex. N.)  The statement informed the City that a new "group of extremists" was using sound amplification devices, verbal abuse, and threatening actions to impede access to the clinic.  (*See id.*)  The new group was also "intimidat[ing] uninvolved citizens . . . on their way to their local synagogue" and was causing fear among children at the public library across the street.  (*Id.*)  According to Defendant's Chief of Police, Arthur O'Keefe, these activities included such things as physically confronting, screaming at, and intimidating young women and local business employees, causing him to fear that "more people would start to get hurt."  (Joint Ex. J-3 at 21:12 – 22:2.)

Life protest the following Saturday, asking him to create a greater police presence. (Algrant, T1, 99:23 – 100:6.) However, because Engle Street was a one-way street, there was plenty of warning time for protestors to see the police coming—they would become temporarily peaceful as a police car drove by and then "heat up again" after the police car passed. (*Id.* at 100:7–17; *see* Dacey, T1, 167:22 – 168:3.) Ms. Algrant told Deputy Police Chief Suffern that the police needed to stop and get out of their cars, talk to the protestors, and make their presence known more assertively. (Algrant, T1, 100:18 – 101:12.) Nonetheless, while the police presence temporarily eased tensions at MMA, the hostile protests resumed immediately after officers left. (*See id.* at 101:16–24; PSUF ¶¶ 56–57; Joint Ex. J-3 (O'Keefe Deposition Excerpt) at 14:13-21; Dacey, T1, 168:4–9.)

Ms. Algrant spoke with Chief O'Keefe and Mr. Dacey about having a regular police presence stationed at MMA on Saturday mornings, but the officials concluded that it was financially prohibitive, was contrary to the City's policy against providing off-duty police officers to private businesses without reimbursement, and would negatively impact the City's ability to address crime and rebuild after Hurricane Sandy. (*See* Algrant, T1, 101:25 – 102:9, 104:6–20; Dacey, T1, 168:10 – 174:4.) The City was "short on cash," "there were more vacancies [in the police department] than there should have been," and the department was "too strained," as the City "had problems with shootings, drive-by shootings, drug issues, [and] gang issues," unlike most other towns in Bergen County. (Dacey, T1, 168: 13 – 169:11.) Mr. Dacey testified that it would have cost "about $100 an hour" per officer to increase the police presence at MMA, but he also stated that he never performed a full calculation of the costs involved because using taxpayer funds to protect a private organization was against City policy. (*Id.* at 170:9; 183:14 – 186:8.)

In response to the escalating dangers to patients, Ashley Gray co-founded a volunteer escort program at MMA to escort patients to the clinic when they arrived at the area. (*See* PSUF

4

Appx4

¶ 24.)  The volunteers risked their own safety because the Bread of Life protestors took pictures of them, their cars, and their license plates.  (Dacey, T1, 175:10–14.)  To reduce the risk, the escorts were required to avoid using their real names and avoid engaging with the protestors.  (*See* PSUF ¶¶ 51, 52.)  Beginning in December 2013, Ms. Gray sent weekly "escort reports" to Ms. Algrant about the activities of the Bread of Life group.  (*See* Gray, T2, 235:13–24; Pl. Ex. CC.)  Such activities included: "blocking access to the clinic door"; "blocking patients and escorts on the sidewalk"; "shouting into the clinic when the door is opened"; "creating tripping hazards"; "repeated physical assault of escorts"; "screaming directly into [patients'] faces"; and "videotaping [patients]," making them "hysterical."  (Pl. Exs. X, BB.)  Ms. Gray also sent Ms. Algrant photographic and video evidence of these activities.  (Algrant, T1, 139:14–20.)  Bread of Life protestors recorded some of their own activities as well and posted about their activities on YouTube and Facebook.  (*See id.* at 96:24 – 97:11; Gray, T2, 258:19 – 259:3, 266:24 – 267:13; Pl. Ex. DD.)  Using Google and other internet tools, Ms. Gray was able to learn the names of six of the members of the Bread of Life group, as well as the location of their church, and she forwarded this information to Ms. Algrant.  (*See* Gray, T2, 266:8 – 267:13; Pl. Ex. DD.)

Ms. Algrant talked to the escorts about filing complaints against problematic protestors, but the escorts felt unsafe doing so, as did patients, their companions, and MMA staff.  (*See* Algrant, T1, 112:14 – 113:4, 113:10 –114:3, 117:17 – 118:14.)  New Jersey does not permit filing anonymous complaints, and the City concluded that any individual who filed a complaint would be in danger of reprisal from the Bread of Life protestors.  (*See id.*; Dacey, T1, 175:1–20 ("So we talked to the physicians and the employees [about filing a complaint] and they were very reluctant, because we actually also talked to them about possibly getting an injunction against the Bread of Life protestors. And they were very leery about doing it because they were scared of retribution

towards them.").)   In one incident, a young escort became "hysterical" when a police officer insisted that she give her name and home address to file a report about a dangerous encounter with some of the protestors. (Algrant, T1, 109:5 – 110:2.) After Ms. Algrant called Deputy Chief Larry Suffern, the escort was eventually permitted to use the clinic's address.  (*Id.* at 110:4–19.)

