# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## No. 22-2647

JERYL TURCO,
*Plaintiff-Appellant,*

v.

CITY OF ENGLEWOOD, NEW JERSEY,
*Defendant-Appellee.*

On Appeal from the United States District Court for the
District of New Jersey, Civil Action No. 2:15-cv-03008 (SDW/LDW)
Sat Below:  Hon. Susan D. Wigenton, U.S.D.J.

---

## BRIEF OF DEFENDANT-APPELLEE
## CITY OF ENGLEWOOD

---

WEINER LAW GROUP LLP
629 Parsippany Road
P.O. Box 438
Parsippany, N.J. 07054-0438
Phone:  973-403-1100  Fax:  973-403-0010
Attorneys for Defendant-Appellee
City of Englewood

On the Brief:
   Donald A. Klein, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES.......................................................................iii

INTRODUCTION...................................................................................... 1

STATEMENT OF THE ISSUES ................................................................ 2

STATEMENT OF RELATED CASES ....................................................... 2

STATEMENT OF THE CASE .................................................................. 3

    A.  Facts Relevant to the Issues Submitted for Review .................................... 3

    B.  Relevant Procedural History .................................................... 10

    C.  Rulings Presented for Review.................................................. 11

SUMMARY OF ARGUMENT.................................................................. 11

ARGUMENT ........................................................................................... 13

    I.  THE DISTRICT COURT PROPERLY FOLLOWED THE THIRD
       CIRCUIT'S MANDATE ON REMAND AND THE LAW OF THE
       CASE DOCTRINE.............................................................13

       A. The Remand.......................................................................... 13

       B. Law of the Case .................................................................. 16

    II.  THE DISTRICT COURT DID NOT ERR IN HOLDING THAT
       THE CITY'S BUFFER ZONE ORDINANCE IS NARROWLY
       TAILORED. ............................................................................... 19

       A. Defendant's Legitimate Interests ............................................. 22

       B. Burden on Plaintiff's Speech.................................................. 26

    C. Less Restrictive Means ............................................................ 33

       1. Fear of Reprisal ............................................................... 34

       2. Financial Restraints ......................................................... 37

    D. Adoption of the Buffer Zone Ordinance ................................ 38

III.  THE DISTRICT COURT DID NOT ERR IN REJECTING
     PLAINTIFF'S OVERBREADTH CHALLENGE TO THE
     CITY'S BUFFER ZONE ORDINANCE ................................. 46

IV. THE DISTRICT COURT DID NOT ERR IN DISMISSING
     PLAINTIFF'S FIRST AMENDMENT FREE ASSEMBLY AND
     NEW JERSEY CONSTITUTION FREE SPEECH CLAIMS ................ 50

V.  ALTERNATIVELY, THE BUFFER ZONE ORDINANCE
     SHOULD BE UPHELD ON CONSTIUTIONAL AVOIDANCE
     GROUNDS ......................................................................... 51

CONCLUSION ........................................................................ 54

CERTIFICATION OF ADMISSION TO THE BAR ........................... 55

CERTIFICATION OF COMPLIANCE WITH RULE 32(a) and RULE 28 ......... 56

CERTIFICATION OF FILING AND SERVICE ................................. 57

# TABLE OF AUTHORITIES

**Page**

Cases

*Arizona v. California,*
    460 U.S. 605 (1983) ................................................................ 16

*Bankers Trust Company v. Bethlehem Steel Corporation,*
    761 F.2d 943 (3d Cir. 1985)............................................. 13, 14

*Bernitsky v. United States,*
    620 F.2d 948 (3d Cir. 1980) ................................................... 51

*Board of Airport Commissioners of the City of Los*
    *Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)........................ 25

*Bruni v. City of Pittsburgh,*
    941 F.3d 73 (3d Cir. 2019)...........17, 20, 25, 33, 34, 38, 44, 47, 48, 50, 51, 52, 53

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.,*
    447 U.S. 557  (1980) ............................................................ 20

*Comite de Jornaleros de Redondo Beach v. City of*
    *Redondo Beach*, 657 F.3d 936 (9th Cir. 2011)........................... 47, 48

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ...................................................... 23, 24

*Fairview Park Excavating Co., Inc. v. Al Monzo*
    *Construction Company, Inc.,* 560 F.2d 1122 (3d Cir.
    1977) .................................................................................. 51

*Free Speech Coalition, Inc. v. Attorney General United*
    *States*, 787 F.3d 142 (3d Cir. 2015)........................................ 19

*Frisby v. Schultz,*
    487 U.S. 474 (1988) ............................................................ 48

*Georgia v. Public. Resource.Org, Inc.*,
    140 S. Ct. 1498 (2020) ........................................................ 24

*Harte-Hanks Communications, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ........................................................... 19

*Hill v. Colorado*,
    530 U.S. 703 (2000) ..................................................*passim*

*Hurley v. Irish-American Gay, Lesbian and Bisexual
    Group of Boston*, 515 U.S. 557 (1995) ............................... 19

*In re Chambers Development Company, Inc.*,
    148 F.3d 214 (3d Cir. 1998)............................................... 13

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ..................................................*passim*

*McCutcheon v. America's Servicing Company*,
    560 F.3d 143 (3d Cir. 2009)............................................... 13

*McTernan v. City of York, Pa.*,
    564 F.3d 636 (3d Cir. 2009)............................................... 50

*Monasky v. Taglieri*,
    140 S. Ct. 719 (2020) ....................................................... 13

*Musacchio v. United States*,
    577 U.S. 237 (2016) ......................................................... 17

*Public Interest Research Group of New Jersey, Inc. v.
    Magnesium Elektron, Inc.*, 123 F.3d 111 (3d Cir. 1997).................................... 16

*Reilly v. City of Harrisburg*,
    790 Fed. Appx. 468 (3d Cir. 2019) .....................33, 43, 51, 52

*Turco v. City of Englewood*,
    935 F.3d 155 (3d Cir. 2019)........................................*passim*

*Twp. of Pennsauken v. Schad*,
   160 N.J. 156, 175, 733 A.2d 1159 (1999) ............................................................ 50

*United States v. Gregg*,
   32 F.Supp.2d 151 (D.N.J. 1998) .................................................................. 44, 45

*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................................... 50, 51

*United States v. Williams*,
   553 U.S. 285 (2008) .................................................................................... 50

Statutes

N.J.S.A. 26:2H 2 ............................................................................................... 39

N.J.S.A. 40:55D-66.2 ........................................................................................ 39

Other Authorities

18B Charles A. Wright, Arthur R. Miller, Edward
   Cooper, *Federal Practice and Procedure* §4478 (2022) .............................. 14, 16

## **INTRODUCTION**

On August 19, 2019, a three-judge panel of this Court reversed a summary judgment in favor of plaintiff Jeryl Turco which had declared defendant City of Englewood's Buffer Zone Ordinance unconstitutional (*"Turco I"*). In doing so, the panel held that because *McCullen v. Coakley*, 573 U.S. 464 (2014) involved a 35-foot buffer zone and the Ordinance in this case involved an eight-foot buffer zone, there is a "substantial distinction" that the District Court did not adequately discuss in relying upon *McCullen*; and held, further, that a conclusion that an eight-foot buffer zone imposed an inappropriate burden on speech as a matter of law would be "directly at odds" with the Supreme Court's decision in *Hill v. Colorado*," 530 U.S. 703 (2000), which case the District Court did not even cite. The panel remanded the case "for proceedings consistent with this opinion."

The remand was to resolve, consistent with the law prescribed in the Court's Opinion, two material fact issues: (i) whether the eight-foot buffer zone posed an impermissible burden on speech and (ii) whether fear of reprisal and financial restraints prevented alternative measures from being effective. After a two-day trial, in which the District Court heard testimony from plaintiff and from five City witnesses, the Court made detailed findings of fact, based largely on its credibility determinations, and determined that the Ordinance should be upheld on its face and as applied.

## STATEMENT OF THE ISSUES

1.     Whether the District Court complied on remand with the Third Circuit's mandate and the law of the case doctrine. (Appx2).

2.     Whether the District Court's credibility determinations and its finding that the Buffer Zone Ordinance is narrowly tailored were clearly erroneous. (Appx13-20).

3.     Whether the District Court's credibility determinations and its finding that the Buffer Zone Ordinance is not overbroad were clearly erroneous. (Appx20-22).

4.     Whether the District Court erred in dismissing plaintiff's other constitutional claims. (Appx22 n.12).

5.     Alternatively, whether the Buffer Zone Ordinance should be upheld on constitutional avoidance grounds. (Appx22 n. 11).

## STATEMENT OF RELATED CASES

*Turco v. City of Englewood*, 935 F.3d 155, 172 (3d Cir. 2019), where the Third Circuit reversed the District Court's grant of summary judgment to plaintiff in this case and remanded "for proceedings consistent with this opinion." *See also* August 19, 2019 Third Circuit Judgment (remanding the case "in accordance with the opinion of this Court") (dkt. #55).

## STATEMENT OF THE CASE

### A.    Facts Relevant to the Issues Submitted for Review

The "Relevant Facts" section of the Statement of the Case in plaintiff's Brief (Pb3-17) makes no reference to the following (bolded) findings of fact made by the District Court on remand -- which facts are clearly material. As shown in the annotations in the District Court's Opinion (referenced below), such findings are based principally on admissions made by plaintiff and on the credible testimony of witnesses the City of Englewood presented at trial.

