# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 22-2647

---

JERYL TURCO
*Plaintiff-Appellant*,

v.

CITY OF ENGLEWOOD
*Defendant-Appellee*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (No. 3:15-cv-03008)

---

**BRIEF FOR THE STATES OF NEW JERSEY, DELAWARE, AND
PENNSYLVANIA AS *AMICI CURIAE* IN SUPPORT OF APPELLEE**

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

MAYUR P. SAXENA
*Assistant Attorney General*

MELISSA FICH
AMANDA I. MOREJÓN
*Deputy Attorneys General*
Office of the New Jersey

Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(973) 648-2489
Amanda.Morejon@law.njoag.gov

*Attorneys for Amici States*

# **TABLE OF CONTENTS**

INTRODUCTION AND INTERESTS OF AMICI ..................................................1

ARGUMENT

I.     THE ORDINANCE ADVANCES SIGNIFICANT
GOVERNMENTAL INTERESTS .......................................................3

II.    THE CITY'S ORDINANCE IS NARROWLY TAILORED.............10

    A. Precedent Makes Clear That Proposed Alternatives to
Buffer Zones May Be Inadequate to Protect Public Safety ..........11

    B. The Trial Record in This Case Confirms That Other
Alternatives To Buffer Zones Would Not Have Been
Effective ........................................................................................15

    C. Nothing in *McCullen* Requires a Different Result.........................20

III.   THE CITY'S ORDINANCE IS NOT FACIALLY
OVERBROAD ...................................................................................24

CONCLUSION .................................................................................................26

## TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Arietta v. City of Allentown*,
 No. 04-226, 2004 WL 1774623 (E.D. Pa. Aug. 9, 2004) ......................................15

*Brown v. City of Pittsburgh*,
 586 F.3d 263 (3d Cir. 2009)...................................................................................1

*Bruni v. City of Pittsburgh*,
 824 F.3d 353 (3d Cir. 2016)..............................................................................7, 19

*Bruni v. City of Pittsburgh*,
 941 F.3d 73 (3d Cir. 2019)...........................................................6, 14, 20, 21, 25

*Burson v. Freeman*,
 504 U.S. 191 (1992) ................................................................................................6

*Clark v. Cmty. for Creative Non-Violence*,
 468 U.S. 288 (1984) .............................................................................................3, 5

*Cox v. Louisiana*,
 379 U.S. 536 (1965) ................................................................................................5

*Heffron v. Int'l Soc'y for Krishna Consciousness*,
 452 U.S. 640 (1981) ................................................................................................5

*Hill v. Colorado*,
 530 U.S. 703 (2000).......................................................................................passim

*Hughes v. Twenty-First Century Fox, Inc.*,
 304 F. Supp. 3d 429 (S.D.N.Y. 2018) ..................................................................18

*McCullen v. Coakley*,
 573 U.S. 464 (2014).......................................................................................passim

*McTernan v. City of York*,
 564 F.3d 636 (3d Cir. 2009)...................................................................................6

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ...................................................................4

*Metro. Life Ins. Co. v. Massachusetts*,
   471 U.S. 724 (1985) ...................................................................4

*New York ex rel. Vacco v. Operation Rescue Nat'l*,
   80 F.3d 64 (2d Cir. 1996)..........................................................19

*Pro-Choice Network v. Project Rescue*,
   799 F. Supp. 1417 (W.D.N.Y. 1992), *aff'd in part, rev'd in part*
   *Pro-Choice Network v. Schenck*, 67 F.3d 359 (2d Cir. 1994) .................9

*Reilly v. City of Harrisburg*,
   790 F. App'x 468 (3d Cir. 2019) ...............................................14

*Schenck v. Pro-Choice Network of W. New York*,
   519 U.S. 357 (1997) ...............................................................1, 6

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ...................................................................6

*Turco v. City of Englewood*,
   935 F.3d 155 (3d Cir. 2019)................................................passim

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth*,
   550 U.S. 330 (2007) ...............................................................1, 4

*United States v. Stevens*,
   559 U.S. 460 (2010).............................................................24, 26

*United States v. Williams*,
   553 U.S. 285 (2008)..................................................................24

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)...........................................................5, 10, 11

**Statutes**

N.J. Stat. Ann. § 47:4-2 ........................................................................18

N.J. Stat. Ann. § 47:4-4 ........................................................................18

**Other**

*2021 Violence & Disruption Statistics*, National Abortion Federation, 2022 ...........1

Angel M. Foster, et al., *"I didn't doubt my choice, but I felt bad": A*
  *Qualitative Exploration of Canadian Abortion Patients' Experiences*
  *with Protestors*, 102 Contraception 308 (2020) ........................................8

Erin Carrol & Kari White, *Women's Experiences with Protestors While*
  *Accessing Abortion Care in Louisiana*,
  Population Research Center, University of Texas at Austin,
  December 2019 ....................................................................................8

Herminia Palacio, *Over the Precipice Into a Post-Roe World—A Look*
  *at Abortion Rights and Access in the United States*,
  112 Am. J. Pub. Health 1273 (2022) .......................................................9

Katy B. Kozhimannil, et al., *Abortion Access as a Racial Justice Issue*,
  New Eng. J. Med. 1537 (Oct. 27, 2022) ..................................................9

Taylor K. Kelly, *Silencing the Lambs: Restricting the First Amendment*
  *Rights of Abortion Clinic Protestors in Madsen v. Women's Health Center*,
  68 S. Cal. L. Rev. 427 (1995) ...............................................................10

Victoria Reines, *Quieting Speech: Establishing a Buffer Zone Around*
  *Reproductive Freedom*,
  42 Am. J.L. & Med. 190 (2016) ...........................................................8

## <u>INTRODUCTION AND INTERESTS OF AMICI</u>

Amici States New Jersey, Delaware, and Pennsylvania, file this amicus brief in support of Appellee City of Englewood ("City").