However, even with the benefit of using the MMA address, there was still risk to individuals who filed complaints, and only "a handful" of "[m]ore than 100" escorts have filed complaints.  (Taylor, T2, 293:9–12.)[3]  For example, when the Bread of Life protestors learned Ashley Gray's name, they targeted her personally, showing her pictures and a video of her that they had found on the internet, which she found "[v]ery intimidating."  (Gray, T2, 244:23 – 245:11.)   Ms. Gray stopped escorting at MMA in 2020, in part because she feared that the protestors would find out about her father's death from COVID and use that information to "taunt [her], say unkind things, and harass" her.  (*Id.* at 226:13–24, 271:1–7.)   Another former volunteer escort, Andrea Long, testified that escorts were also reluctant to file complaints because the subsequent court proceedings required them to attend multiple hearings, take off work, and potentially explain to their employer that they volunteered at an abortion clinic.  (*See* PSUF ¶ 25; Long, T2, 330:17–24.)   The escorts who did file complaints were generally team leaders and did so in the most "flagrant" cases, *i.e.*, when protestors remained in the buffer zone after the Ordinance was enacted and continued to harass or threaten patients or escorts despite requests to stop. (Taylor, 290:19 – 293:12; Long, 329:2 – 330:13.)[4, 5]

[3] Christine Taylor has been a volunteer escort at MMA since 2016.  (PSUF ¶ 32.)

[4] For example, prior to the enactment of the Ordinance, at least four individuals filed complaints with the police about the actions of the Bread of Life group.  (*See* Pl. Exs. BB and CC; Algrant, T1, 109:5 – 110:19.)  Since the enactment of the Ordinance, Ms. Taylor has filed three complaints and Ms. Long has filed five complaints.  (*See* Taylor, T2, 292:17 – 293:6; Long, T2, 325:3 – 329:17.)

[5] While Ms. Gray, Ms. Taylor, and Ms. Long have written about their experiences at MMA online or in published writings, most MMA escorts have not.  (*See* Gray, T2, 260:11 – 261:9; Taylor, T2, 297:4 – 301:10; Long, T2, 332:7 – 333:11.)

Defendant adopted the Ordinance (#14-11) on March 18, 2014, in order to deescalate the situation at MMA by creating a degree of separation between the Bread of Life protestors and MMA patients, doctors, staff, companions, and escorts.  (*See* Pl. Ex. 3 at 13–14 (Defendant's Answer to Plaintiff's Interrogatory No. 9); Dacey, T1, 178:19 – 180:6; Algrant, T1, 116:6 – 117:13; Joint Ex. J-3 (O'Keefe Deposition Excerpt) at 25:8–18.)  "The practical effect of the ordinance was the creation of . . . [t]wo semicircular buffer zones extend[ing] outwards eight feet from either side of the facility's entrance" and driveway, as well as a "third buffer zone spann[ing] the width of the facility's entrance [and driveway] and extend[ing] to the street." *Turco*, 935 F.3d at 159.[6]  "A picture of the buffer zones (shown in yellow) is set forth below:"

---

[6] The Ordinance states, in relevant part:

  A. Definitions. As used in this section, the following terms shall have the meanings indicated:
    1. "Health care facility" – as set forth in N.J.S.A. 26:2H 2.
    2. "Transitional facility" – Community residences for the developmentally disabled and community shelters for victims of domestic violence as those terms are defined in N.J.S.A. 40:55D-66.2.
  B. Within the City of Englewood, no person shall knowingly enter or remain on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following:
    1. persons entering or leaving such facility;
    2. employees or agents of such facility acting within the scope of their employment;
    3. law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and
    4. persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility
  C. The provisions of subsection B shall only take effect during such facility's business hours and if the area contained within the radius and rectangle described in said subsection B is clearly marked and posted.

(PSUF ¶ 10.)



*Id.* at 159–60 (image cropped).  The diagram below shows the sidewalk in front of MMA, with yellow lines as painted:



(Joint Ex. J-1 (image cropped) (depicting the south side of Engle Street on the left side of the diagram).)

8

After the Ordinance was enacted, the situation at MMA generally became calmer. (Algrant, T1, 121:8 – 123:25.)  Sidewalk counselors and protestors could still talk to patients, but anyone needing to enter or exit the clinic had eight feet of space to do so without physical harassment.  (*See id.*)  The clinic door could open out without obstruction because the buffer zone cleared out the overcrowded space in front of the entrance.  (*See id.*)  In fact, Ms. Algrant stopped receiving weekly escort reports and escorts reduced the number of shifts they worked.  (*See id.*)  Ms. Gray believed so strongly that the buffer zone was working and needed to stay that she used her name in her 2015 certification in this case. (Gray, T2, 269:20 – 270:5.)  Ms. Gray testified that the buffer zone created space that prevented confrontations that could easily escalate, and stopped people from positioning themselves so close to the front door that they intimidated patients.  (*See id.* at 241:5–19.)  It helped the escorts get people in and out of the clinic entrance more easily.  (*See id.*)  Sidewalk counselors and protestors no longer followed patients all the way up to the front door, blocking other people behind them who were trying to enter the building.  (*See* Long, T2, 323:16 – 324:21.)  Witnesses, including Plaintiff, agreed that the Bread of Life protestors generally respected the buffer zone, perhaps going through it but rarely remaining in it.  (*See* Turco, T1, 58:15–20; Algrant, T1, 121:15–18; Long, T2, 320:8–10, 321:25 – 322:2; Taylor, T2, 289:12–14.)