### Measures Undertaken by the City Prior to the Buffer Zone Ordinance
(Appx3-4)

**Ms. Algrant [former Englewood Council President] spoke to [then Englewood Police] Chief O'Keefe about hiring off-duty Englewood police officers to be present at MMA on Saturday mornings (which MMA agreed to pay for in accordance with City policy).** (*See* Algrant, T1, 97:18-98.2.) **However, Chief O'Keefe advised that the City's off-duty police officers did not want the particular work, since there was a substantial difference between being in a squad car while somebody paves a street and confronting hostile protestors.** (*See id.* at 98:3-17.) **Ms. Algrant then asked Chief O'Keefe to list the opportunity with the Teaneck and Tenafly Police Departments, but that did not succeed either.** (*See id.* at 98:18-25; *see also* Dacey, T1, 166:13-167:2.)

**Ms. Algrant also asked Chief O'Keefe to arrange patrol cars to go by**

the clinic more often on Saturday mornings when the Bread of Life protestors would be there, and either change or speed up the route to create more of a presence. (*See* PSUF ¶53; Algrant, T1, 99:1-7.) **She reached out to Deputy Police Chief Larry Suffern on Wednesdays when she expected a Bread of Life protest the following Saturday, asking to create a greater police presence.** (Algrant, T1, 99:23-100:6.) **However, because Engle Street is a one-way street, there was plenty of warning time for protestors to see the police coming – they would become temporarily peaceful as a police car drove by and then "heat up again" after the police car passed.** (*Id.* at 100:7-17; *see* Dacey, T1, 167:22-168:3.) **Ms. Algrant told Deputy Police Chief Suffern that the police needed to stop and get out of their cars, talk to the protestors, and make their presence known more assertively.** (Algrant, T1, 100:18-101:12.) **Nonetheless, while the police presence temporarily eased tensions at MMA, the hostile protests resumed immediately after officers left.** (*See id.* at 101:16-24; PSUF ¶¶56-57; Joint Ex. J-3 (O'Keefe Deposition Excerpt) at 14:13-21; Dacey, T1, 168:4-9.)

### <u>Financial Resources</u> (Appx4)

**Ms. Algrant spoke with Chief O'Keefe and Mr. Dacey [then Englewood City Manager] about having a regular police presence stationed at MMA on Saturday mornings, but the officials concluded that it was financially prohibitive, contrary to the City's policy against providing off-duty police**

officers to private businesses without reimbursement, and would negatively impact the City's ability to address crime and rebuild after Hurricane Sandy. (*See* Algrant, T1, 101:25-102:9, 104:6-20; Dacey, T1, 168:10-174:4.) **The City was "short on cash", "there were more vacancies [in the police department] than there should have been," and the department was "too strained," as the City "had problems with shootings, drive-by shootings, drug issues, [and] gang issues", unlike most other towns in Bergen County.** (Dacey, T1, 168:13-169:11.)

### The Volunteer Escorts / Fear of Reprisal (Appx4-6)

In response to the escalating danger to patients, Ashley Gray co-founded a volunteer escort program at MMA to escort patients to the clinic when they arrived at the area. (*See* PSUF ¶24). **The volunteers risked their own safety because the Bread of Life protestors took pictures of them, their cars, and their license plates.** (Dacey, T1, 175:10-14). **To reduce the risk, the escorts were required to avoid using their real names and avoid engaging with the protestors.** (*See* PSUF ¶¶51, 52.)

Ms. Algrant talked to the escorts about filing complaints against problematic protestors, but the escorts felt unsafe doing so, as did patients, their companions, and MMA staff. (*See* Algrant, T1, 112:14-113:4, 113:10-114:3, 117:17-118:14.) **New Jersey does not permit filing anonymous**

complaints and the City concluded that any individual who filed a complaint would be in danger of reprisal from the Bread of Life protestors. (*See id*; Dacey, T1, 175:1-20.)

Even with the benefit of using the MMA address, there was still risk to individuals who filed complaints, and only a "handful" of "[m]ore than 100 escorts"] have filed complaints. (Taylor, T2, 293:9-12.)   When the Bread of Life protestors learned Ashley Gray's name, they targeted her personally, showing her pictures and a video of her that they had found on the internet, which she found "[v]ery intimidating." (Gray, T2, 244:23-245:11.) Ms. Gray stopped escorting at MMA in 2020, in part because she feared that the protestors would find out about her father's death from COVID and use that information to "taunt [her], say unkind things, and harass" her.   (*Id.* at 226:13-24, 271:1-7.) The escorts who did file complaints were generally team leaders and did so in the most "flagrant" cases, *i.e.*, when protestors remained in the buffer zone after the Ordinance was enacted and continued to harass or threaten patients or escorts despite requests to stop. (Taylor, 290:19-293:12; Long, 329:2-330:13.)

### Adoption of the Buffer Zone Ordinance (Appx7, 9-10)

Defendant adopted the Ordinance (#14-11) on March 18, 2014, in order to deescalate the situation at MMA by creating a degree of separation between

the Bread of Life protestors and MMA patients, doctors, staff, companions, and escorts. (*See* Pl. Ex. 3 at 13-14 (Defendant's Answer to Plaintiff's Interrogatory No. 9); Dacey, T1, 178:19-180.6; Algrant, T1, 116:6-117:13; Joint Ex. J-3 (O'Keefe Deposition Excerpt) at 25:8-18).

After the Ordinance was enacted, the situation at MMA generally became calmer. (Algrant, T1, 121:8-123:25.) Sidewalk counselors and protestors could still talk to patients, but anyone needing to enter or exit the clinic had eight feet of space to do so without physical harassment. (*See id.*) The clinic door could open out without obstruction because the buffer zone cleared out the overcrowded space in front of the entrance. (*See id.*) Ms. Gray believed so strongly that the buffer zone was working and needed to stay that she used her name in her 2015 Certification in this case. (Gray, T2, 269:20-270:5). Ms. Gray testified that the buffer zone created space that prevented confrontations that could easily escalate, and stopped people from positioning themselves so close to the front door that they intimidated patients. (*See id.* at 241:5-19). It helped the escorts get people in and out of the clinic entrance more easily. (*See id.*) Sidewalk counselors and protestors no longer followed patients all the way up to the front door, blocking other people behind them who were trying to enter the building. (*See* Long, T2, 323:16-324:21.) Witnesses, including plaintiff, agreed that the Bread of Life protestors

generally respected the buffer zone, perhaps going through it but rarely remaining in it. (*See* Turco, T1, 58:15-20; Algrant, T1, 121:15-18; Long, T2, 320:8-10, 321:25-322:2; Taylor, T2, 289:12-14.)

### The Situation at the Clinic Without the Buffer Zone (Appx10)

When this Court invalidated the Ordinance in 2017, "[i]t was absolute chaos." (Taylor, T2, 287:18-20.) Protestors on microphones and loudspeakers or with huge signs would stand right next to the door or even chase patients right up to the door. (*See id.* at 288:2-23.) Taylor testified to the impact on patients, stating, "I don't know how many patients I have had hold my hand, grab me, cry on my shoulder, tuck their head into my neck so that they don't have to look at it." (*Id.* at 287:6-8.) One protestor would walk up to the front door and just scream. (Long, T2, 319:9-320:4.) Even plaintiff would follow patients up to the front door. (*Id.* at 318:3-5.) Sometimes a patient's companion who was behind plaintiff would not be able to get around her to reach the entrance. (*Id.* at 318:6-9.)

### Plaintiff's Method of Sidewalk Counseling (Appx10-12)

Unlike other sidewalk counselors, plaintiff does not remain stationary. (PSUF ¶67.) She runs in all different directions to meet patients as they approach the clinic. (*See* Turco, T1, 41:11-17, 44:11-21) ("I will approach a girl from anywhere that she is coming. And the sooner I get to her, the more time I

have to be able to share literature, share a message . . . .") The clinic escorts call plaintiff "the Runner" because she runs up to patients when they are arriving and runs after and follows patients as they are leaving, for a block or more -- even as they are going to their cars, and even as they are crossing Engle Street. (*See* Gray, T2, 240:14-241:2; Long, T2, 314:13-20; 318:11-17; Turco, T1, 44:22-24, 45:8-9; Taylor, T2, 284:18-285:8). **Plaintiff generally meets patients at some distance from the buffer zone and walks with them to the perimeter of the buffer zone because she requires about 30 to 45 seconds to convey her message and hand them literature.** (*See* Turco, T1, 43:14-25, 45:25-46:3, 46:13-15; *see also* Taylor, T2, 283:18-284:10; Long, T2, 316:2-317:11). **Plaintiff also used this approach when there was no buffer zone.** (*See* Turco, T1, 48:10-16).

In practice, plaintiff "**can easily walk in the street gutter to traverse the rectangular buffer zones, which she does.**" (*See* Turco, T1, 64:9-16.) **Plaintiff can also get into the area between the two rectangular zones by crossing Engle Street.** (*See id.* at 62:5-24). **If a patient is approaching from the north, plaintiff sometimes just runs up Engle Street to meet the patient, avoiding the sidewalk entirely.** (*See id.* at 47:2-11.) **When a patient is approaching from the south, Plaintiff's ministry is minimally affected.** (PSUF ¶68.) **Plaintiff will run down Engle Street, as she did before the Ordinance, and meet the patient as far as**

**the next intersection so that she will have the time she needs to talk to the patient.** (*See* Turco, T1, 45:10-46:12.) **Plaintiff is able to get to the buffer zone on the south side of the clinic without obstruction and be no more than eight feet from the MMA doorway.** (*See id.*).