States have a significant interest in protecting the health, safety, and welfare of their residents. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth*, 550 U.S. 330, 342-43 (2007). To serve this interest, States have long exercised their police powers to implement measures that guarantee residents unimpeded access to health care services. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 715, 724-26 (2000) (upholding Colorado's eight-foot floating buffer zone law); *Brown v. City of Pittsburgh*, 586 F.3d 263, 277-81 (3d Cir. 2009) (holding Pittsburgh may constitutionally impose either a fifteen-foot fixed buffer zone or a *Hill*-type buffer zone). States' ability to protect residents is particularly crucial given that assaults directed at abortion clinic staff and patients increased 128% from 2020 to 2021. *See 2021 Violence & Disruption Statistics*, National Abortion Federation, 2022, at 2.

The Supreme Court has held that States, either directly or through their municipalities, may rely on content-neutral laws to regulate the activity outside of health care facilities so long as their regulations are narrowly tailored to serve the States' significant interest in protecting the public's health and safety. *See McCullen v. Coakley*, 573 U.S. 464, 477 (2014); *Schenck v. Pro-Choice Network of W. New*

1

*York*, 519 U.S. 357, 374, 377 (1997). Although the *amici* States vary in the precise measures they utilize to secure access to health care services, they share a common interest in preserving the ability to create buffer zones around health care facilities.

The *amici* States also have substantial experience enforcing their laws to protect the health, safety, and welfare of their residents. The States' experience teaches that less restrictive means than buffer zone laws will unfortunately sometimes be inadequate to protect the health and safety interests of residents who seek to obtain health care services, including abortion services. As they have found, measures like increased police presence, individual or case-by-case injunctions, and the filing of complaints often fall short of ensuring that patients can access health care services without the threat of harassment or physical contact, or actual physical violence, by protestors. Accordingly, the *amici* States believe that a content-neutral buffer zone law like the one enacted by the City of Englewood remains a critical tool for States and municipalities to address public safety concerns at health care facilities.

Here, following a bench trial, the District Court correctly concluded that the City's buffer zone ordinance does not violate the First Amendment. In reaching that conclusion, the District Court carefully adhered to this Court's earlier decision in this case. *Turco v. City of Englewood*, 935 F.3d 155, 162-67 (3d Cir. 2019). In that earlier appeal, this Court held that the Ordinance was content neutral; that the City

had a significant interest in enacting a buffer zone law; that there was a "substantial distinction" between the City's eight-foot buffer zone and the thirty-five foot buffer zone the Supreme Court struck down in *McCullen*, 573 U.S. at 485; and that a fact-finder could reasonably conclude the Ordinance was narrowly tailored. *Turco*, 935 F.3d at 162-67. Those conclusions, coupled with the District Court's meticulous factual findings after trial, readily resolve this appeal. They make plain that the Ordinance is constitutional.

## **ARGUMENT**

The City's Ordinance does not violate the First Amendment. As the parties have agreed throughout this litigation, and as the Third Circuit held in *Turco*, the City of Englewood's buffer zone ordinance is content-neutral. *Turco*, 935 F.3d at 162 ("The parties also agree—as do we—that the restrictions imposed are content-neutral."); *see* Appx13 (Opinion). The Ordinance therefore survives scrutiny so long as it is "narrowly tailored to serve a significant governmental interest." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *see also Turco*, 935 F.3d at 162; Appellant's Br. 21 (acknowledging that "intermediate scrutiny is the correct standard" for assessing Turco's claims). The Ordinance easily clears that bar. As the District Court correctly found after trial, record evidence demonstrates that the Ordinance is supported by a significant governmental interest and is tailored to

that interest. *See* Appx1 (Opinion). And the Ordinance also is not overbroad. *Id.* This Court thus should affirm the District Court's decision.

## I. THE ORDINANCE ADVANCES SIGNIFICANT GOVERNMENTAL INTERESTS.

Precedent and the factual record established at trial demonstrate a significant governmental interest in enacting buffer zone laws.

1. The Supreme Court and this Court have long made clear that States, acting either directly or through their municipalities, have a significant interest in protecting the health and safety of their residents. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *United Haulers*, 550 U.S. at 342-43. Consistent with bedrock principles of federalism, States have "great latitude under their police powers to legislate as to the protection of the lives" and "health" of "all persons." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (internal quotation marks omitted). In exercising those police powers, "States and municipalities plainly have a substantial interest in controlling the activity around certain public ... places," such as "schools, courthouses, polling places," and "health care facilities." *Hill*, 530 U.S. at 728.