Nonetheless, some issues still remained.  Ms. Gray explained that "there were bumps in the road.  The presence of the protestors really kind of ebbed and flowed.  So for example, when there was something about abortion in the news, a lot more [protestors] would come and that would present additional challenges even with the buffer zone helping the situation." (Gray, T2, 241:20 – 242:2.)  Months after the Ordinance went into effect, Ms. Algrant received two reports stating that Bread of Life was becoming "louder and more numerous than in a long while," and that "this most intimidating group seems to be growing."  (Algrant, T1, 144:20 – 145:16.)  However, Ms.

9

Algrant stated that these reports concerning "flare-ups" were "sporadic" and relatively infrequent compared to the situation in the months prior to the Ordinance's enactment, when "they were coming in all the time." (*Id.* at 155:23 – 156:1.) Still, another sidewalk counselor, Rosemary Garrett testified at her deposition that the buffer zones did not reduce the obnoxious behavior of Bread of Life protestors. (*See* Joint Ex. J-2 at 38:17 – 39:9; PSUF ¶¶ 22, 23.)

However, when this Court invalidated the Ordinance in 2017, "[i]t was absolute chaos." (Taylor, T2, 287:18–20.) Protestors on microphones and loudspeakers or with huge signs would stand right next to the door or even chase patients right up to the door. (*See id.* at 288:2–23.) Taylor testified to the impact on patients, stating, "I don't know how many patients I have had hold my hand, grab me, cry on my shoulder, tuck their head into my neck so that they don't have to look at it." (*Id.* at 287:6–8.) One protestor would walk up to the front door and just scream. (Long, T2, 319:9 – 320:4.) Even Plaintiff would follow patients up to the front door. (*Id.* at 318:3–5.) Sometimes a patient's companion who was behind Plaintiff would not be able to get around her to reach the entrance. (*Id.* at 318:6–9.)

**B      Plaintiff's Ministry**

Plaintiff is not a hostile or aggressive anti-abortion protestor. (PSUF ¶ 14.) Rather, she refers to herself as a "sidewalk counselor." (*Id.*) Since 2007, her practice has been to calmly approach women entering MMA and attempt to engage in peaceful, nonconfrontational conversations. (*Id.* ¶ 15.) She believes that such conversational interaction is far more effective than the aggressive approach used by the Bread of Life protestors. (*Id.*)

Unlike other sidewalk counselors, however, Plaintiff does not remain stationary. (*Id.* ¶ 67.) She runs in all different directions to meet patients as they approach the clinic. (*See* Turco, T1, 41:11–17 ("I will approach a girl from anywhere that she is coming. And the sooner I get to her,

10

the more time I have to be able to share literature, share a message . . . ."), 44:11–21.)  In fact, the

clinic escorts call Plaintiff "the Runner" because she runs up to patients as they are arriving and

runs after and follows patients as they are leaving, for a block or more, even as they are going to

their cars, and even as they are crossing Engle Street.  (*See* Gray, T2, 240:14 – 241:2; Long, T2,

314:13–20, 318:11–17; Turco, T1, 44:22–24, 45:8–9; Taylor, T2, 284:18 – 285:8.)  Plaintiff

generally meets patients at some distance from the buffer zone and walks with them to the

perimeter of the buffer zone because she requires about 30 to 45 seconds to convey her message

and hand them literature.  (*See* Turco, T1, 43:14–25, 45:25 – 46:3, 46:13–15; *see also* Taylor, T2,

283:18 – 284:10; Long, T2, 316:2 – 317:11.)  She has used this approach whether or not there is a

buffer zone.  (*See* Turco, T1, 48:10–16.)

Prior to the enactment of the Ordinance, Plaintiff was free to approach women on the public

sidewalk in front of MMA and accompany them all the way to the clinic door without being

hindered by the buffer zones in front of the MMA main entrance and driveway.  (*See* Turco, T1,

13:22 – 15:23.)  Thus, if Plaintiff was standing south of the clinic doorway area and saw a patient

approaching from north beyond the driveway, she was free to run up the sidewalk to the patient in

a straight line, try to engage in conversation, hand literature to the patient, and walk with the patient

all the way back to the clinic door.  (*See id.*)

With the Ordinance in effect, if Plaintiff is standing to the south of the doorway area and

sees a patient approaching from north beyond the driveway, she must walk around the radius arc

to the left of the doorway, sidestep to the street to avoid the rectangular zone in front of the

doorway, hurry to the next rectangular zone by the driveway, and sidestep that zone by going into

the street, before she can try to engage the patient.  (*See id.* at 24:25 – 25:14; Joint Ex. J-1.)  While

trying to converse with that patient on the way back toward the clinic door, Plaintiff must sidestep

11

Appx11

to avoid the driveway radius arcs and rectangular area, and then reconnect with the patient who has likely continued walking in a straight line.  If successful, Plaintiff must then stop at the radius arc to the north of the door or at the doorway rectangular zone.