## B.    Relevant Procedural History

Jeryl Turco commenced this action against the City of Englewood on April 29, 2015 challenging the constitutionality of the Buffer Zone Ordinance which was adopted by the City in March 2012. (dkt. #1).[1] Defendant filed an Answer and Jury Demand on June 25, 2015. (dkt. #13). On July 15, 2015, the parties stipulated that in consideration for the withdrawal of defendant's jury demand, plaintiff would not claim damages in this matter in excess of $19.00. (dkt. #14).

After the completion of discovery, the parties filed motions for summary judgment on April 21, 2017. (dkt. ##43, 44). The District Court entered an Opinion and Order on November 14, 2017 granting plaintiff's summary judgment motion and denying defendant's summary motion as moot. (dkt. ##49, 50). Defendant filed a Notice of Appeal on December 13, 2017. (dkt. #53).

Following oral argument, the Third Circuit issued an Opinion on August 19, 2019, reversing this Court's grant of summary judgment to plaintiff and remanding the case "for proceedings consistent with this opinion." *Turco v. City of*

---

[1] "dkt." references are to docket entries in the District Court in this matter.

*Englewood*, 935 F.3d 155, 172 (3d Cir. 2019). Plaintiff filed a Petition for Rehearing before the original panel and the court en banc on September 3, 2018. By Order dated September 13, 2018, the Court denied plaintiff's Petition. The Third Circuit issued a Judgment in lieu of a formal mandate on September 23, 2019 remanding the case "in accordance with the opinion of this Court."

The District Court tried this case on February 23 and 24, 2022, and filed an Opinion (Appx1-22) and Order & Judgment in favor of defendant, City of Englewood, on all claims (Appx23) on August 12, 2022.

Plaintiff filed a Notice of Appeal on November 22, 2022. (Appx24-25).

**C.**    **Rulings Presented for Review**

The ruling presented for review is the District Court's August 12, 2022 Order & Judgment.

## SUMMARY OF ARGUMENT

The Third Circuit issued an Opinion on August 19, 2022 ("*Turco I*") setting forth rules of law to be applied, and identifying material fact issues to be factually determined, by the District Court upon remand "for proceedings consistent with this opinion". Plaintiff's Brief on this appeal is an attempt to reargue that ruling. It ignores the legal guidelines set forth in the *Turco I* Opinion -- that were followed by the District Court in a post-remand bench trial. It also affords no deference to credibility determinations necessarily and clearly made by the District Court in

resolving material issues of fact and ignores admissions made by plaintiff.

The District Court found that plaintiff uses the same method of sidewalk counseling whether or not there is a buffer zone; that plaintiff meets patients at long distances from the buffer zone and walks with them as she requires about 30 to 45 seconds to convey her message and hand them literature; that overall plaintiff has talked to patients on a regular basis both before and after the City's adoption of the Ordinance; and that the burden on plaintiff's speech is not substantial because the overall impact of the Ordinance on plaintiff's ministry has been relatively small.

Plaintiff trivializes "fear of reprisal" and "financial restraints" as "excuses" why alternatives to the buffer zone were not implemented. However, the District Court soundly rejected such arguments in her detailed factual findings. In fact, as clearly shown by a comparison of the situation at the site when the Buffer Zone Ordinance has been in effect and the period during which it was invalidated, the buffer zone has been quite successful in addressing the problems that existed at the site nearly a decade ago.

Plaintiff's overbreadth argument is inconsistent with the overbreadth cases that the Third Circuit panel said in *Turco I* should guide the District Court's analysis on remand and, as the District Court correctly found, is otherwise insufficient.

# ARGUMENT

## POINT I

### THE DISTRICT COURT PROPERLY FOLLOWED THE THIRD CIRCUIT'S MANDATE ON REMAND AND THE LAW OF THE CASE DOCTRINE.

#### The Standard of Review

Questions of law are reviewed *de novo. Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020); *McCutcheon v. America's Servicing Company*, 560 F.3d 143, 147 (3d Cir. 2009). However, such review is subject to the Third Circuit's mandate on remand and the law of the case doctrine. *See* discussion *infra*, Point I.

## A.    The Remand

In its Opinion in this case, the Third Circuit reversed the District Court's grant of summary judgment to plaintiff and remanded the case "for proceedings consistent with this opinion." *Turco v. City of Englewood*, 935 F.3d 155, 172 (3d Cir. 2019). *See also* August 19, 2019 Judgment of the Third Circuit (remanding the case "in accordance with the opinion of this Court").

Where there is a specific remand such as this:

> [D]istrict courts "must implement both the letter and spirit of the mandate, taking into account [our] opinion and the circumstances it embraces." When we direct the district court "to act in accordance with [our] opinion . . . the opinion becomes part of the mandate and must be considered together with it."

*In re Chambers Development Company, Inc.*, 148 F.3d 214, 224 (3d Cir. 1998) (citation omitted). *See also Bankers Trust Company v. Bethlehem Steel*

13

*Corporation*, 761 F.2d 943, 949-950 (3d Cir. 1985):

> "Where the reviewing court in its mandate prescribes that the court shall proceed in accordance with the opinion of the reviewing court, such pronouncement operates to make the opinion a part of the mandate as completely as though the opinion had been set out at length." *** The mandate and the opinion must be considered together in their entirety with particular reference to the issues considered. (citation omitted)

This Court did not simply remand this matter "for further proceedings". Its Opinion sets forth specific guidelines as to the law to be followed on remand and the parameters of the remand.

> The "mandate" rule binds a lower court on a remand to the law of the case established on appeal. The very structure of a hierarchical court system demands as much.

18B Charles A. Wright, Arthur R. Miller, Edward Cooper, *Federal Practice and Procedure* §4478 at 1 (2022).

Notwithstanding, throughout her Brief, plaintiff attempts to reargue legal issues contrarily decided by the Third Circuit in *Turco I*. For example:

**Size of Buffer Zone.** Plaintiff argues that this Court in *Turco I* correctly noted that the buffer zone in this case "is identical to the law struck down in *McCullen*, save for the size of the zones imposed". (Pb29). But this characterization is incomplete. This Court held in *Turco I*:

> In nearly all material respects, the amended Act [in Massachusetts] was identical to the Ordinance before us, except the Massachusetts law established a thirty-five foot buffer zone and the Ordinance establishes an eight-foot buffer zone. **This is a substantial distinction**

> **that the District Court did not adequately discuss in relying upon**
> ***McCullen*** **to support its order granting summary judgment in**
> **Turco.**

935 F.3d at 163 (emphasis added).

*Hill v. Colorado.* Plaintiff attempts to distinguish *Hill* and claim that *Hill* is

inapplicable to this case. *See, e.g.,* Pb 29-30. But the following is what this Court

held in *Turco I*:

> [O]n this record, we cannot say that the eight-foot buffer zone
> imposed an inappropriate burden on speech as a matter of law.
> Moreover, **such a conclusion would be directly at odds with the**
> **Supreme Court's decision in** ***Hill v. Colorado.*** *** In fact, the
> District Court did not even cite *Hill*.

935 F.3d at 165, 167 (emphasis added). Relying on *Hill*, the Third Circuit observed

in *Turco I* that an eight-foot restriction leaves ample room to communicate a

message through speech; that the state has an interest in protecting the health and

safety of its citizens which may justify a special focus on unimpeded access to

health care facilities and the avoidance of potential trauma to patients associated

with confrontational protest; that rules that provide specific guidance to

enforcement authorities serve the interest in evenhanded application of the law;

that it is important to distinguish between state restrictions on a speaker's right to

address a willing audience and those restrictions that protect listeners from

unwanted communication; that there is great difficulty in protecting a pregnant

woman from physical harassment with legal rules that focus exclusively on the

individual impact of each instance of behavior; and that signs, pictures, and voice itself can cross an 8-foot gap with ease. 935 F.3d at 166-67. Plaintiff's Brief simply rejects the relevance of *Hill.* (Pb25).

**Overbreadth**. Plaintiff argues that the District Court's overbreadth legal analysis is erroneous as a matter of law (Pb50). But the District Court's legal analysis (Appx20-22) cites, and directly parallels, the legal analysis by the Third Circuit in *Turco I.* 935 F.3d at 170-72.

## B.   Law of the Case

Besides being contrary to the Third Circuit's Opinion and Judgment in *Turco I* as to the rules of law applicable on remand, plaintiff's arguments run afoul of the law of the case doctrine:

> The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation. The doctrine applies "as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988). Because it prevents courts from entertaining endless appeals on the same issue, the doctrine promotes finality and judicial economy. "Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Charles A. Wright, Arthur R. Miller, Edward Cooper, *Federal Practice and Procedure* § 4478 at 788 (1981).

*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 116 (3d Cir. 1997). *See also Arizona v. California,* 460 U.S. 605, 618 (1983) (the doctrine posits that when a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case).

As the Supreme Court said in *Musacchio v. United States*, 577 U.S. 237, 245 (2016), the law of the case doctrine "may describe an appellate court's decision not to depart from a ruling that it made in a prior appeal in the same case." This principle is especially applicable in this case. First, in her Petition for Rehearing, which was denied, plaintiff made the same legal arguments she makes in this appeal. Secondly, this Court's decision in *Turco I* was cited extensively in *Bruni v. City of Pittsburgh*, 941 F.3d 73, 87 n.17, 88, 90-92 (3d Cir. 2019). More particularly, in *Bruni*, a subsequent Third Circuit panel cited *Turco I* for the following:

- The government has a significant interest in "protecting the health and safety of its citizens, which 'may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests.'" 935 F.3d at 166.

- The size of a buffer zone, while not necessarily in and of itself dispositive, is still a "substantial distinction" that must factor into a court's analysis of the relative burden on speech. *Id.* at 163.