The Supreme Court has recognized that health care facilities, in particular, implicate "unique concerns," because "[p]ersons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions." *Id.* at 728-29. As the Court has explained, the States' interest in protecting the health and safety of their residents therefore "may justify a special

focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." *Id.* at 715.

States and municipalities are plainly authorized to pursue that interest under the First Amendment. States can "regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Cox v. Louisiana*, 379 U.S. 536, 554 (1965); *see also Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647-48 (1981). Thus, "even in a public forum," States can protect the public's safety by imposing "reasonable restrictions on the time, place, or manner of protected speech," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), so long as the restrictions are both content-neutral and "narrowly tailored to serve a significant governmental interest," *Clark*, 468 U.S. at 293.

Creating buffer zones around health care facilities, including abortion clinics, accords with both the *amici* States' duty to protect public safety and health and the dictates of the First Amendment. As the Supreme Court and this Court have held, such buffer zone laws, much like buffer zones around polling places and funeral homes, serve States' interest in protecting the health and safety of their residents. *See Turco*, 935 F.3d at 166 (noting significant interests served by buffer zone laws); *see also, e.g.*, *Hill*, 530 U.S. at 719-20, 724-30 (holding Colorado's health care facility buffer zone law served "the States' interest in protecting access and privacy"

for patients); *Bruni v. City of Pittsburgh*, 941 F.3d 73, 88 (3d Cir. 2019) (*Bruni II*) (similar); *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (upholding polling place buffer zone law); *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (noting that "funeral picketing" is subject to reasonable time, place, or manner restrictions).

As the District Court explained, precedent also makes clear that buffer zones serve several other related and significant State interests. *See* Appx14-15 (Opinion). "[B]uffer zones 'clearly serve' the 'government interest[] in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks," and at the same time "'protecting property rights.'" *Turco*, 935 F.3d at 163 (quoting *McCullen*, 573 U.S. at 486-87); *see Schenck*, 519 U.S. at 372-73; *Hill*, 530 U.S. at 715; *Bruni II*, 941 F.3d at 88. They likewise serve the *amici* States' significant interest in "'protecting a woman's freedom to seek pregnancy-related services,'" *Turco*, 935 F.3d at 163 (quoting *McCullen*, 573 U.S. at 486-87), and in "protecting the medical privacy of patients whose psychological and physical well-being [are] threatened as they [are] held 'captive' by medical circumstance." *Schenck*, 519 U.S. at 372-73; *see also McTernan v. City of York*, 564 F.3d 636, 650 (3d Cir. 2009) (noting State's interest in protecting similar privacy interests of clinic personnel). And such laws "'provide specific guidance to enforcement authorities [and] serve the interest in evenhanded application of the law,'" avoiding "'the great difficulty of protecting'" patients "'from physical harassment with legal rules that focus exclusively on the

individual impact of each instance of behavior'" or "'demand[] in each case an accurate characterization (as harassing or not harassing)'" of any specific individual's conduct. *Turco*, 935 F.3d at 166 (quoting *Hill*, 503 U.S. at 715, 729).

Given the overwhelming benefits such tailored laws can bring, "all four of the Supreme Court's buffer zone precedents—*Madsen*, *Schenck*, *Hill*, and *McCullen*—accepted that the laws at issue furthered significant government interests." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 367 (3d Cir. 2016) (*Bruni I*).

2. The strength of the City's interests is reinforced by the record in this case. The District Court found that protesters from a religious organization called Bread of Life have repeatedly engaged in "extremely aggressive, loud, intimidating, and harassing behavior." Appx2 (Opinion); *see also, e.g.*, Appx526 (Parties' Stipulation of Undisputed Facts (PSUF) ¶ 5). The testimony at trial demonstrated that patients were regularly confronted by protesters "yelling and screaming in [their] face[s]," Appx165, and that members of the City Council received regular reports indicating that the Bread of Life protesters were "blocking access to the clinic door," "blocking patients and escorts on the sidewalk," "shouting into the clinic when the door is opened," "creating tripping hazards," and engaging in "repeated physical assault[s] of escorts," Appx5 (Opinion); Appx637-641 (Ex. X), 644-645 (Ex. BB).

In light of these serious concerns, the City enacted the Ordinance to "creat[e] a degree of separation between the Bread of Life protesters" and "patients, doctors,

staff, companions, and escorts" at health care facilities in Englewood. Appx7 (Opinion). The Ordinance sought to protect patients and clinic workers from being "harassed or assaulted," and "[d]e-escalat[e] ... the type of unstable and dangerous situations that had developed." Appx607-608; *see* Appx189 (trial testimony noting Ordinance was enacted "to keep staff of the clinic safe" and "to keep patients and their companions safe"); Appx178-179 (similar). The evidence thus shows that the Ordinance sought to advance the City's clear interest in "protect[ing] those who enter" such health care clinics "from the harassment, the nuisance, the persistent importuning, the following, the dogging, and the implied threat of physical touching that can accompany an unwelcome approach." *Hill*, 530 U.S. at 724.