However, in practice, Plaintiff can easily walk in the street gutter to traverse the rectangular buffer zones, which she does.  (*See* Turco, T1, 64:9–16.)  Plaintiff can also get into the area between the two rectangular buffer zones by crossing Engle Street.  (*See id.* at 62:5–24.)  In fact, if a patient is approaching from the north, Plaintiff sometimes just runs up Engle Street to meet the patient, avoiding the sidewalk entirely.  (*See id.* at 47:2–11.)

When a patient is approaching from the south, Plaintiff's ministry is minimally affected. (PSUF ¶ 68.)  Plaintiff will run down Engle Street, as she did before the Ordinance, and meet the patient as far as the next intersection so that she will have the time she needs to talk to the patient. (*See* Turco, T1, 45:10 – 46:12.)  Plaintiff is able get to the buffer zone on the south side of the clinic without obstruction and be no more than eight feet from the MMA doorway.  (*See id.*)[7]

Overall, Plaintiff has talked to patients on some kind of regular basis both before and after Englewood's adoption of the Ordinance, but the Ordinance has resulted in "some obstruction" and "some difficulty" in her ability to do so "at least 50 percent of the time."  (*Id.* at 28:7–11; PSUF ¶ 63.) The difficulty involved with navigating the buffer zones, and being forced to go out into the street, is compounded by the presence of cars, delivery trucks, and sometimes snow.  (*See* Turco,

---

[7] During the COVID-19 pandemic, Sofia, a restaurant adjacent to MMA and south of it on Engle Street, set up tables and planters outside its restaurant and MMA.  (*See* Taylor, T2, 293:18–19; Long, T2, 334:24 – 335:2.)  The planters differ in size and move fairly frequently, as do the tables, sometimes depending on holidays or the season. (*See* Taylor, T2, 293:20 – 294:25; Long, T2, 335:3–6.)  Plaintiff can walk around the planters; they are set on the edge of the sidewalk by the curb, not in the middle of the sidewalk.  (*See* Taylor, T2, 295:14–24.)  The distance from the MMA building to the street is 11 feet 10 inches, so there is at least 3 feet 10 inches of space between the end of the semicircular buffer zones and the street. (*See* PSUF ¶ 44.)  However, the objects do add to the difficulty of trying to communicate with patients.  Plaintiff estimates that the objects take up "probably half the sidewalk you could use." (Turco, T1, 39:17–24.)  Even one of Defendant's witnesses, Andrea Long, testified that Sofia's objects narrowed the passageway for walking by "maybe half," but added that Plaintiff could still walk up to the circular buffer zone on the south side of the main entrance.  (Long, T2, at 342:1–8, 343:2–19.)

T1, 63:22 – 64:4.)  However, Plaintiff admits that the Bread of Life protestors have also negatively impacted her ability to communicate with patients, as they cause patients to run into the clinic as quickly as possible.  (*See* PSUF ¶ 65; Turco, T1, 48:25 – 49:13.)

Other sidewalk counselors have been able to talk to patients on a regular basis both before and after the Ordinance went into effect.  (*See* PSUF ¶ 64.)  For example, Rosemary Garrett, who began sidewalk counseling outside of MMA in 2013, remains stationary.  (*See* PSUF ¶¶ 22, 23.) She testified at her deposition that she was not bothered by the new buffer zone and was able to counsel patients even when the buffer zone was there.  (*See* Joint Ex. J-2 at 28:6 – 29:13.)

## III.    CONCLUSIONS OF LAW

### A.    Narrow Tailoring

As the Third Circuit explained on appeal, § 1983 lawsuits that allege a First Amendment violation are analyzed using a three-part test.  *Turco*, 935 F.3d at 161 (citing *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  The court must (1) "determine whether the First Amendment protects the speech at issue"; (2) "consider the 'nature of the forum'"; and (3) "resolve 'whether the [government's] justifications for exclusion from the relevant forum satisfy the requisite standard.'"  *Id.* at 161–62 (quoting *Cornelius*, 473 U.S. at 797.) "Only the third prong of the test is at issue in this" case, as Defendant "concedes that the First Amendment fully protects the speech at issue here and that the Ordinance clearly regulates speech in a traditional public forum (i.e., the sidewalk)."  *Id.* at 162 (citations omitted).  The parties also agree that the restrictions imposed are content-neutral—the Ordinance impacts the speech of those who support abortion as well as those who oppose it.  *Id.* (citations omitted).  This Court therefore applies intermediate scrutiny.  *Id.* (citation omitted).