- A municipality can demonstrate that it "attempted . . . [or] considered alternative means of bringing order to the sidewalk" even if it 'has[s] not

'prosecute[d] any protestors for activities taking place on the sidewalk' and did not seek injunctive relief against individuals whose conduct was the impetus for the Ordinance.'" *Id.* at 167.

- "When a buffer zone broadly applies to health care facilities" to include "buffer zones at non-abortion related locations, we may then conclude 'the 'comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive.'" *Id.* at 171.

- The principle is well-established in First Amendment jurisprudence that it is our duty to "accord a measure of deference to the judgment of [the] city council," considering "[the] statute's application to real-world conduct, not fanciful hypotheticals." *Id.* at 171-72.

- *Turco I* continued to rely on *Hill* since *McCullen* and *Reed* were handed down, declining to strike down an eight-foot buffer zone as a matter of law because "such a conclusion would be directly at odds with the Supreme Court's decision in *Hill v. Colorado.*" *Id.* at 165.

\*\*\*

In addition, the Third Circuit's Internal Operating Procedures should bar plaintiff's effort to have another panel of this Court reconsider the Court's decision in *Turco I. See* 3d Cir. I.O.P. 9.1 (2018) ("Policy of Avoiding Intra-circuit Conflict of Precedent"):

It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.

## POINT II

### THE DISTRICT COURT DID NOT ERR IN HOLDING THAT THE CITY'S BUFFER ZONE ORDINANCE IS NARROWLY TAILORED

### The Standard of Review

The following relevant standards were omitted from plaintiff's discussion of First Amendment cases cited in plaintiff's statement of the Standard of Review (Pb19): Independent appellate review does not limit an appellate court's deference to a trial court on matters of witness credibility. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 567 (1995) (citing *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). In *Harte-Hanks*, the Supreme Court held that credibility determinations are reviewed under the clearly erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses. A First Amendment independent review is not equivalent to a *de novo* review of the ultimate judgment itself. *Free Speech Coalition, Inc. v. Attorney General United States*, 787 F.3d 142, 151 (3d Cir. 2015). *See* Point I, Standard of Review (which is incorporated by reference herein).

### Narrow Tailoring

19

Since the City of Englewood's Buffer Zone Ordinance is content neutral, intermediate scrutiny applies. *Turco,* 935 F.3d at 162 (citing *McCullen,* 573 U.S. at 485-86). Accordingly, to withstand constitutional scrutiny, the Ordinance must be "narrowly tailored to serve a significant governmental interest." *Id.* (quoting *Bruni,* 824 F.3d at 363-64). "[T]o be narrowly tailored, the Ordinance must not burden substantially more speech than is necessary to further the government's legitimate interests." *Turco,* 935 F.3d at 162 (citing *McCullen,* 573 U.S. at 486). Unlike a content-based speech restriction, the Ordinance "need not be the least restrictive or least intrusive means of serving the government's interests." *Id.* Rather, the First Amendment prohibits the government from regulating speech in a way that would allow a substantial burden on speech to fall in an area that "does not serve to advance its goals." *Id.*

Plaintiff's reliance on snippets from inapposite First Amendment cases is misplaced. For example, plaintiff relies on *Thompson v. W. States Med. Cir.,* 535 U.S. 357, 371 (2002) for the proposition that if the City "could achieve its interests in a manner that does not restrict speech, or that restricts less speech, [i]t must do so" (Pb35), but leaves out the reference in the same sentence to the fact that the Court was addressing the final prong of the test described in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.,* 447 U.S. 557 (1980) that is applicable in commercial speech cases.

In its Opinion in *Turco I*, the Third Circuit identified two material fact issues that could not be determined by summary judgment. First, pointing out that the Court said in *Hill* that an eight-foot separation between the speaker and the audience allows the speaker to communicate at a "normal conversational distance" and should not have any adverse impact on the readers' ability to read signs, the Court held that:

> Given the Court's analysis in *Hill*, **we simply cannot conclude that the eight-foot buffer zones established under the Ordinance posed a severe burden on speech**, and the record is clearly inadequate to support such a conclusion **as a matter of law**.

935 F.3d at 167. Secondly, pointing out that the District Court did not fully appreciate the difference between the presence of demonstrable alternatives in *McCullen* and the evidence on this record that explains why less restrictive means were not likely to serve the City's interests here, the Court held that:

> [T]he City and its representatives explained that it had attempted to increase police presence at the Clinic, had considered alternative means of bringing order to the sidewalk, and proffered reasonable explanations for why those other means were ineffective. *** In summary, **the testimony of the various stakeholders when properly viewed in the light most favorable to the City demonstrated that the City considered alternative means of restricting speech around the clinic. A jury could find that financial restraints and fear of reprisal prevented these measures from being effective.**

935 F.3d at 167, 169. After a two-day trial, during which the District Court had the ability to hear the testimony and judge the credibility of the City of Englewood's witnesses and that of plaintiff Turco, the District Court answered these questions

and ruled, correctly, in the City's favor.

## A.    <u>Defendant's Legitimate Interests</u>

Consistent with the law to be applied on remand, the District Court held that "the state ha[s] an interest in protecting health and safety, which 'may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests.'" (Appx14) (citing *Turco,* 935 F.3d at 166 (quoting *Hill,* 530 U.S. at 715)). The District Court found that the Buffer Zone Ordinance "serves this interest by creating an unobstructed pathway for patients to enter the MMA Clinic without confrontation." (Appx14). Plaintiff does not dispute this law or its application to the MMA clinic. *See* Pb22 ("Turco concedes that unimpeded access to health care facilities can certainly constitute a legitimate government interest").

The District Court further held that that the Ordinance's clearly marked buffer zones also "'provide specific guidance to enforcement authorities [and] serve the interest in evenhanded application of the law,'" bv avoiding "'the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary.'" (Appx14-15) (citing *Turco,* 935 F.3d at 166 (quoting *Hill,* 530 U.S. at 715, 729)). Despite

the Third Circuit's clear reliance on *Hill*, plaintiff attempts in her Brief to reargue *Turco I* on this point. (Pb24-25).

Plaintiff argues that "[i]n *McCullen*, the Court observed that the Massachusetts law, upon which Englewood's Ordinance was modeled, 'would not be content neutral if it were concerned with undesirable effects that arise from the direct impact of speech on the audience or listeners' reactions to speech.'" (Pb24). But plaintiff ignores the *McCullen* Court's subsequent comment: "Whether or not a single person reacts to abortion protestors' or petitioners' counseling, large crowds outside abortion clinics can still compromise public safety, impede access, and obstruct sidewalks." 573 U.S. at 481. Also, this Court in *Turco I* held that:

> The parties also agree – as do we – that the restrictions imposed are content-neutral . . . . The Ordinance impacts the speech of those who support abortion as well as those who oppose it; it is clearly content neutral.

935 F.3d at 162 (citing *McCullen* and noting that the Court in *McCullen* concluded that the Massachusetts statute was content neutral).

Plaintiff further argues that because "a majority of the Supreme Court has observed that '[t]he Court's abortion cases have . . . distorted First Amendment doctrines,' *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275–76 (2022) (citing two dissenting opinions in *Hill*), this Court should defer to *McCullen*, the latest Supreme Court decision to weigh the constitutionality of buffer zones." (Pb24-25). The District Court correctly rejected this argument.

(Appx. 17 n.9). In the more than 200 pages of Opinions in *Dobbs*, there is but a single reference to *Hill* -- that consists of only one sentence: "The Court's abortion cases have . . . distorted First Amendment doctrines." 142 S. Ct. at 2276 and n. 65 (citing two dissenting opinions in *Hill*). However, "[c]omments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1511 (2020). Further, this brief statement, made in passing, is clearly dicta in a case involving solely the issue of the constitutionality of abortions (which was not an issue in *Hill*). Even the majority opinion in *Dobbs* does not agree with plaintiff's position:

> And to ensure that our decision is not misunderstood or mischaracterized, **we emphasize that our decision concerns the constitutional right to abortion and no other right. Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion.**

*Dobbs*, 142 S. Ct. at 2277-78 (emphasis added).

While plaintiff attempts to distinguish *Hill* (Pb29-30), this Court was fully aware of such distinctions when deciding *Turco I*. *See, e.g., Turco*, 935 F.3d at 165-66, where this Court said:

> There, the Court considered whether a Colorado statute that regulated speech within 100 feet of a health care facility violated the First Amendment. Specifically, the statute made it "unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in

oral protest, education, or counseling with such other person."

Rejecting plaintiff's argument, the District Court held, correctly, that the City of Englewood's Ordinance was not more burdensome than the statute in *Hill* -- pointing out, for example, that:

> Outside the 8-foot buffer zone, Plaintiff is able to approach anyone, without any gap, and regardless of whether they consent. The *Hill* plaintiffs were unable to do this within 100 feet of health care facilities. Inside the 8-foot buffer zone, patients can still hear from Plaintiff regardless of whether they consent. They can also receive literature from Plaintiff if they consent, by stepping towards her.

(Appx 18).

Arguing that it is o.k. to be within one foot of a young, vulnerable patient (Turco, T1, 50:19-51:4), plaintiff belittles the governmental interests served by buffer zones. However, "buffer zones 'clearly serve' the 'government interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *Turco*, 935 F.3d at 163 (citing *McCullen*, 573 U.S. at 486-87). *See also Bruni v. City of Pittsburgh*, 941 F.3d 73, 88 (3d Cir. 2019) (citing *Turco I* and holding that buffer zones serve such legitimate public interests). Buffer zones are simply not analogous to the ban of all First Amendment activities in an airport terminal, as suggested by plaintiff. (Pb52) (citing *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)).