3. Empirical research also underscores that the City has a significant interest in protecting patients at health care facilities. Close contact with protestors outside health care facilities, including abortion clinics, can deter patients from accessing health care services. *See* Victoria Reines, *Quieting Speech: Establishing a Buffer Zone Around Reproductive Freedom*, 42 Am. J.L. & Med. 190, 204 (2016); Erin Carrol & Kari White, *Women's Experiences with Protestors While Accessing Abortion Care in Louisiana*, Population Research Center, University of Texas at Austin, December 2019, at 2. The impact of protestors can be "especially upsetting" for patients who "either bec[ame] pregnant as a result of rape" or were "impregnated by an abusive partner." Angel M. Foster, et al., *"I didn't doubt my choice, but I felt*

*bad": A Qualitative Exploration of Canadian Abortion Patients' Experiences with Protestors*, 102 Contraception 308, 311 (2020). The stress of contact with protestors outside of health care facilities can also increase medical risks for patients seeking abortion services, including elevated blood pressure and hyperventilation. *See, e.g.*, *Pro-Choice Network v. Project Rescue*, 799 F. Supp. 1417, 1427 (W.D.N.Y. 1992), *aff'd in part, rev'd in part Pro-Choice Network v. Schenck*, 67 F.3d 359 (2d Cir. 1994) (noting "uncontradicted testimony that the risks associated with an abortion increase if the patient suffers from additional stress and anxiety").

Ensuring residents have unimpeded access to health care facilities that offer abortion services is particularly important given the racial and ethnic disparities in reproductive health outcomes. *See* Katy B. Kozhimannil, et al., *Abortion Access as a Racial Justice Issue*, New Eng. J. Med. 1537, 1538 (Oct. 27, 2022) (citing data indicating "that Black and Indigenous people are two to four times as likely as White people to die during pregnancy or around the time of childbirth"). Research shows that "[p]oor and low-income women make up the majority of U.S. abortion patients," so it is these individuals who are most likely to bear the cost of "logistical hurdles" when seeking abortion care. *See* Herminia Palacio, *Over the Precipice Into a Post-Roe World—A Look at Abortion Rights and Access in the United States*, 112 Am. J. Pub. Health 1273, 1274 (2022). Moreover, because health care facilities that offer abortion services, including abortion clinics, "are often the only local providers of

low-cost prenatal care, birth control, cancer screening, infertility treatment, gynecological care, or adoption services," Taylor K. Kelly, *Silencing the Lambs: Restricting the First Amendment Rights of Abortion Clinic Protestors in Madsen v. Women's Health Center*, 68 S. Cal. L. Rev. 427, 437 (1995), maintaining unimpeded access to these facilities is especially critical in many communities.

In short, States and municipalities have a strong interest in "protect[ing] those who wish to enter health care facilities" by enacting buffer zone laws. *Hill*, 530 U.S. at 729-30. Accordingly, the District Court correctly held that the Ordinance serves a significant governmental interest. Appx14-15 (Opinion).

## II.    THE CITY'S ORDINANCE IS NARROWLY TAILORED.

The Supreme Court has made clear that content-neutral clinic buffer zone laws are valid "time, place, and manner regulation[s]" so long as the laws are "'narrowly tailored to serve a significant governmental interest.'" *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 796); *see also Turco*, 935 F.3d at 162. To be narrowly tailored, the law "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 799). That inquiry turns in large measure on whether the government "considered alternative means of restricting speech around the clinic," and whether it "reasonably rejected them or found them to be ineffective." *Turco*, 935 F.3d at 169, 170; *see also McCullen*, 573 U.S. at 467 ("[T]he government must

demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests."). The law, however, "'need not be the least restrictive or least intrusive means'" of serving the State's interests. *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 798).

Here, precedent and the trial record both demonstrate that the Ordinance was narrowly tailored. The Supreme Court and this Court have long held that alternatives to buffer zones may not be adequate to protect public safety at health care facilities. And the trial record in this case bears that out. As the District Court correctly found, the City considered numerous alternative means of bringing order, but those measures would have been ineffective in ensuring the health and safety of those individuals seeking reproductive health care services. Appx3-6 (Opinion). That conclusion is consistent with the Supreme Court's decisions in *Hill* and *McCullen*, and with this Court's precedents.

A.    <u>Precedent Makes Clear That Proposed Alternatives to Buffer Zones May Be Inadequate to Protect Public Safety.</u>

The *amici* States, as law enforcers, are acutely aware that alternatives to health care facility buffer zones will often fall short of ensuring unimpeded access to health care facilities. The Supreme Court and this Court's precedents recognize as much: they make clear that alternatives to buffer zones may not always adequately protect public safety on sidewalks outside of health care facilities.

In *Hill*, for example, the Supreme Court explained that existing legal rules that shield patients from "physical harassment" may not adequately protect public safety where patients are regularly subject to "close physical approaches by demonstrators" outside of health care facilities. 530 U.S. at 729. The Court noted the "great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement" by a protester outside a clinic. *Id.* "Such individualized characterization of each individual movement," *Hill* explained, "is often difficult to make accurately." *Id.* As the Court held, a "bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." *Id.* In other words, the Court made clear that alternatives such as stronger enforcement of existing anti-harassment rules may not be adequate to protect public safety or First Amendment rights on the public sidewalk outside of health care facilities.