13

To withstand intermediate constitutional scrutiny, "the Ordinance must be 'narrowly tailored to serve a significant governmental interest.'" *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). For a content-neutral speech restriction such as the Ordinance "'to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *McCullen*, 573 U.S. at 486). "Unlike a content-based speech restriction, the Ordinance 'need not be the least restrictive or least intrusive means of' serving the government's interests." *Id.* (quoting *McCullen*, 573 U.S. at 486). "Rather, the First Amendment prohibits the government from regulating speech in a way that would allow a substantial burden on speech to fall in an area that 'does not serve to advance its goals.'" *Id.* (quoting *McCullen*, 573 U.S. at 486.) With this framework in mind, this Court applies intermediate scrutiny below.

### 1.    Defendant's Legitimate Interests

As the Third Circuit observed, "the state ha[s] an interest in protecting health and safety, which 'may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests.'" *Id.* at 166 (summarizing and quoting *Hill v. Colorado*, 503 U.S. 703, 715 (2000)). Englewood's Ordinance serves this interest by creating an unobstructed pathway for patients to enter the MMA clinic without confrontation. Furthermore, "the buffer zones 'clearly serve' the 'government interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *Id.* at 163 (citing *McCullen*, 573 U.S. at 486–87); *see also Bruni v. City of Pittsburgh*, 941 F.3d 73, 88 (3d Cir. 2019) (citing *Turco* and holding that buffer zones serve such "legitimate" public interests). The Ordinance's clearly marked buffer zones also "'provide specific guidance to enforcement authorities [and] serve the interest in evenhanded application of the law,'" by avoiding "'the great

difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary.'" *Turco*, 935 F.3d at 166 (quoting *Hill*, 503 U.S. at 715, 729). Because the government's interests here are plainly significant and legitimate, this Court will proceed to evaluate whether the Ordinance is narrowly tailored to further those interests.

       *2.*    *Burden on Plaintiff's Speech*

     To be narrowly tailored, the Ordinance "'must not burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 161 (quoting *McCullen*, 573 U.S. at 486). Upon reviewing the testimony and other evidence in this matter, this Court finds that the burden on Plaintiff's speech is not substantial because the overall impact of the Ordinance on Plaintiff's ministry has been relatively small. Plaintiff is still able to meet patients at some distance from the buffer zones and walk with them to the perimeter of the doorway buffer zone, giving her about 30 to 45 seconds to convey her message and hand them literature. (*See* Turco, T1, 43:14–25, 45:25 – 46:3, 46:13–15; *see also* Taylor, T2, 283:18 – 284:10; Long, T2, 316:2 – 317:11.) Her approach has not changed since the Ordinance was enacted, (*see* Turco, T1, 48:10–16), and the few extra seconds in the buffer zone that she has lost during the walk to the MMA entrance are not substantial if the patient is unwilling to listen. If the patient is willing to stop and listen, then the Ordinance has no impact at all. If anything, the Ordinance may have given Plaintiff more opportunities to engage patients by decreasing the size and aggressiveness of the Bread of Life group, which caused patients to run into the clinic as quickly as possible. (*See* PSUF ¶ 65; Turco, T1, 48:25 – 49:13.)

With respect to her runs *to* the patients, the buffer zones only impact Plaintiff's ministry when a patient is approaching from the north side of Engle Street, preventing her from being able to run to the patient in a straight line on the sidewalk.  (*See* Turco, T1, 13:22 – 15:23, 24:25 – 25:14; Joint Ex. J-1.)  However, the buffer zones only extend to the end of the sidewalk in front of the MMA entrance and driveway—Plaintiff can otherwise run along the sidewalk or run in the gutter as needed.  (*See* Turco, T1, 47:2–11, 64:9–16.)  In fact, this has been her practice, as Plaintiff and several escorts testified that she often *crosses* Engle Street to meet patients coming from the other side or walking back to their cars.  (*See id.* at 44:22–24, 45:8–9; Gray, T2, 240:14 – 241:2; Long, T2, 314:13–20, 318:11–17; Taylor, T2, 284:18 – 285:8.)[8]

As the Third Circuit concluded, this case is distinguishable from *McCullen v. Coakley*, 573 U.S. 464 (2014), in which the Supreme Court struck down a Massachusetts law establishing a 35-foot buffer zone—Defendant's Ordinance establishes only an eight-foot buffer zone and "[t]his is a substantial distinction." *Turco*, 935 F.3d at 163.  The Massachusetts buffer zone carved out a significant portion of the adjacent sidewalks and required counselors to stand "well back" from the clinic, "prohibit[ing] McCullen and her colleagues from effectively engaging in sidewalk counseling either verbally or by handing literature to the patients." *Id.* at 163–64 (citing *McCullen*, 573 U.S. at 487–88).  That is not the case here.  Although the Ordinance adds "some difficulty" to Plaintiff's efforts to reach patients "at least 50 percent of the time," (Turco, T1, 28:7–11), there was no testimony that the eight-foot buffer zones prohibit Plaintiff from engaging in the one-on-one conversations that are central to her sidewalk counseling.  An eight-foot gap is sufficiently

---

[8] To the extent that Sofia's outdoor dining setup has created additional obstacles for Plaintiff when she is running to patients approaching from the south side or walking back with them to the clinic, these obstacles do not prevent her from using the sidewalk or gutter, but only narrow her passage.  (*See* Taylor, T2, 295:14–24; Long, T2, 342:1–8, 343:2–19.)  Moreover, these obstacles affect Plaintiff and the patients equally.  If anything, having to slowly navigate a narrow passage between the restaurant's planters and tables with a pregnant patient would only increase the duration of Plaintiff's conversation with the patient.