The District Court correctly found that the "government's interests here are plainly significant and legitimate." (Appx15).

## B.   Burden On Plaintiff's Speech

Plaintiff's burden argument is erroneously intertwined with plaintiff's continued attempt to equate the buffer zones in this case and in *McCullen*. For example, plaintiff argues that the City of Englewood's Ordinance "is nearly a carbon copy of the statute that would be struck down just a few months later by the unanimous Supreme Court in *McCullen*." (Pb4). *See also* Pb24 (Englewood Ordinance was modeled after Massachusetts law). That is simply not so, and the Third Circuit rejected this argument in *Turco I* in remanding to the District Court:

> [T]he Massachusetts law established a thirty-five foot buffer zone and the [City of Englewood's] Ordinance establishes an eight-foot buffer zone. This is **a substantial distinction** that the District Court did not adequately discuss in relying upon *McCullen* . . . .

935 F.3d at 163 (emphasis added).

Unlike the City of Englewood's Buffer Zone Ordinance, the Massachusetts buffer zones carved out a significant portion of the adjacent sidewalks and required the counselor to "stand well back" from the clinic, "prohibit[ing] McCullen and her colleagues from effectively engaging in sidewalk counseling either verbally or by handing literature to the patients." *Turco*, 935 F.3d at 164. In *McCullen*, a sidewalk counselor **could never get closer than 35 feet from the clinic**. In contrast, in this case plaintiff can get **eight feet from the clinic**. As the District Court held: "An

eight-foot gap is sufficiently narrow for Plaintiff and patients to converse in a normal tone with ease" and it is "narrow enough for Plaintiff to hand literature to willing recipients, who can easily step towards her." (Appx16-17) (citing *Hill*, 530 U.S. at 715-16, 726-27 and *Turco*, 935 F.3d at 166). In *Turco I*, this Court pointed out that "the 8-foot restriction on an unwanted physical approach leaves ample room to communicate a message through speech" and "[s]igns, pictures, and voice itself can cross an 8-foot gap with ease." 935 F.3d 166 -67 (quoting *Hill*, 530 U.S. at 729).

The First Amendment prohibits the government from regulating speech in a way where the regulation would allow a substantial burden on speech that does not serve to advance the government's legitimate interests. *Turco*, 935 F.3d at 162 (citing *McCullen*, 573 U.S. at 486). No such burden on plaintiff's speech exists in this case.

Plaintiff's method of sidewalk counseling is central to the burden analysis, but, while the subject of much testimony at trial, it is barely mentioned in plaintiff's Brief. In fact, the District Court found that: **Plaintiff uses the same approach whether or not there is a buffer zone. She generally meets patients at some distance from the buffer zone and walks with them to the perimeter of the buffer zone because she requires about 30 to 45 seconds to convey her message and hand them literature.** Unlike other sidewalk counselors, plaintiff

does not remain stationary; **she runs in all different directions to meet patients as they approach the clinic.** The clinic escorts call plaintiff "the Runner" because she runs up to patients when they are arriving and runs after and follows patients as they are leaving, for a block or more -- even as they are going to their cars and even as they are crossing Engle Street. *See also* Appx361 (Taylor, T2, 289:21-25) (absent a buffer zone plaintiff still chased patients a long distance; that behavior did not change); Appx359 (Taylor, T2, 287:2-8) (plaintiff will chase patients leaving the clinic, some of whom are not handling the aftereffects of anesthesia very well). The District Court found, correctly, that "the burden on Plaintiff's speech is not substantial because the overall impact of the Ordinance on Plaintiff's ministry has been relatively small." (Appx15).

Completely ignoring her method of sidewalk counseling, plaintiff claims that the buffer zones make it more difficult for her to speak one-on-one with clients and to hand them literature. (Pb18). But that is precisely what she is doing when she walks with patients for 30 to 45 seconds, as she says she must in order to convey her message; and, contrary to her claim (Pb30), she is obviously less than eight feet away from a patient when she is doing so in an area where there is no buffer zone. Nor does the Ordinance burden patients who want to hear what plaintiff has to say (Pb32); they are totally free to walk with her to the buffer zone and stop at the perimeter of the buffer zone if they want to continue to hear what

she has to say.

If plaintiff is not able to communicate with a patient within the 30 to 45 second time period she requires before reaching the buffer zone, or convince a patient to stop to talk with her, a couple seconds walking through the eight-foot buffer zone (Appx116) (Turco, T1, 44:7-10) would be of little moment. As the District Court found, "the few extra seconds in the buffer zone that she has lost during the walk to the MMA entrance are not substantial if the patient is unwilling to listen." (Appx15). On the other hand, in the absence of the buffer zone, the situation in front of the MMA Clinic was completely chaotic and would impair, rather than facilitate, plaintiff's ability to communicate with patients in that area. ("[I]t was absolute chaos."). (Appx10) (Opinion).

Plaintiff admits that she communicates with "a lot" of patients using her method of counseling; that she has convinced patients to listen to her and to take literature from her when walking with them; and that she has been successful in referring patients to organizations that will help them get jobs. (Appx119, 120, 125-26) (Turco, T1, 47:7-11, 48:1-4, 53:24-54:8). *See also* Appx338 (Long, T2, 316:7-317:7) (plaintiff will talk to a patient while walking to the buffer zone and hand out pamphlets during the walk).

Plaintiff's testimony is corroborated by the deposition testimony of Rosemary Garrett, another sidewalk counselor, excerpts of whose testimony was

introduced at trial. (Appx449). Plaintiff argues that the District Court's factual findings regarding Ms. Garrett's sidewalk counsel were "highly misleading" (Pb8-9). But this is flatly wrong. It ignores the parties' stipulation (which referred to Ms. Garrett and others) that: "Other sidewalk counselors have been able to talk to patients **on a regular basis** both before and after adoption of the buffer zone ordinance." (Appx539) (PSUF ¶64, cited by the District Court (Appx.13)) (emphasis added). It also misstates the reason why Ms. Garrett sidewalk counsels on the corner far away from the Clinic building. Ms. Garrett did not testify in her deposition that it was because of the Buffer Zone Ordinance, as plaintiff suggests (Pb9); she testified that it was because she did not want to be near the Bread of Life people. (Appx473).

In an effort to analogize the sidewalk counselors in *McCullen* and the sidewalk counselors in this case, plaintiff argues that "[e]ven under the 35-foot buffer zone in *McCullen*, where the Court held that the law burdened the speech of sidewalk counselors, Eleanor McCullen was still able to persuade 'about 80 women not to terminate their pregnancies.'" (Pb31) (citing *McCullen*, 573 U.S. at 487). But, as this Court noted in *Turco I*, the Court in *McCullen* went on to say:

> but that this figure was "far fewer people" than she previously reached. Jean Zarella, another petition [sic] in McCullen, described a far more dramatic effect of the Massachusetts Act. Before its passing, she stated that she had an estimated one-hundred "successful interactions." After its enactment, the buffer zones prevented her from persuading a single patient.

935 F.3d at 164 (citing *McCullen*, 573 U.S. at 487-88).

Plaintiff argues that the District Court found that navigating the buffer zones forced plaintiff to go out into the street and that this was "downplayed" by the District Court. (Pb8 and n.3). But the argument by plaintiff that she would be exposed to "the perils of entering a busy city street" (*id.*) rings hollow, given, for example, the District Court's factual finding, based on plaintiff's own admission, that plaintiff "will **run down Engle Street, as she did before the Ordinance,** and meet the patient as far as the next intersection". (Appx12) (Turco, T1, 45:10-46:12) (emphasis added). Further, plaintiff admits that she has not seen any other sidewalk counselor go into the street as she does. (Appx140) (Turco, T1, 68:24-69:1).

Plaintiff's so-called "obstacle course" argument (*e.g.,* Pb28) is similarly refuted by the record. It is simply not true, as plaintiff argues, that Turco's testimony about her ability to sidewalk counsel was largely accepted by the District Court. (Pb7). On the contrary, after recounting what plaintiff said she had to do because of the purported "obstacle course" (*id.*), the District Court found that, in practice, plaintiff can easily walk in the street gutter to traverse the rectangular buffer zones, which she does; that plaintiff can also get into the area between the two rectangular zones by crossing Engle Street; that if a patient is approaching from the north, plaintiff sometimes just runs up Engle Street to meet the patient, avoiding the sidewalk entirely; and that plaintiff is able to get to the

buffer zone on the south side of the clinic without obstruction and be no more than eight feet from the MMA doorway. (Appx.12).

All of the foregoing findings of fact are based on plaintiffs' admissions and on credibility determinations made by the District Court as to the various witnesses presented at trial, including not only plaintiff but also volunteer escorts Ashley Gray, Andrea Long, and Christine Taylor.

\*\*\*

By Executive Order dated June 3, 2020, made during COVID, Governor Murphy opened up outdoor dining in New Jersey and authorized and encouraged municipalities to allow outdoor dining both on restaurant property and on municipally-governed areas, including sidewalks. (Appx539) (PSUF ¶70). The City of Englewood subsequently passed a Resolution Temporarily Waiving Certain Provisions of the City Code to Assist Local Businesses During the Covid-19 Pandemic (authorizing City officials to permit restaurants to relocate existing or locate new tables/seating on City sidewalks pursuant to an application process and permitting the utilization of the public right of way of the adjacent property owner for outdoor dining with that owner's consent). (Appx540) (PSUF ¶71). The owner of Sofia, the restaurant immediately to the south of the MMA Clinic, obtained Outdoor Dining Licenses that were ultimately approved by the Zoning Inspector of the City of Englewood. (Appx540-41) (PSUF ¶¶ 72-76). Sofia owns the planters

and tables in front of its restaurant and the MMA Clinic. (Appx365) (Taylor, T2, 293:18-19).