This Court made precisely the same point the last time this case came before it: that alternatives to buffer zones may be inadequate. *Turco*, 935 F.3d at 163, 165. After canvassing the summary judgment record, this Court concluded that the "testimony of the various stakeholders when properly viewed in the light most favorable to the City demonstrated that the City considered alternative[s]," and held

12

that a fact-finder "could find that financial restraints and fear of reprisal prevented these measures from being effective." *Id.* at 169. As the panel explained, the fact-finder could find "it was not feasible to permanently provide a significantly increased police presence at the clinic" based on testimony from the former Chief of Police. *Id.* at 167. The Court explained that the testimony of other city officials could also establish that the City "had attempted to increase police presence at the clinic on a volunteer basis," but was unable to do so; that the City regularly dispatched "on-duty officers" to the clinic, but "hostile protests would resume as soon as the officers left"; and that the City "encouraged the clinic to seek an injunction or file criminal complaints," but "those efforts were hampered because the clinic escorts feared for their safety" given "the threat of retaliation from the hostile protesters." *Id.* at 168. And the Court noted that testimony could support the inference that individual complaints or injunctions would be inadequate because escorts "fear[ed] ... reprisals." *Id.* at 169.

In other words, this Court has already held as a matter of law that the District Court could reach the factual conclusion it reached here—namely, that the City had adequately considered alternatives and had reasonably rejected those alternatives as "ineffective." *Id.* at 167. As this Court made clear in *Turco* (and reaffirmed in *Bruni II*), the government's consideration of alternatives may be adequate—and rejection of those alternatives reasonable—"even if [the government] 'has not prosecuted any

13

protestors for activities taking place on the sidewalk and did not seek injunctive relief against individuals whose conduct was the impetus for the Ordinance.'" *Bruni II*, 941 F.3d at 91 (quoting *Turco*, 935 F.3d at 167).

Other decisions from this Court are in accord. In *Bruni II*, for example, this Court held that Pittsburgh had reasonably concluded that other "less burdensome alternatives" to a "fixed buffer zone" were "unsuccessful in meeting the [City's] legitimate interests." 941 F.3d at 90. These alternatives included "an overtime police detail," which was cost-prohibitive; "incident-based response by the police," which ultimately "proved unsuccessful in preventing or deterring aggressive incidents and congestion;" and reliance on criminal laws, which the police found "inadequate to address the problem of protestors following patients and obstructing their way to the clinic." *Id.* at 90-91. Likewise, in *Reilly v. City of Harrisburg*, this Court held that Harrisburg had reasonably determined alternatives to a buffer zone would not adequately meet the City's interests. 790 F. App'x 468, 477-78 (3d Cir. 2019). This Court pointed to testimony that "existing criminal laws ... were insufficient to keep protests under control before the Ordinance's enactment," finding that the City could not "expend police resources to enforce these laws." *Id.* at 477.

The experience of municipalities in the *amici* States also reinforces that other alternatives may not successfully address public safety concerns while protecting the First Amendment interests at stake. For example, the City of Allentown attempted

to use its event permitting scheme to address unruly protestors outside of health care facilities. *See Arietta v. City of Allentown*, No. 04-226, 2004 WL 1774623, at \*1-3 (E.D. Pa. Aug. 9, 2004). In 2004, eight protestors filed suit against the city, mayor, police chief, and police department for issuing summons charging the protestors with loitering, trespassing, and protesting without permits. *Id.* at \*1. The court enjoined defendants from enforcing the permitting ordinance against the individual plaintiffs and upheld plaintiffs' First Amendment challenge. *Id.* at \*12-13. Allentown's efforts indicate that enforcing permitting schemes, loitering laws, or trespassing ordinances may not be the most effective means of protecting patients and staff members while simultaneously ensuring that protestors' First Amendment rights are protected.

Thus, because the proposed alternatives to buffer zones may not adequately protect public safety, a wealth of precedent confirms that States and municipalities have latitude to enact buffer zone laws where the facts on the ground warrant it.

B.    <u>The Trial Record in This Case Confirms That Other Alternatives To Buffer Zones Would Not Have Been Effective.</u>

As noted, this Court already made clear in its prior decision in this case that the record at summary judgment was sufficient for a fact-finder to conclude that "the City considered alternative means of restricting speech around the clinic," and that "financial restraints and fear of reprisal prevented these measures from being effective." *Turco*, 935 F.3d at 169. The trial record and District Court's meticulous findings of fact only further reinforce that conclusion.

15

As the District Court found, the "testimony from City officials credibly showed" that the City had attempted to increase the police presence at the clinic. Appx19 (Opinion); *see also* Appx3-4 (Opinion); Appx168-174 (trial testimony from President of the Englewood City Council Lynn Algrant recounting discussions with City Manager Timothy Dacey and then-Chief of Police Arthur O'Keefe about ways to increase police presence); Appx609 (police "dr[ove] by the site more frequently and stopp[ed] to get out of the car"). The City, however, was unable to permanently position an officer at the clinic because of significant resource constraints. Appx3-4 (Opinion); Appx19 (Opinion); *Turco*, 935 F.3d at 167; Appx169-170 (Algrant trial testimony). "[O]fficials concluded that it was financially prohibitive, was contrary to the City's policy against providing off-duty police officers to private businesses without reimbursement, and would negatively impact the City's ability to address crime and rebuild after Hurricane Sandy." Appx4 (Opinion); Appx173-177 (Algrant trial testimony regarding overtime costs, other projects straining the budget, staffing shortfalls, and the need to address violent crime); Appx240, 256-258 (Dacey trial testimony). The City also tried to hire volunteer off-duty police officers, but those officers "did not want th[at] particular work." Appx3 (Opinion); *see also* Appx170 (Algrant trial testimony); Appx238 (Dacey trial testimony). And the City posted the opportunity to neighboring police departments—with little success. Appx3 (Opinion); *see also* Appx170 (Algrant trial testimony).