16

narrow for Plaintiff and patients to converse in a normal tone with ease. *See Hill*, 503 U.S. at 726–27 ("[T]his 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" (quoting *Schenck v. Pro-Choice Network C.f W. New York*, 519 U.S. 357, 377 (1997))). It is also narrow enough for Plaintiff to hand literature to willing recipients, who can easily step towards her. *See Turco*, 935 F.3d at 166 ("[I]t [i]s important to distinguish between 'state restrictions on a speaker's right to address a willing audience and those [restrictions] that protect listeners from unwanted communication.'" (quoting and analyzing *Hill*, 503 U.S. at 715–16)). As a result, Plaintiff has been able to talk to patients on a regular basis both before and after the Ordinance was enacted, as have other sidewalk counselors such as Rosemary Garrett. (*See* PSUF ¶¶ 63, 63; Joint Ex. J-2 at 28:6 – 29:13.)

The present case is more akin to *Hill*, in which the Supreme Court upheld another eight-foot buffer zone.[9] *See* 503 U.S. at 703. Plaintiff points to several distinctions between this case and *Hill*. (*See* D.E. 91 at 29–30 ¶¶ 23–26.) Unlike the Ordinance, the *Hill* statute more accurately created an eight-foot bubble zone—within a 100-foot buffer zone—that prohibited individuals from knowingly approaching another person within eight feet of that person to pass a leaflet, counsel, or hold a sign unless that person consented. *See Hill*, 530 U.S. at 707–08. Thus, the bubble zone could be pierced when the listener consented. *See id.* In contrast to the operation of

---

[9] On June 27, 2022, Plaintiff submitted a notice of supplemental authority, asking this Court to ignore *Hill's* precedential status in view of the Supreme Court's recent decisions in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), and *City c.f Austin, Texas v. Reagan Nat'l Advert. c.f Austin, LLC*, 142 S. Ct. 1464 (2022). (D.E. 95.) This Court declines to do so. *Dobbs* cites to *Hill* once in more than 200 pages. *See Dobbs*, 142 S. Ct. 2275–76 ("The Court's abortion cases have . . . distorted First Amendment doctrines." (citing two dissenting opinions in *Hill*)). This is classic dicta—the instant case and *Hill* concern First Amendment rights, while *Dobbs* concerns the right to an abortion and explicitly "emphasize[s] that our decision concerns the constitutional right to abortion and no other right. Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion." *Id.* at 2277–78. In *City c.f Austin*, Justice Thomas castigated *Hill* in his dissent, 142 S. Ct. at 1481–91, and the majority responded by saying, "[W]e do not . . . 'resuscitat[e]' a decision that we do not cite . . . ." *Id.* at 1475 (quoting the dissent). That the majority expressly declined to engage with the dissent's attack on *Hill* (in a case about signage) is not a sufficient basis for this Court to ignore *Hill's* precedential status.

the Colorado law in *Hill*, Plaintiff here cannot cross into a buffer zone imposed by the Ordinance to continue speaking one-on-one with a patient, even if the patient consents. Although this distinction is meaningful, it does not make Defendant's Ordinance more burdensome than the statute in *Hill*. Outside the 8-foot buffer zone, Plaintiff is able to approach anyone, without any gap, and regardless of whether they consent. The *Hill* plaintiffs were unable to do this within 100 feet of health care facilities. Inside the 8-foot buffer zone, patients can still hear from Plaintiff regardless of whether they consent. They can also receive literature from Plaintiff if they consent, by stepping towards her. Accordingly, any burden on Plaintiff's speech caused by Defendant's Ordinance is not substantial, especially in view of Defendant's significant interests.

   *3.    Less Restrictive Means*

   "[W]here the burden on speech is de minimis, a regulation may be viewed as narrowly tailored," because "challengers would struggle to show that alternative measures would burden *substantially* less speech." *Bruni*, 941 F.3d at 89 (internal quotation marks, citations, and alteration omitted). While "a rigorous and fact-intensive inquiry will be required where a restriction imposes a significant burden on speech, . . . a less demanding inquiry is called for where the burden on speech is not significant—whether due to a restriction's scope, the size of the speech-free zone, or some combination of the two." *Id.* (internal quotations marks and citations omitted).

   Even assuming that the burden on Plaintiff's speech is substantial, this Court is satisfied that Englewood has "show[n] that it tried or 'seriously considered[ ] substantially less restrictive alternatives.'" *Reilly v. City of Harrisburg*, 790 F. App'x 468, 473 (3d Cir. 2019) (quoting *Bruni*, 941 F.3d at 89). In *McCullen*, the Supreme Court identified multiple alternative measures that Massachusetts could have taken instead of enacting a buffer zone ordinance, including: (1) using an unchallenged subsection of that act, which prohibited blocking entrances, without banning

18

speech; (2) enacting a local version of the federal Freedom of Access to Clinic Entrances Act ("FACE Act"), 18 U.S.C. § 248; (3) enacting an ordinance specifically prohibiting harassment near health care facilities; (4) using existing ordinances against obstruction of driveways; (5) using "generic criminal statutes"; and (6) seeking injunctive relief as necessary against specific persons with a history of obstructing access. *See McCullen*, 573 U.S. at 490–93.