Given plaintiff's method of communicating with patients away from the buffer zone, the table and planters at the site do not materially burden her ability to communicate with patients. Plaintiff admits that people do not dine on Saturday mornings at Sofia. (Appx125) (Turco, T1, 53:3-9; *see also* Appx408 (Long, T2, 336:5-7) (Sofia opens after we leave on Saturdays). Also, the planters are set on the edge of the sidewalk by the curb, not in the middle of the sidewalk, and you can easily walk around them. (Appx367) (Taylor, T2, 295:14-24); (Appx415) (Long, T2, 343:7-10). As the District Court noted in her Opinion, these objects affect plaintiff and patients equally. (Appx16 n.8).

### C.   Less Restrictive Means

Where the burden on speech is *de minimis*, a regulation may be viewed as narrowly tailored because challengers would struggle to show that alternative measures would burden substantially less speech. *Bruni*, 941 F.3d at 89 (citing *McCullen*, 573 U.S. at 495). A less demanding inquiry is called for where the burden on speech is not significant -- whether due to a restriction's scope, the size of the speech-free zone, or some combination of the two. *Id.*; *see also Reilly v. City of Harrisburg*, 790 Fed. Appx. 468, 473-74 (3d Cir. 2019). Where the burden imposed by a restriction on speech is not significant, the government need

demonstrate neither that it has tried or considered *every* less burdensome alternative nor that it tried or considered every less burdensome alternative discussed in *McCullen*. *Bruni*, 941 F.3d at 91.

Plaintiff argues that "the City did not pursue any actions similar to those suggested by the *McCullen* Court for addressing **the same problem** Englewood faced." (Pb15). But the problems were not the same. The record in *McCullen* is not at all similar to that in this case. Only by ignoring the record and the factual findings and credibility determinations made by the District Court can plaintiff attempt to make this argument. Moreover, **plaintiff disparagingly trivializes the very real and significant distinctions – including fear of reprisal and financial restraints -- as mere "excuses".** (Pb13).

### 1. Fear of Reprisal

The District Court found that **the volunteers risked their own safety because the Bread of Life protestors took pictures of them, their cars, and their license plates; that to reduce the risk, the escorts were required to avoid using their real names and avoid engaging with the protestors; that Ms. Algrant talked to the escorts about filing complaints against problematic protestors, but the escorts felt unsafe doing so, as did patients, their companions, and MMA staff; that New Jersey does not permit filing of anonymous complaints and the City concluded that any individual who filed a**

**complaint would be in danger of reprisal from Bread of Life protestors;** and that **even with the benefit of using the MMA address, there was still risk to individuals who filed complaints.** (Appx5-6).

Volunteer Escort Ashley Gray testified at trial that she was targeted personally by the Bread of Life protestors, who showed pictures and a video of her that they had found on the internet, which she found "[v]ery intimidating". (Appx6) (Opinion). This video was played by protestors **at the site** while Ms. Gray was volunteer escorting. (Appx317) (Gray, T2, 245:5-9). Plaintiff's callous reaction was that "there is nothing to suggest that this amounted to illegal behavior." (Pb46-47). Plaintiff does not address Ms. Gray's trial testimony that she stopped escorting at the MMA Clinic in 2020, in part because she feared that the protestors would find out about her father's death from COVID and use that information to "taunt [her], say unkind things, and harass" her. (Appx6). *See also Turco I*, where this Court noted that Ms. Gray testified in her deposition that antiabortion groups were notorious for finding out people's personal information, whether patients or abortion providers or escorts, and using it to further target their acts of harassment; and that her colleagues have had antiabortion protestors show up at their place of work, their houses, and put their phone numbers and addresses and personal information and photos on websites. 935 F.3d at 168.

In an effort to minimize the fear of reprisal, plaintiff argues that the District

Court noted that after the enactment of the Ordinance, Ms. Taylor has filed three complaints and Ms. Long has filed five complaints. (Pb46). More importantly, the District Court found that **only a "handful" of "[m]ore than 100" escorts have filed complaints; and that the escorts who did file complaints were generally team leaders and did so in the most "flagrant" cases**. (Appx6).

Plaintiff further argues that "it betrays common sense to think that physicians at MMA would be hesitant to file complaints about illegal behavior when they publicly identified themselves complaining about the Bread of Life group." (Pb46). But plaintiff's speculation ignores the trial testimony of Mr. Dacey that:

> So we talked to the physicians and the employees [about filing a complaint] and they were very reluctant, because we actually also talked to them about possibly getting an injunction against the Bread of Life protestors. And they were very leary about doing it because they were scared of retribution towards them.

(Appx246-47) (Dacey, T1, 174:24-175:6).

Plaintiff argues that New Jersey Governor Murphy "signed into law a statewide program that provides a legal substitute address for victims and survivors of domestic violence, stalking, sexual violence, and reproductive health patients and providers. N.J.S.A. 47:4-1 *et seq.*" (Pb47). What plaintiff does not point out, however, is that the statute helps escorts only if they need to use an anonymous address in the case of **off-site** harassment. *See* Appx 404-05 (Long, 332:21-333:3).

It does nothing to protect a complainant's name.

Finally, plaintiff does not address the District Court's finding as to an additional reason why escorts were so reluctant to file complaints: "because the subsequent court proceedings required them to attend multiple hearings, take off work, and potentially explain to their employer that they volunteered at an abortion clinic." (Appx6) (citing PSUF ¶25; Long, T2, 330:17-24).

## 2. **Financial Restraints**

Plaintiff offered no evidence at trial to refute the testimony of the City's witnesses as to the financial restraints on both the City and its Police Department, who testified about the vacancies in the Police Department due to economic conditions; the fact that the City of Englewood has had one of the highest crime rates in Bergen County; the City's problems with drive-by shootings, drug crime, and gang issues; and the City's rule of thumb that a police officer makes about $100 per hour. (Appx4). The District Court found City witnesses Dacey and Algrant to be credible on these issues at trial – without the need for a formal cost analysis, as urged by plaintiff (Pb42). Mr. Dacey testified too that the Police Department was a major element of the budget, which he was involved in preparing, and was the most expensive department the City had. (Appx241) (Dacey, T1, 169:17-24).

The City's necessary policy of requiring reimbursement for the provision of

off-duty police officers to private entities is uniformly applied in situations such as this. *See, e.g.*, Appx 176 (Algrant, T1, 104:22-105:2) (the Dwight Englewood School paid to have off-duty police officers on their campus after Sandy Hook when there was a lot of anxiety among parents that schools were vulnerable); Appx245 (Dacey, T1, 173:2-6) (synagogues would hire off-duty police officers for security).

Relying on *McCullen*, plaintiff argues that "the prime objective of the First Amendment is not efficiency." (Pb45). But, citing this very statement, the Third Circuit noted in *Bruni II* that the Court in *McCullen* "did not have occasion to consider other circumstances where 'the limitations of manpower and the need to be able to deploy officers in response to emergencies' made it not feasible to permanently provide a significantly increased police presence at the clinic." *Bruni*, 941 F.3d 73 at n.21. Indeed, Mr. Dacey testified: "[I]f you have people stationed someplace providing security, they can't be answering calls, they can't [be] doing investigations, they can't [be] riding around on patrol." (Appx245) (Dacey, T1, 173:22-25). This is not a case where, as plaintiff suggests (Pb43), the City was simply desirous of saving money.

### D.   Adoption of the Buffer Zone Ordinance

The Buffer Zone Ordinance was adopted by the Englewood City Council on March 18, 2014 and reads in pertinent part as follows:

A. Definitions. As used in this section, the following terms shall have the meanings indicated:

1. "Health care facility" – as set forth in N.J.S.A. 26:2H 2.

2. "Transitional facility" – Community residences for the developmentally disabled and community shelters for victims of domestic violence as those terms are defined in N.J.S.A. 40:55D-66.2.

B. Within the City of Englewood, no person shall knowingly enter or remain on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following:

1. persons entering or leaving such facility;

2. employees or agents of such facility acting within the scope of their employment;

3. law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

4. persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

C. The provisions of subsection B shall only take effect during such facility's business hours and if the area contained within the radius and rectangle described in said subsection B is clearly marked and posted.

(Appx618-19). *See also Turco,* 935 F.3d at 158-59.

Plaintiff argues that prior to adoption of the Buffer Zone Ordinance, Ms. Algrant received from Senior Counsel for the New York City Law Department a copy of the First Circuit decision in *McCullen* affirming the validity of Massachusetts' buffer zone law and that Ms. Algrant replied, "that is a great idea." (Pb39-40). As Ms. Algrant testified at trial, however, the "great idea" was the idea of a buffer zone -- not of a 35-foot buffer zone as in *McCullen. See* (Appx224-25) (Algrant T1, 152:20-153:7).

In a footnote, plaintiff argues that "in a finding not disturbed on appeal, nor revised in the district court's Trial Opinion, the court wrote of the effects of the Ordinance: "Plaintiff and others similarly situated are excluded from approximately twenty-four feet on either end of the Clinic, or forty-eight feet in total of the public sidewalk outside the Clinic." (Pb6 n.2). Not so. Citing this Court's decision in *Turco I* (at 159), the District Court on remand found that: "The practical effect of the ordinance was the creation of . . . [t]wo semicircular buffer zones extend[ing] outwards eight feet from either side of the facility's entrance [and driveway] and extend[ing] to the street. (Appx7).