The City also arranged for "patrol cars to go by the clinic more often on Saturday mornings when the ... protestors would be there, and either change or speed up the route to create more of a presence." Appx3 (Opinion); *see* Appx171 (Algrant trial testimony); Appx537 (PSUF ¶ 53). The City quickly found, however, that any benefits to that approach were fleeting: as police officers would drive by, protestors "would become temporarily peaceful," but "hostile protests resumed immediately after officers left." Appx4 (Opinion); *see* Appx172-173 (Algrant trial testimony); Appx239-240 (Dacey trial testimony); Appx537 (PSUF ¶ 57).

Moreover, the City considered pursuing criminal enforcement and seeking injunctions against certain protestors, and also encouraged volunteer escorts to file criminal complaints. Appx5 (Opinion); Appx184 (Algrant trial testimony); Appx247 (Dacey trial testimony). But the escorts, patients, companions, and clinic staff "felt unsafe" reporting harassment at the clinic, because they feared retaliation by the protestors. Appx5-6 (Opinion); *see* Appx184-185 (Algrant trial testimony); Appx247 (Dacey trial testimony); *see also Turco*, 935 F.3d at 168-69. Indeed, protestors outside the clinic sometimes targeted escorts personally, posting photos and videos of them online. *See* Appx6 (Opinion); Appx247 (Dacey trial testimony); Appx316-317 (Gray trial testimony). And escorts reported being "physically assaulted" or "harass[ed]" by protestors. Appx318 (Gray trial testimony). Clinic escorts "were also reluctant to file complaints because the subsequent court

17

proceedings required them to attend multiple hearings, take off work, and potentially explain to their employer that they volunteered at an abortion clinic." Appx6 (Opinion); *see* Appx402 (Long trial testimony). Those concerns—particularly the threat of retaliation—meant that many clinic escorts were unwilling to file complaints, especially because New Jersey law does not allow complainants to file anonymously. Appx5-6 (Opinion); *see* Appx247 (Dacey trial testimony).[1]

Turco's response falls flat. Turco argues that *some* victims and witnesses were willing to file complaints, which (her brief suggests) means that this was a sufficient alternative. *See* Appellant's Br. 14, 46. But the fact that a small group of individuals were willing to take on the risk of retaliation and harassment that filing a complaint brings hardly undermines the District Court's well-supported fact finding that many other patients, escorts, companions, and staff would be deterred. Appx5-6 (Opinion). Moreover, an alternative solution that requires individuals to risk that retaliation and harassment simply by seeking to protect their access to health care is no alternative at all, but a Hobson's choice between two undesirable options. *Cf. Hughes v. Twenty-*

---

[1] In 2019, New Jersey amended its Address Confidentiality Program Act to allow certain reproductive health service patients and providers to "establish new addresses to prevent their assailants or other individuals from finding them." N.J. Stat. Ann. § 47:4-2. Clinic escorts and patients can therefore file complaints without disclosing their addresses. N.J. Stat. Ann. § 47:4-4. However, because complainants must still disclose their names, patients and clinic personnel are still likely to be wary of filing, as protestors may still be able to learn their complainant's address online. Indeed, even when clinic escorts could file a complaint using their clinic's address, many feared filing a complaint. *See* Appx6 (Opinion).

*First Century Fox, Inc.*, 304 F. Supp. 3d 429, 448 (S.D.N.Y. 2018) (explaining, in Title VII Context, that formally filing a complaint "is not always" available because the complainant could face retaliation and harassment). And finally, even if a few individuals may have been willing to file, case-by-case injunctions would not prevent harassment where named protestors could find others to take their place. *Cf. New York ex rel. Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996). Given the powerful governmental interest in protecting access to health care, this alleged alternative falls short.

Finally, in addition to increasing the police presence at the clinic, arranging for patrol cars to drive by, and encouraging patients, escorts, companions, and staff to file complaints, the City attempted to increase its enforcement of other statutes and ordinances. Among other things, the City attempted to more strictly enforce noise ordinances and parking regulations, and it considered possible zoning changes. Appx237 (Dacey trial testimony); Appx537-538 (PSUF ¶¶ 54-59); Appx605-606. But none of these enforcement efforts "prevent[ed] aggressive and violent protestors from coming to the site." Appx605; *see* Appx537-538 (PSUF ¶¶ 54-59).