Defendant did not avail itself of any of these less restrictive alternatives,[10] but that alone is not dispositive. *See Bruni*, 941 F.3d at 91. The testimony from City officials credibly showed that they considered some of these alternatives but ran into the same problems that would render all of the *McCullen* alternatives less effective: the City was struggling financially and had multiple vacancies in its already-strained police department; off-duty police officers were not volunteering to monitor MMA; Bread of Life protestors were generally peaceful when they saw police officers arriving; and patients, companions, volunteer escorts, and MMA physicians and staff were all generally afraid of filing complaints against Bread of Life protestors because of the risk of reprisal. *See* discussion *supra* Section II.A.

City officials were entitled to consider these obstacles while crafting a solution, *see Bruni*, 941 F.3d at 91 n.21, and they were not required to "meticulously vet every less burdensome alternative," *Turco*, 935 F.3d at 171 (quotation omitted), particularly where the situation at MMA required urgent action and the chosen solution created a much safer situation for all parties, *see* discussion *supra* Section II.A. Accordingly, this Court finds that the Ordinance is "narrowly

---

[10] Plaintiff specifically faults Defendant for (1) adopting the Ordinance in place of a former ordinance that prohibited blockading, obstructing, and impeding access to health care and transitional facilities; (2) not enacting a local version of the FACE Act or a buffer zone law like Pittsburgh's, which (as eventually interpreted by the Third Circuit) would have addressed the patrolling, picketing, and demonstrating of the Bread of Life group, but allowed sidewalk counselors to engage in one-on-one communications; (3) not prosecuting Bread of Life protestors for violating laws already on the books, such as those prohibiting harassment, disorderly conduct, and simple and aggravated assault; (4) not pursuing injunctive relief against bad actors caught on photo or video; and (5) not ascertaining whether any of the protestors were already subject to an injunction issued against certain MMA protestors in *United States v. Gregg*, 32 F. Supp. 2d 151, 161–62 (D.N.J. 1998). (*See* D.E. 91 at 32–33 ¶¶ 32–36.)

tailored to serve a significant governmental interest," *McCullen*, 573 U.S. at 477 (quotation omitted), and it therefore satisfies intermediate scrutiny.

## B.     Overbreadth

In the alternative, Plaintiff argues that even if the Ordinance is narrowly tailored, it is unconstitutional because it is overbroad. (*See* D.E. 91 at 38–40 ¶¶ 49–56.) The Ordinance broadly applies to all health care facilities and transitional facilities in Englewood.  (*See* PSUF ¶ 10.) Plaintiff argues that "the Ordinance fails overbreadth because it creates buffer zones at all health care and transitional facilities without any legal justification to apply such a sweeping remedy to address problems at one location." (D.E. 91 at 38 ¶ 50 (emphases omitted).)  As for the reasons for this inclusion, Ms. Algrant testified that the City did not want protestors making it difficult for people to get in and out of transitional facilities, (Algrant, T1, 125:13–17), and Mr. Dacey testified that the Ordinance was intended to reach all health care and transitional facilities because "protests can pop up any day for any reason anywhere," (Dacey, T1, 179:3–8).  Plaintiff contends that Defendant failed to identify a history or an example of such protests taking place outside transitional facilities in Englewood.  (*See* D.E. 91 at 39 ¶ 52.)  Plaintiff further argues that restricting First Amendment activities in buffer zones outside every health care and transitional facility in Englewood goes far beyond any justification that the City has for attempting to regulate one group of protestors at one location.  (*See id.* at 39 ¶ 54.)

A law is "impermissibly overbroad" when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 n.6 (2008) (internal quotation marks and citation omitted).  "'[T]he overbreadth claimant bears the burden of demonstrating, from the text of [the law], and from actual fact, that substantial overbreadth exists.'" *Turco*, 935

20

F.3d at 172 (quoting *United States v. Stevens*, 559 U.S. 460, 485 (2010)). "'In determining whether a statute's overbreadth is substantial, [a court must] consider a statute's application to real-world conduct, not fanciful hypotheticals.'" *Id.* (quoting *Stevens*, 559 U.S. at 485.)