Plaintiff never addresses the legitimate need for the multiple buffer zones at the site. As Ms. Algrant testified at trial, the City wanted a buffer zone around the driveway because "most of the anti-choice extremist violence has been around

doctors and other clinic staff" and "the driveway and particularly the way that it is constructed with that archway . . . struck me as a potentially very dangerous place for clinic staff" where they could be easily surrounded by protestors when in their car. *** And in order to keep patients and their escorts safe, I felt like we needed to protect the door." (Appx188-89) (Algrant, T1, 116:17-117:5, 10-13).

The Buffer Zone Ordinance was not adopted because it was "easy" (Pb24). It reflected the City of Englewood's deliberate and thoughtful balancing of the interests of all involved. *See* (Appx250) (Dacey, T1, 178:19-24) ("We felt the buffer zone was a way to kind of protect the employees and the patients of the clinic while still protecting the ability of the people to protest."). As Ms. Algrant testified at trial: "I felt that we were in a race to the bottom and . . . that on any given Saturday something could erupt and I was very concerned that something could turn violent." (Appx185) (Algrant, T1, 113:12-15, 24).

Albeit acknowledging the urgency of the situation in late 2013/early 2014, plaintiff asks why the Buffer Zone Ordinance was not replaced after its adoption. (Pb40). The simple answer is that the Ordinance was generally quite successful. As the District Court found: **The City adopted the Ordinance in order to deescalate the situation at MMA by creating a degree of separation between the Bread of Life protestors and MMA patients, doctors, staff, companions, and escorts. After the Ordinance was enacted, the situation at MMA generally became**

**calmer. Sidewalk counselors and protestors could still talk to patients, but anyone needing to enter or exit the clinic had eight feet of space to do so without physical harassment. The clinic door could open out without obstruction because the buffer zone cleared out the overcrowded space in front of the entrance. \*\*\* It helped the escorts get people in and out of the clinic entrance more easily. Sidewalk counselors and protestors no longer followed patients all the way up to the front door, blocking other people behind them who were trying to enter the building. Witnesses, including plaintiff, agreed that the Bread of Life protestors generally respected the buffer zone, perhaps going through it but rarely remaining in it.** (Appx7, 9). These facts also help answer plaintiff's question "if existing ordinances could not be enforced, for lack of complaints, before the enactment of the Ordinance, how then could an additional ordinance (creating buffer zones) be enforced?" (Pb47-48).

As the District Court described, this is in sharp contrast to the situation at the site after the Buffer Zone Ordinance was invalidated: **"It was absolute chaos."** Protestors on microphones and loudspeakers or with huge signs would stand right next to the door or even chase patients right up to the door. Ms. Taylor testified to the impact on patients, stating, "I don't know how many patients I have had hold my hand, grab me, cry on my shoulder, tuck their head into my neck so that they

don't have to look at it." One protestor would walk up to the front door and just scream. Even plaintiff would follow patients up to the front door, and sometimes a patient's companion who was behind plaintiff would not be able to get around her to reach the entrance. (Appx10).

***

The City's Buffer Zone Ordinance did not substantially burden plaintiff's speech. However, even if that were not the case, the City showed that it tried or seriously considered less restrictive alternatives, *Reilly*, 790 Fed. Appx. at 473, and the District Court so found. (Appx18). However, each of the alternatives suggested by plaintiffs suffers the same real and significant infirmities: fear of reprisal and financial resources.

Plaintiff argues, without citation, that the District Court "**found**" that "Englewood **failed to**" 1) prosecute the Bread of Life protestors for violating laws already on the books, such as those prohibiting harassment, disorderly conduct, and simple and aggravated assault; 2) enact 'a local version of the FACE Act or a buffer zone law like Pittsburgh's which (as eventually interpreted by the Third Circuit) would have addressed the patrolling, picketing, and demonstrating of the Bread of Life group, but allowed sidewalk counselors to engage in one-on-one communications'; 3) 'pursue injunctive relief against bad actors caught on photo or video'; 4) and failed to even try to ascertain 'whether any of the protestors were

already subject to an injunction against certain MMA protestors' issued in *United States v. Gregg*, 32 F. Supp. 2d 151, 161–62 (D.N.J. 1998)." (Pb12-13). However, the District Court did not find that the City had "failed" to do anything.

On the contrary, citing *Bruni*, 941 F.3d at 91, the District Court found that whether the City availed itself of any of these alternatives was not dispositive because: "The testimony from City officials **credibly showed** that they considered some of these alternatives but ran into the same problems that would render all of the *McCullen* alternatives less effective: **the City was struggling financially and had multiple vacancies in its already-strained police department; off-duty police officers were not volunteering to monitor MMA; Bread of Life protestors were generally peaceful when they saw police officers arriving; and patients, companions, volunteer escorts, and MMA physicians and staff were all generally afraid of filing complaints against Bread of Life protestors because of the risk of reprisal.**" (Appx19) (emphasis added). As the District Court further noted, "City officials were entitled to consider these obstacles while crafting a solution, see *Bruni*, 941 F.3d at 91 n.21, and they were not required to meticulously vet every less burdensome alternative, *Turco*, 935 F.3d at 171 (quotation omitted), particularly where the situation at MMA required urgent action and the chosen solution created a much safer situation for all parties." (*Id.*)

Plaintiff's arguments regarding alternative measures are deficient for other

reasons as well. For example, plaintiff argues that the City did not even try to ascertain whether any of the protestors were already subject to an injunction against certain MMA protestors issued in *United States v. Gregg*, 32 F.Supp.2d 151, 161–62 (D.N.J. 1998). (Pb13). However, as former Police Chief O'Keefe testified in his Certification, which was introduced at trial, "that injunction expired when there was a change in ownership of the clinic" (Appx517) and the Bread of Life protestors first came to the site decades later. Also, the situation was demonstrably different when the injunction was entered. As Chief O'Keefe testified in his deposition, the protestors at that time chained themselves to the front and back doors of the Clinic, linked arms, and blocked the roadway. (Pb39). *See also* (Appx160) (Algrant, T1, 88:13-17) (police had "to come with bolt cutters and drag people off on flatbed trucks"). Such protestors were "a readily identifiable group" (Pb1) and it was possible to focus on the "precise individuals" and the "precise conduct" causing a "particular problem" (Pb37) (citing *McCullen*, 573 U.S. at 492).

Also, selectively citing Ms. Gray's trial testimony, plaintiff argues that the MMA Clinic was videoing events outside of the Clinic. (Pb38). However, plaintiff fails to mention that Ms. Gray testified that the Clinic did not have good quality cameras, that the cameras covered only a limited area, and that the video was granular and may not have had sound. (Appx328-29; 343) (Gray, T2, 256:17-

257:1, 271:8-12).

## POINT III

## THE DISTRICT COURT DID NOT ERR IN REJECTING PLAINTIFF'S OVERBREADTH CHALLENGE TO THE CITY'S BUFFER ZONE ORDINANCE.

### The Standard of Review

*See* Point I, Standard of Review and Point II, Standard of Review (which are incorporated by reference herein).

### Overbreadth

In reversing the District Court's grant of summary judgment to plaintiff on overbreadth grounds, the Third Circuit established clear legal guidelines to be applied on remand:

- An ordinance need not precisely target the acts it was passed to remedy; the fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance; when a buffer zone broadly applies to health care facilities, the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive. *Turco*, 935 F.3d at 171 (citing *Hill,* 530 U.S. at 731).

- A regulation's overbreadth must be substantial, not only in an absolute sense but also relative to the statute's plainly legitimate sweep, and a court must consider a regulation's application to real-world conduct, not fanciful hypotheticals (the

overbreadth claimant having the burden of demonstrating that substantial overbreadth exists). *Turco*, 935 F.3d at 172.

- The "broad principle of deference to legislative judgments" (*Bruni*, 824 F.3d at 370 n.18) is well-established in First Amendment jurisprudence, and we are mindful of our duty to "accord a measure of deference to the judgment" of Englewood City council. *Turco*, 935 F.3d at 171 (citing *Hill*, 530 U.S. at 727).

The District Court correctly followed these guidelines post-remand and determined that plaintiff had not met her burden of showing that substantial overbreadth exists. (Appx20-22).

Plaintiff's "overinclusive" argument (Pb33) is based on the erroneous premise that in *McCullen* the Court found the law not to be narrowly tailored because it applied to all reproductive facilities. On the contrary, the Court said that "creating **35-foot** buffer zones" at every clinic across the Commonwealth is hardly a narrowly tailored solution. *McCullen*, 573 U.S. at 493 (emphasis added). Plaintiff's reliance on *McCullen* in support of its overbreadth argument is the same error the Court in *Turco I* said the District Court had previously made in granting summary judgment to plaintiff – *i.e.*, conflating the narrow tailoring analysis with the overbreadth analysis:

> To support its conclusion that the Ordinance is overbroad, the District Court stated: "To meet the narrowly-tailored requirement, Defendant must create an Ordinance that targets the exact wrong it seeks to remedy." Although overbreadth and narrow tailoring are related, **the**

**Supreme Court has rejected the District Court's assertion that an Ordinance must precisely target the acts it was passed to remedy**.