All of this evidence belies Turco's claim that the City neglected to "seriously consider[] and reasonably reject[] different methods that other jurisdictions have found effective." Appellant's Br. 39 (quoting *Bruni I*, 824 F.3d at 371). Notwithstanding Turco's argument to the contrary, Appellant's Br. 38, it is irrelevant

whether the City "prosecute[d] any protestors for activities taking place on the sidewalk" or sought "injunctive relief against individuals whose conduct was the impetus for the Ordinance." *Turco*, 935 F.3d at 167; *Bruni II*, 941 F.3d at 91. What matters is whether the City "attempted" or "had considered alternative means of bringing order to the sidewalk," and whether the City has "proffered reasonable explanations for why those and other means were ineffective." *Turco*, 935 F.3d at 167. The record evidence at trial and the District Court's factual findings make clear that the answer to both questions is yes.

## C.      Nothing in *McCullen* Requires a Different Result.

In rejecting Turco's challenge to the Ordinance, the District Court carefully adhered to this Court's analysis in the prior appeal in this case, and properly situated the Ordinance in relation to two key Supreme Court decisions: *Hill* and *McCullen*. Both decisions applied the standard reserved for content-neutral speech restrictions, but reached different results in light of the particular facts of each case. In *Hill*, the Court upheld a law that prohibited individuals from knowingly approaching within eight feet of a person entering a health care facility to protest, counsel, or distribute literature, unless the person consented. In *McCullen*, the Court struck down a much more burdensome law that created a thirty-five-foot buffer zone outside of abortion clinics. The District Court correctly concluded, much as this Court did in *Turco*, that

the Ordinance was far more similar to the law upheld in *Hill*, and that it was plainly distinguishable from the one invalidated in *McCullen*. Appx16-18 (Opinion).

Turco's main argument on appeal is that *McCullen*, not *Hill*, controls. *See* Br. 33. That argument, however, ignores the "two very important ways" in which this case differs from *McCullen*. *Turco*, 935 F.3d at 165.

*First*, as the District Court correctly recognized, the laws at issue here and in *McCullen* impose entirely different burdens. *See* Appx16-17 (Opinion). The scope of the burden can make a difference: "a less demanding inquiry is called for where the burden on speech is not significant—whether due to a restriction's scope [or] the size of the speech-free zone." *Bruni II*, 941 F.3d at 89. In this respect, the provision in *McCullen* and this Ordinance could not be more different: the former carved out a thirty-five foot buffer zone, but the Ordinance's buffer zone is only eight feet.

As this Court already highlighted in *Turco*, "[t]his is a substantial distinction." 935 F.3d at 163; *see* Appx16 (Opinion). The thirty-five foot buffer zone in *McCullen* imposed a significant burden on sidewalk counselors' ability to convey any message, preventing them from engaging patients in respectful conversation. 573 U.S. at 487-88. Here, by contrast, "Plaintiff is still able to meet patients" anywhere outside the eight-foot buffer zone and engage them in conversation. Appx15 (Opinion). As the District Court found, Turco is still able to engage in sidewalk counseling even with a small buffer zone. Appx12 (Opinion); *see* Appx 538-539 (PSUF ¶¶ 63-64) (Turco

21

admitting "she has been able to talk to patients on some kind of regular basis both before and after adoption of the Buffer Zone Ordinance"); Appx135-136 (Turco adding that she can generally traverse the buffer zones without obstruction); Appx 117-119 (Turco testifying that she engages in counseling by meeting patients a considerable distance away from the entrance to the clinic). And other sidewalk counselors have indicated that they "[weren't] bothered by the new buffer zone" whatsoever. Appx469 (testimony of Rosemary Garrett). The District Court thus reasonably concluded that "any burden on Plaintiff's speech" is "not substantial" when compared to the buffer zone in *McCullen*. Appx18 (Opinion).

*Second*, the record evidence of the alternatives Massachusetts considered was far weaker than the evidence here. In *McCullen*, the Supreme Court found that Massachusetts "ha[d] available to it a variety of approaches that appear capable of serving its interests," but that the State offered little evidence demonstrating that it considered, for example, initiating prosecutions or seeking injunctions. *McCullen*, 573 U.S. at 494-95. By contrast, the record here "credibly showed" that the City had considered these and other options, but identified "problems that would render all of the *McCullen* alternatives less effective." Appx19 (Opinion); *see supra* at 15-20. There is thus a clear "difference between the presence of demonstrable alternatives in *McCullen* and the evidence on this record that explains why less restrictive means were not likely to serve the City's interest here." *Turco*, 935 F.3d at 163.

In light of these important differences, the more apt comparison is to *Hill*, not *McCullen*. Appx17 (Opinion). The statute in *Hill* operated slightly differently than the Ordinance, as it created an eight-foot floating buffer zone between speakers and passersby that applied anywhere within 100 feet of the clinic's entrance. *Id.* But both the law in *Hill* and the Ordinance impose minimal burdens on protected speech and leave open ample avenues for sidewalk counselors to convey their message. In *Hill*, the Court held the eight-foot floating buffer zone did not greatly affect such sidewalk counselors, who were still able to relay a message to willing listeners. As the Court rightly explained: "This 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" 530 U.S. at 726-27. In fact, the *Hill* Court noted that the buffer zone might ultimately *help* sidewalk counselors by requiring loud, aggressive protestors to moderate their conduct. *Id.* at 727.