In the Court's view, Plaintiff has not met her burden of showing that substantial overbreadth exists. "'[W]hen a buffer zone broadly applies to health care facilities' to include 'buffer zones at non-abortion related locations,' we may then 'conclude the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive.'" *Bruni*, 941 F.3d at 92 (quoting *Turco*, 935 F.3d at 171). In *Bruni*, the Third Circuit rejected a similar overbreadth argument against an ordinance that "authorizes [Pittsburgh] to create buffer zones at any health facility in the [c]ity, regardless of whether the [c]ity has identified a problem at the location in the past." *Id.* at 91. The Third Circuit explained that "'[t]he fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance.'" *Id.* at 92 (quoting *Hill*, 530 U.S. at 730–31). In fact, Pittsburgh had only enforced its ordinance at "two facilities, both of which [had] suffered from violence and obstruction in the past." *Id.* at 91. Similarly, Englewood's Ordinance has been applied only at the MMA clinic, given the unique history of harassment and violence at that site. As in *Bruni*, the Ordinance only applies when the buffer zones are "clearly marked and posted," (PSUF ¶ 10), and Plaintiff has not submitted evidence of its application at any transitional facilities. The overbreadth doctrine "is to be used sparingly, where the demonstrated overbreadth is considerable," and only where there is "a realistic danger that the [law] will significantly compromise recognized First Amendment protections of parties not before the Court." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1265 (3d Cir. 1992) (quotation and citations omitted). No

such danger realistically exists here, and this Court therefore finds Defendant's Ordinance to be constitutional, both on its face and as applied to Plaintiff.

**IV.    CONCLUSION**

For the reasons set forth above, this Court finds in favor of Defendant on all claims.[11, 12]

An appropriate order follows.

s/ Susan D. Wigenton
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:      Clerk
cc:        Hon. Leda D. Wettre, U.S.M.J.
           Parties

---

[11] This Court does not address the parties' arguments regarding the doctrine of constitutional avoidance, (*see* D.E. 91 at 22–24; D.E. 92 at 37–39), because it finds that the Ordinance is constitutional without a narrowing construction.

[12] The parties did not meaningfully brief Plaintiff's First Amendment freedom of assembly and association and state law freedom of speech claims.  Nonetheless, this Court notes that its First Amendment freedom of speech analysis equally applies to Plaintiff's remaining claims.  *See McTernan v. City of York, PA*, 564 F.3d 636, 644 n.3 (3d Cir. 2009) ("[Plaintiff] references his claim of right to assembly but does not set forth a separate argument in his brief. For purposes of our analysis, we conclude that this claim is encompassed in his free speech claim." (internal citation omitted)); *Twp. of Pennsauken v. Schad*, 733 A.2d 1159, 1169 (N.J. 1999) ("Because our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment, federal constitutional principles guide the Court's analysis.").

Appx22

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JERYL TURCO,

                Plaintiff,

v.

CITY OF ENGLEWOOD, NEW JERSEY,

                Defendant.

Civ. Action No. 15-3008 (SDW) (LDW)

**ORDER & JUDGMENT**

August 12, 2022

**WIGENTON**, District Judge.

       This Court held a bench trial for two days in this matter regarding Plaintiff Jeryl Turco's ("Plaintiff") claims against Defendant City of Englewood, New Jersey ("Defendant"). For the reasons stated in this Court's Trial Opinion dated August 12, 2022,

       **IT IS**, on this 12th day of August 2022,

       **ORDERED** that judgment is entered in favor of Defendant on all claims, and

       **ORDERED** that Plaintiff's Complaint is **DISMISSED**.

       **SO ORDERED.**

                           *s/ Susan D. Wigenton*
                           **SUSAN D. WIGENTON**
                           **UNITED STATES DISTRICT JUDGE**

Orig:     Clerk
cc:       Hon. Leda D. Wettre, U.S.M.J.
          Parties

Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org

Mark R. Scirocco
Legal Center for Defense of Life, Inc.
Law Offices of Robert A. Scirocco
98 Route 46, Suite 6
Budd Lake, New Jersey 07828
Tel. 973-691-1188; Fax 973-691-3353
mark@sciroccoesq.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERYL TURCO, | Case No. 2:15-cv-03008 |
| Plaintiff, | |
| | Judge Susan D. Wigenton |
| v. | Magistrate Judge Leda D. Wettre |
| CITY OF ENGLEWOOD, NEW JERSEY, | |
| Defendant. | |

## NOTICE OF APPEAL

Plaintiff Jeryl Turco appeals to the United States Court of Appeals for the Third Circuit from this Court's Trial Opinion (Doc. 97) and Order and Judgment (Doc. 98), issued August 12, 2022, entering judgment in favor of Defendant on all Plaintiff's claims and dismissing Plaintiff's complaint.

Appx24

Respectfully submitted on this 2d day of September 2022.


/s/ Francis J. Manion                        Mark R. Scirocco
Francis J. Manion                            Legal Center for Defense of Life, Inc.
*Lead Attorney*                              Law Offices of Robert A. Scirocco
Geoffrey R. Surtees*                         98 Route 46, Suite 6
American Center for Law & Justice            Budd Lake, New Jersey 07828
Post Office Box 60                           Tel. 973-691-1188; Fax 973-691-3353
New Hope, Kentucky 40052                     mark@sciroccoesq.com
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org; gsurtees@aclj.org          * Admitted pro hac vice

Erik M. Zimmerman*                           *Counsel for Plaintiff*
Edward L. White III*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel. 734-680-8007; Fax 734-680-8006
ewhite@aclj.org;
ezimmerman@aclj.org

2

Appx25

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2022, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to all CM/ECF participants.

/s/ Francis J. Manion
Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org

Appx26