*Turco*, 935 F.3d at 170-71 (emphasis added) (citing *Hill*, 530 U.S. at 730-31). In so ruling, the Third Circuit rejected the District Court's earlier reliance on *Frisby v. Schultz*, 487 U.S. 474, 485 (1988), which is cited again by plaintiff (Pb35) along with *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011), which relied on *Frisby* (*id.*). The other out-of-circuit cases cited by plaintiff (*id.*), which too are based on the same principle as *Frisby*, are also contrary to this Court's ruling in *Turco I*.

Plaintiff argues that the City of Englewood "produced no evidence of obstruction or confrontation outside any health care facility other than at 40 Engle Street." (Pb22). But this is not relevant, given the law applicable on remand: the fact that the coverage of an ordinance is broader than the specific concern that led to its enactment is of no constitutional significance. *Turco*, 935 F.3d at 171 (citing *Hill*, 530 U.S. at 730-31). Also, in *Bruni II* the Third Circuit rejected an overbreadth argument by plaintiffs challenging an ordinance because it authorized the City of Pittsburgh to create buffer zones at any health facility in the City regardless of whether the City has identified a problem at the location in the past. 941 F.3d at 91-92.

Plaintiff further argues that the statute in *Hill* applied only to health care facilities, while the Ordinance goes beyond health care facilities to include

transitional facilities. (Pb52-53). However, the District Court specifically noted and addressed the fact that the Buffer Zone Ordinance encompassed transitional facilities and further noted that Ms. Algrant testified that the City did not want protestors "making it difficult for people to get in and out of the transitional facilities". (Appx20). This was important to the City because transitional facilities can provide supportive housing for people with developmental disabilities and mental illness and is "a huge need in our community". (Appx196-97) (Algrant, T1, 124:21-25, 125:11-12). The City had legitimate reasons for including in the Buffer Zone Ordinance transitional facilities. Plaintiff's retort that buffer zones could be imposed "on all places of businesses with front doors that adjoin a public sidewalk" (Pb53) is a *reductio ad absurdum.*

Plaintiff has the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists. *Turco*, 935 F.3d at 172. The District Court correctly held that plaintiff failed to meet this burden as to both health facilities and transitional facilities. (Appx21). With regard to the latter, the District Court noted that the Buffer Zone Ordinance only applies when the buffer zones are "clearly marked and posted" and that plaintiff has not submitted evidence of its application at any transitional facilities. (*Id.*). In response, plaintiff only points to a stipulation by the parties relating to the marking and posting at "medical facilities". (Pb51).

"[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 374 (3d Cir. 2016) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010). That clearly is not the case here. "Invalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008). The District Court was correct in not employing it here. (Appx.21-22).

## POINT IV

### THE DISTRICT COURT DID NOT ERR IN DISMISSING PLAINTIFF'S FIRST AMENDMENT FREE ASSEMBLY AND NEW JERSEY CONSTITUTION FREE SPEECH CLAIMS.

#### The Standard of Review

*See* Point I, Standard of Review (which is incorporated by reference herein).

#### Other Constitutional Issues

Defendant, City of Englewood, agrees with plaintiff (Pb53-54) that the disposition of plaintiff's First Amendment free speech claims controls the disposition of plaintiff's other constitutional claims (*i.e.*, plaintiff's First Amendment free assembly and New Jersey free speech claims) -- as the District Court concluded. (Appx22 n.12). *See McTernan v. City of York, PA.*, 564 F.3d 636, 644 n.3 (3d Cir. 2009); *Twp. of Pennsauken v. Schad*, 160 N.J. 156, 175, 733 A.2d 1159, 1169 (1999).

## POINT V

## ALTERNATIVELY, THE BUFFER ZONE ORDINANCE SHOULD BE UPHELD ON CONSTITUTIONAL AVOIDANCE GROUNDS.

### The Standard of Review

This Court can affirm a District Court's disposition on grounds other than those on which the District Court relied. *Fairview Park Excavating Co., Inc. v. Al Monzo Construction Company, Inc.,* 560 F.2d 1122 n.2 (3d Cir. 1977); *Bernitsky v. United States,* 620 F.2d 948, 950 (3d Cir. 1980). While the issue of constitutional avoidance was raised by the parties at trial, the District Court did not address the issue "because it [found] that the Ordinance is constitutional without a narrowing construction." (Appx. 22 n.11). This Court reviews legal issues *de novo. See* Point I, Standard of Review (which is incorporated by reference herein).

### Constitutional Avoidance

In her Brief on appeal plaintiff relies on "constitutional avoidance" cases like *Bruni II* and *Reilly* to argue that the City should have adopted, not a buffer zone ordinance, but an ordinance prohibiting congregating, patrolling, picketing, and demonstrating in a prescribed zone. (Pb12-13). But those cases were not decided on such ground. Rather, they were **interpreting** an existing ordinance. *Bruni II* contained the express disclaimer: "Of course, we may not 'rewrite a . . . law to conform it to constitutional requirements,' *United States v. Stevens,* 559 U.S. at 481 . . . (2010)" but can act where "the Ordinance is readily susceptible to a

narrowing construction." 941 F.3d at 85-86. The Buffer Zone Ordinance in this case is not subject to the narrowing construction urged by plaintiffs; the language of the Ordinance clearly does not support a construction that the Buffer Zone Ordinance does not apply to sidewalk counselors.

On the other hand, the City argued, alternatively, at trial, that the Buffer Zone Ordinance was subject to the narrowing construction that it permits persons to walk through the buffer zone area to get from one side to the other. While the Buffer Zone Ordinance clearly encompasses sidewalk counselors, *Turco*, 935 F.3d at 158-60, Section B(4) of the Ordinance provides an exception from the prohibitions of the Ordinance for "persons using the public sidewalk or street right of way adjacent to such facility solely for the purpose of reaching a destination other than such facility." This Court could reasonably construe such language to mean that plaintiff could traverse the buffer zone area from the south to the north, or vice versa, simply to get from Point A outside of the buffer zone area to Point B outside of the buffer zone area.

Under the doctrine of constitutional avoidance, in determining a facial challenge to a statute, if it be readily susceptible to a narrowing construction that would make it constitutional, it will be upheld. *Bruni*, 941 F.3d at 85; *Reilly*, 790 Fed. Appx. at 474. Such is the case here.

While the constitutional avoidance doctrine is applied as a matter of law

independently of the intent or the interpretation of the drafters of the Ordinance *Bruni*, 941 F.3d at n.14, the testimony of witnesses at trial further supports the reasonableness of this construction. Ms. Gray testified that plaintiff initially walked through the buffer zones to get from south of the perimeter to north of the perimeter but then stopped when the litigation was filed. (Appx319) (Gray, T2, 247:10-24), that Ms. Gray understood from the language of the Buffer Zone Ordinance that plaintiff could walk through the buffer zones for this limited purpose (Appx320) (Gray, T2, 248:5-7), and that Ms. Gray so advised plaintiff but plaintiff continued to walk around the buffer zones after the litigation was filed (Appx319-20) (Gray, T2, 247:25-248:4, 8-9). *See also* Appx387 (Long, T2, 315:13-24) (Ms. Turco's pattern of walking changed once the litigation was filed). Indeed, plaintiff herself acknowledged at trial that she walked through the buffer zone after the Buffer Zone Ordinance was adopted but abruptly stopped doing that when she commenced this litigation and began cutting into the street at that time. (Appx145-46) (Turco, T2, 73:25-74:18).

## CONCLUSION

For the foregoing reasons, defendant/appellee City of Englewood respectfully requests that the District Court's Order and Judgment of August 12, 2022 be affirmed.

Respectfully submitted,

WEINER LAW GROUP LLP
629 Parsippany Road
Parsippany, NJ 07054
Tel: (973) 402-1100
Attorneys for Defendant-Appellee
City of Englewood

By: *s/ Donald A. Klein*
        Donald A. Klein, Esq.
        Attorney ID # 281791972

Dated: January 5, 2023

## <u>CERTIFICATION OF ADMISSION TO THE BAR</u>

I, the undersigned, certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit. Pursuant to 28 <u>U.S.C.</u> §1746, I certify under penalty of perjury that the foregoing is true and correct.

_s/ Donald A. Klein_
Donald A. Klein, Esq.

Dated: January 5, 2023

## CERTIFICATION OF COMPLIANCE WITH RULE 32(a) AND RULE 28

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,586 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportional spaced typeface in Times New Roman style 14 point.

3.  The text of the e-filed Brief and of the hard copy are identical.

4.  The e-filed document has been scanned by Microsoft Defender Antivirus (Version 1.335.1416.0) during the creation of the document and during the e-filing of said document for any viruses.

5.  I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*s/ Donald A. Klein*
Donald A. Klein, Esq.

Dated: January 5, 2023

## <u>CERTIFICATION OF FILING AND SERVICE</u>

I, Donald Klein, Esq., certify as follows:

1.   On this date, I caused one (1) copy of the Brief of Defendant-Appellee City of

Englewood to be e-filed with the United States Court of Appeals for the Third

Circuit using the CM/ECF system, and thereby served the Brief on counsel for

Plaintiff-Appellant.

2.   On this date, I caused a copy of the Brief of Defendant-Appellee City of

Englewood to be sent by regular mail to counsel for Plaintiff-Appellant:

>    Francis J. Manion, Esq.
>    American Center for Law & Justice
>    P.O. Box 60
>    New Hope, Kentucky 40052

3.   Pursuant to 28 <u>U.S.C.</u> §1746, I certify under penalty of perjury that the

foregoing is true and correct.

>    *s/ Donald A. Klein*
>    Donald A. Klein, Esq.

Dated: January 5, 2023

2498778_1.docx