The Court's reasoning in *Hill* applies straightforwardly to the eight-foot buffer zone created by the Ordinance. As this Court put the point in this very case: "Given the Court's analysis in *Hill*, we simply cannot conclude that the eight-foot buffer zones established under the Ordinance posed a severe burden on speech." *Turco*, 935 F.3d at 167. And on remand and after a bench trial, the District Court agreed: "the burden on Plaintiff's speech is not substantial because the overall impact of the Ordinance on Plaintiff's ministry has been relatively small." Appx15 (Opinion). Indeed, the District Court found that "the Ordinance may have given Plaintiff more

opportunities to engage patients by decreasing the size and aggressiveness of the Bread of Life group." Appx15 (Opinion); *see also, e.g.*, Appx13 (Opinion) (finding that the other protestors "negatively impacted [Turco's] ability to communicate with patients, as they cause patients to run into the clinic"). Thus, just as in *Hill*, the buffer zone leaves open ample alternative channels for speech.

If anything, the Ordinance imposes a *lesser* burden on speech than *Hill*. The law in *Hill* did not allow any sidewalk counselors to approach within eight feet of patients anywhere inside a one-hundred foot radius of the clinic without the patient's consent. The Ordinance, by contrast, permits sidewalk counselors to engage patients in close conversation—without any gap—*anywhere* outside of the eight-foot buffer zones. As the District Court noted, the "*Hill* plaintiffs were unable to do this within 100 feet of health care facilities." Appx18 (Opinion). The Court's decision in *Hill* thus strongly supports the conclusion that this Ordinance is narrowly tailored.

## III.   THE CITY'S ORDINANCE IS NOT FACIALLY OVERBROAD.

Finally, the District Court also correctly rejected Turco's facial overbreadth challenge to the Ordinance. Appx21-22 (Opinion); *see* Appellant's Br. 48-53. A statute is impermissibly overbroad only when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). "Invalidation for overbreadth is strong medicine that is not to be casually employed." *United States v.*

*Williams*, 553 U.S. 285, 293 (2008) (internal quotation marks omitted). Turco cannot justify the strong medicine of facial invalidation because her arguments are virtually identical to those considered and rejected in *Hill*.

Turco's first argument—that the Ordinance is overbroad because it applies beyond the MMA clinic, Appellant's Br. 49—is squarely foreclosed by *Hill*. *Hill* held that "[t]he fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance. What is important is that all persons entering or leaving health care facilities share the interests served by the statute." 530 U.S. at 730-31. In fact, as *Hill* explained, "the comprehensiveness of the statute" in this context "is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." *Id.* at 731. This Court has since echoed *Hill*'s overbreadth holding, both in this case and in *Bruni II*. *See Turco*, 935 F.3d at 171; *Bruni II*, 941 F.3d at 92. The same conclusion applies here: persons entering the facilities covered by the Ordinance share a common interest in avoiding aggressive and confrontational protests. The Ordinance's coverage is appropriate in light of the policy justifications for its enactment.

Turco's second argument—that the Ordinance is overbroad because it "bans" all speech within the designated zones, Appellant's Br. 51-52—is also foreclosed by *Hill*. The Court's decision in *Hill* rejected a virtually identical argument, finding that eight-foot buffer did not amount to a "ban," but "merely regulates the places where

communications may occur." 530 U.S. at 731. The Ordinance here similarly enables sidewalk counselors and protestors to continue engaging in speech so long as they are in areas outside of the tailored eight-foot zones.

The Ordinance's sweep is both modest and legitimate: it regulates the places in which interactions may occur in order to protect public safety and health care access at the covered health care facilities, but without interfering with First Amendment activities. Turco has failed to sustain her heavy burden of showing that the Ordinance, when judged in relation to that legitimate sweep, is unconstitutional in a substantial number of its applications. *See Stevens*, 559 U.S. at 473. The District Court therefore correctly rejected her overbreadth claim.

## **CONCLUSION**

This Court should affirm the District Court's judgment.

Respectfully Submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:    /s/ Amanda Morejón
Amanda I. Morejón
Deputy Attorney General

Dated: January 12, 2023

JOSH SHAPIRO
*Attorney General of Pennsylvania*
16th Fl., Strawberry Sq.
Harrisburg, PA 17120

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 N. French Street
Wilmington, DE 19801

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

Pursuant to Local Rule 28.3(d), I certify that I am an attorney in good standing

of the bar of the Third Circuit.

/s/ Amanda Morejón
Amanda I. Morejón
Deputy Attorney General

Dated: January 12, 2023

## CERTIFICATION OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Microsoft Word 2019, in Times New Roman, 14 point, type style. I further certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 6,227 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I certify that the text of the paper copies of this brief and the text of the PDF version of this brief filed electronically with the Court today are identical, pursuant to Local Rule 31.1(c). I further certify that prior to electronically filing this brief with the Court today it was scanned by McAfee VirusScan Enterprise 8.8, a virus detection software, and found to be free from computer viruses.

/s/ Amanda Morejon
Amanda I. Morejón
Deputy Attorney General

Dated: January 12, 2023

## <u>CERTIFICATION OF SERVICE</u>

On January 12, 2023, the undersigned caused this brief to be filed with the

Clerk of the United States Court of Appeals for the Third Circuit via electronic filing.

I further certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system with hardcopies to be sent via

overnight mail when directed by the Court.

/s/ Amanda Morejon
Amanda I. Morejón
Deputy Attorney General

Dated: January 12, 2023