# United States Court of Appeals

*for the*

# Third Circuit

Case No. 22-2647

JERYL TURCO,

*Appellant,*

– v. –

CITY OF ENGLEWOOD, NEW JERSEY,

*Appellee.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY IN CASE NO. 2-15-CV-03008
HONORABLE SUSAN D. WIGENTON, U.S. DISTRICT JUDGE

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

JAY ALAN SEKULOW**
JORDAN SEKULOW**
STUART J. ROTH*
AMERICAN CENTER FOR LAW
   AND JUSTICE
201 Maryland Avenue, N.E.
Washington, D.C. 20002
Tel.: 202-546-8890

EDWARD L. WHITE III*
AMERICAN CENTER FOR LAW
   AND JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007

* Admitted to Third Circuit Bar
** Not admitted in this jurisdiction

FRANCIS J. MANION*
   *Lead Counsel*
GEOFFREY R. SURTEES**
AMERICAN CENTER FOR LAW
   AND JUSTICE
6375 New Hope Road
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

Appellant Jeryl Turco is not a corporate entity and therefore does not have responsive information to disclose under Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Rule 26.1.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ..............................................................................1

ARGUMENT IN REPLY ....................................................................2

    I.    Issues on Remand and the Law of the Case ...........................2

    II.    The Ordinance Fails Narrow Tailoring .................................4

        A.    Interests of the City ....................................................4

        B.    The Ordinance is Overinclusive and thus not Narrowly
            Tailored ......................................................................6

        C.    The Ordinance Imposes an Especially Significant
            Burden ........................................................................9

        D.    Less Restrictive Means ..............................................14

            1.    Fear of Reprisal...............................................14

            2.    Financial Restraints ........................................16

            3.    Adoption of the Ordinance and its
    Implementation...................................................................18

    III.    The Law Fails Under the Overbreadth Doctrine.................20

    IV.    Constitutional Avoidance ...................................................23

CONCLUSION ...............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ams. for Prosperity Found. v. Bonta,*
141 S. Ct. 2373 (2021) ..........................................................................13

*Bruni v. City of Pittsburgh,*
824 F.3d 353 (3d Cir. 2016) ................................................... 3, 8, 9, 13

*Bruni v. City of Pittsburgh,*
941 F.3d 73 (3d Cir. 2019) ............................................................ *passim*

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
657 F.3d 936 (9th Cir. 2011) ...............................................................20

*Dobbs v. Jackson Women's Health Org.,*
142 S. Ct. 2228 (2022) ...........................................................................5

*Elrod v. Burns,*
427 U.S. 347 (1976) .............................................................................12

*Frisby v. Schultz,*
487 U.S. 474 (1988) .............................................................................20

*Hill v. Colorado,*
530 U.S. 703 (2000) ...................................................................... *passim*

*McCullen v. Coakley,*
573 U.S. 464 (2014) ...................................................................... *passim*

*NAACP v. Alabama,*
377 U.S. 288 (1964) .............................................................................23

*Price v. City of Chicago,*
915 F.3d 1107 (7th Cir. 2019) ...............................................................6

*Reynolds v. Middleton,*
779 F.3d 222 (4th Cir. 2015) .................................................................8

*Sisters For Life, Inc. v. Louisville-Jefferson Cty.,*
56 F.4th 400 (6th Cir. 2022) .......................................................... 9, 14

*Thompson v. W. States Med. Cir.,*
535 U.S. 357 (2002) ...............................................................................5

*Turco v. City of Englewood*,
935 F.3d 155 (3d Cir. 2019) ......................................................... *passim*

*United States v. Edge Broad. Co.*,
509 U.S. 418 (1993) ........................................................................5

*United States v. Stevens*,
559 U.S. 460 (2010) ......................................................................25

## Statutes & Other Authorities:

N.J.S.A. § 39:4-34 .......................................................................11

N.J.S.A. § 47:4-1 .........................................................................16

N.J.S.A. § 47:4-3 .........................................................................16

# INTRODUCTION

The City's responsive brief fails to support the district court's conclusions of law that the Ordinance at issue satisfies the demands of narrow tailoring and overbreadth. Indeed, much of the brief is a work of misdirection. It discusses at length the issues on remand and the law of the case, despite Turco not challenging any of those. It evades Turco's narrow tailoring/overinclusiveness argument by wrongly twisting it into one about overbreadth and then claiming Turco has conflated the two. The City claims Turco is not burdened in the exercise of her free speech rights but ignores the Supreme Court's clear pronouncement that "when the government makes it more difficult" to engage in one-on-one communication and leafletting, "it imposes an especially significant First Amendment burden." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014). The City whistles past the excuses the Supreme Court rejected in *McCullen* as to why the state could not pursue alternative measures that do not suppress speech by defending other excuses. It waves off the district court's clearly erroneous finding of fact that "Plaintiff has not submitted evidence of its application at any transitional facilities," Appx21, despite a joint statement of undisputed fact to the contrary. CITE Finally, in a last-ditch attempt to save the Ordinance, the City would have this Court construe it in a way contrary to how City officials interpreted it and contrary to the law.

In short, the arguments proffered by the City do not disturb what Turco argued in her opening brief: the Ordinance is not narrowly tailored and the district court erred in holding that it is. This Court should reverse the district court's order and judgment.

## ARGUMENT IN REPLY

## I.    Issues on Remand and the Law of the Case

The question before this Court is whether, having complied with the mandate in *Turco v. City of Englewood*, 935 F.3d 155, 163 (3d Cir. 2019) (*Turco I*), by resolving material factual disputes, the district court correctly articulated and applied the relevant First Amendment standard to those facts. As Turco has explained in her opening brief, and explains in more detail *infra*, the answer to that question is no.

Contrary to the City's claims, Turco does not reargue this Court's ruling in *Turco I*. She does not dispute what the City states this Court ordered on remand in *Turco I*. She acknowledges that the panel in this appeal is not free to reverse *Turco I*.

As Turco has pointed out—repeating what this Court itself noted in *Turco I*—save for the size of the zones imposed by the Ordinance, the Ordinance is identical to the one struck down in *McCullen v. Coakley*, 573 U.S. 464 (2014) "in all material respects." *Turco I*, 935 F.3d at 163. *Turco I* did not hold as a matter of law that the zones imposed by the Ordinance are permissible because they are smaller than the zones at issue in *McCullen*. The issue is whether the zones are consistent with the

demands of narrow tailoring as articulated by the Supreme Court in *McCullen* and this Court's precedents. *See, e.g.*, *Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) (*Bruni I*) and *Bruni v. City of Pittsburgh*, 941 F.3d 73, 79 (3d Cir. 2019) (*Bruni II*). While the size of the zones in this case is factually different from those in *McCullen*, the question is whether that factual distinction ultimately creates a legal distinction. It does not.

With respect to *Hill v. Colorado*, 530 U.S. 703 (2000), Turco does not dispute that *Turco I* applied that decision when addressing the issues of burden and overbreadth in ruling that neither side was entitled to judgment as a matter of law and that a trial on the merits was necessary. The issue is whether, with a bench trial having been concluded, application of *Hill* ineluctably leads to a decision in favor of the City. *Turco I* did not hold that this case was more akin to *Hill* than *McCullen*. To repeat, *Turco I* correctly observed that, except for the size of the zones imposed, the Ordnance is all but identical to the law unanimously held unconstitutional in *McCullen*. While *Hill* observed that "signs, pictures, and voice itself can cross an 8-foot gap with ease" (Def.Br.16), Turco does not share her message by way of signs or pictures displayed at a distance. And while in *Hill*, the Court suggested that voice may be able to cross an 8-foot distance, that doesn't ring true **in this case**, as Turco has explained. (Pl.Br.29–32.)

Concerning overbreadth, *Turco I* did not hold that the Ordinance satisfies overbreadth as a matter of law, as the City implies. Rather, *Turco I* held that because the record was "devoid of any factual development concerning the 'legitimate sweep' of the buffer zones," summary judgment was inappropriate. 935 F.3d at 172. As Turco has explained, and will elaborate further *infra*, Sec. III, facts adduced at trial demonstrate the wide and illegitimate sweep of the Ordinance.

Finally, Turco readily acknowledges that *Bruni II* relied upon *Turco I* in holding that Pittsburgh's buffer zone law satisfied narrow tailoring. (Def.Br.17–18.) That holding, however, must be understood in the context of the Court's interpretation of the Pittsburgh law **not** to include the activities of sidewalk counselors.

## II.    The Ordinance Fails Narrow Tailoring

### A.    Interests of the City

Turco does not "belittle" the government interests served by the zones. (Def.Br.25.) Turco has acknowledged—consistent with *McCullen* and *Turco I*— that unimpeded access to healthcare facilities can constitute a legitimate governmental interest. (Pl.Br.22.) What Turco argued in her opening brief is that the City came forward with no legitimate interests served by creating buffer zones around *transitional* facilities. (Pl.Br.22–23.) And with respect to health care facilities themselves, while the City presented evidence of this interest outside the abortion

clinic at 40 Engle Street ("MMA"), it does not explain, under narrow tailoring, why that interest necessitates buffer zones outside *all* health care facilities within the City. (Pl.Br.22-23) *See infra*, Sec. II.A. The City nowhere attempts to justify City Manager Timothy Dacey's remark that the Ordinance was intended to reach all health care and transitional facilities because "protests can pop up any day for any reason anywhere." Appx251 (Dacey, 179:5–6). Nor does the City really explain City Council President Lynne Algrant's admission that it would seem "very narrowly focused" if the Ordinance singled out "an abortion clinic and the protestors that it would attract." Appx196 (Algrant, 124:1–7).[1]

Regarding governmental interests and *Hill*, Turco would have been remiss in not pointing out what a majority of the Supreme Court observed just last term with respect to that decision: an example of how the Supreme Court's abortion decisions have "distorted First Amendment doctrines." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275–76 (2022). While comments in a dissent are nothing more than that, as the City points out, these were **not** the words of a dissent (Def.Br.24), but of the majority. And though the Court in *Dobbs* did not overturn

---

[1] The City states that Turco's citation to *Thompson v. W. States Med. Cir.*, 535 U.S. 357,371 (2002) is misplaced because the Court was pointing to a commercial speech analysis. (Def.Br.20.) But if the "Constitution . . . affords a lesser protection to commercial speech than to other constitutionally guaranteed expression," *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993), then Turco's speech should be protected at least as much as commercial speech.

*Hill*, the aspersion cast by the Court on *Hill* should not go blithely ignored. As Justice Kennedy wrote in dissent in *Hill*, as cited by the *Dobbs* Court: "The Court's holding contradicts more than a half century of well-established First Amendment principles." *Hill*, 530 U.S. at 765 (Kennedy, J., dissenting). Even before *Dobbs*, this Court recognized in *Bruni II* that "the content neutrality holding of *Hill* may be 'hard to reconcile with both *McCullen* and *Reed*." 941 F.3d at 87 n.17 (quoting *Price v. City of Chicago*, 915 F.3d 1107, 1109 (7th Cir. 2019)).

Regarding *McCullen*, Turco agrees that the majority opinion held that the law was content-neutral. The problem with the district court's decision, however, is its reliance on *Hill* respecting confrontation and ease of enforcement where *McCullen* used a different analysis. (Pl.Br.23–24.) While *Hill* has yet to be formally overturned, in light of the Supreme Court directly questioning the legitimacy of *Hill*, any contradictions between *Hill* and *McCullen* should be resolved by looking to the later decision, i.e., *McCullen*, especially where this Court has observed that the Ordinance is materially identical to the law at issue in that case (excepting the size of the zones imposed).

**B.      The Ordinance is Overinclusive and thus not Narrowly Tailored**

Before reaching the issues of burden and less restrictive measures (and the City's excuses for not pursuing them), the issue of the Ordinance's overinclusiveness under narrow tailoring, i.e., **not overbreadth**, must first be addressed.

Instead of responding directly to Turco's overinclusiveness argument (Pl.Br.33–36), the City evades it entirely by claiming that Turco conflates *McCullen* with overbreadth. (Def.Br.47.) Wrong. The City is doing the conflating.

Turco argued in her opening brief, based squarely on *McCullen*, that the overinclusive nature of the Ordinance alone necessitates a ruling that the Ordinance lacks narrowly tailoring. As in this case, the record before the *McCullen* Court pertained "mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings." 573 U.S. at 493. As in this case, nothing in the record revealed that "individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access." *Id.* For these reasons, the Court held that, even if other, less restrictive approaches would have been ineffective in furthering the state's interests, the law was not narrowly tailored: "[f]or a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is **hardly a narrowly tailored solution**." *Id.* (emphasis added).

To be clear, as Turco previously pointed out, this ruling did not mean that the Massachusetts law failed or survived the petitioners' overbreadth challenge. (Pl.Br.49 n.6.) In fact, *McCullen* explicitly stated that "[b]ecause we find that the Act is not narrowly tailored, we need not consider whether the Act leaves open ample alternative channels of communication. **Nor need we consider petitioners'**

**overbreadth challenge**." 573 U.S. at 464, n.9; *see also Bruni I*, 824 F.3d at 374 (noting that *McCullen* addressed the breadth of the Massachusetts law "only in the context of its free speech analysis and discussion of the disconnect between the government interests at stake and the means through which it sought to vindicate those interests."); *Turco I*, 935 F.3d at 170.

The City's failure to respond to how the Ordinance is not overinclusive in the same way as the Massachusetts law struck down in *McCullen* is fatal. The City does not, and persuasively cannot, argue how the Ordinance, which creates buffer zones outside **all** health care and transitional facilities within the City—despite problems at only one locale for a few hours on one day of the week—is "a narrowly tailored solution." *McCullen*, 573 U.S. at 493.

As the Sixth Circuit recently held in a case establishing a ten-foot buffer zone outside **all** health care facilities in Louisville:

> Because the County may not "burden substantially more speech than is necessary" to further the County's order and access interests, *McCullen*, 573 U.S. at 486, and because the County has not made any showing that **all** medical facilities need this kind of regulation, the ordinance lacks any tailoring, to say nothing of narrow tailoring. "For a problem shown to arise only . . . at one clinic" authorizing buffer zones "at every" Louisville-Jefferson facility "is hardly a narrowly tailored solution." *Id*. at 493; *see, e.g.*, *Reynolds v. Middleton*, 779 F.3d 222, 231-32 (4th Cir. 2015).

*Sisters For Life, Inc. v. Louisville-Jefferson Cty.*, 56 F.4th 400, 405 (6th Cir. 2022) (emphasis in original).[2]

What the Sixth Circuit held in that case, based squarely on *McCullen*, holds true here. The City was not aware of any problems at any location other than MMA. Yet the City established buffer zones outside all health care and transitional facilities within the City. The Ordinance therefore "lacks **any tailoring**, to say nothing of narrow tailoring." *Id.* (emphasis added).

### C.    The Ordinance Imposes an Especially Significant Burden

The City's (and the district court's) analysis for measuring the burden the buffer zones impose on Turco's free speech activities fails at the starting gate. Both ignore, let alone apply, what the Supreme Court held in *McCullen*: "[w]hen the government makes it **more difficult** to engage in these modes of communication [i.e., one-on-one communication and leafletting], it imposes an **especially significant First Amendment burden**." *McCullen*, 573 U.S. 464, 488–89 (2014) (emphasis supplied). Though that standard was repeated in both *Bruni I*, 824 F.3d at 366–67, and *Turco I*, 935 F.3d at 172, the City says nothing about it.

Instead of confronting the clear facts revealing that the buffer zones make it "more difficult" for Turco to engage in her speech activities, the City spends pages

---

[2] The Sixth Circuit decision was decided after Turco filed her opening brief. Shortly after that decision was issued, undersigned counsel emailed a copy of that decision to the City—two weeks before its deadline to file its responsive brief.

arguing, based on the district court's findings of fact, that Turco can run around the zones to meet clients, speak with them exclusively outside the zones, and invite clients to speak with her outside the zones.[3] (Def.Br.27–32.) While Turco can and does do these things, that is not the issue. The issue is whether, in **forcing her** to do these things, under pain of criminal penalties, the Ordinance "makes it more difficult to engage" in leafletting and one-on-one conversation. The answer to that query, based on Turco's testimony, and even observations of the district court, is obvious.

The buffer zones, and the "obstacle course" they create, had a "big effect" on Turco's ability to engage in these two core protected speech activities. Appx98 (Turco, 26:14–19). With respect to handing out literature, Turco testified:

> I couldn't stand right by the girls . . . I'd have to go around. As soon as we hit the area where the buffer zone was, I would have to walk away and go around and into the street and it affected my ability to hand them things.

Appx98 (Turco, 16:19–24).

Concerning one-on-one communication, Turco testified:

> I can't stay by their side and talk to them like a normal person on a sidewalk. I have to – we can be having a conversation – and, again, we speak softly, we don't want to intimidate them, so we try and connect with them, develop a very, you know, quick relationship to let them know we can support them. And if I have to keep walking away from

---

[3] The City and the district court's emphasis on Turco's running is odd. Appx10, 11, 12, 16; Def.Br.8–9, 28, 31. When the government restricts the speech of all persons on a public sidewalk by way of buffer zones, it should not make any constitutional difference whether a free speech plaintiff is fortunate to have the physical ability to "run" around them.

them and – it affects my ability to – even the tone of voice because I am not right next to them, so I can't keep a soft tone of voice and be right next to them.

Appx99 (Turco, 27:7–15).

As the district court itself observed, "[t]he **difficulty** involved with navigating the buffer zones, and being forced to go out into the street, is compounded by the presence of cars, delivery trucks, and sometimes snow." Appx12 (emphasis supplied). The court also found that objects on the sidewalk "**add to the difficulty** of trying to communicate with patients." Appx12, n.7. In short, "the Ordinance has resulted in 'some obstruction' and 'some difficulty'" in Turco's ability to sidewalk counsel "**at least 50 percent of the time**." Appx12 (emphasis added).

While it may be true, as the City and the district court say, that Turco "can easily walk in the street" to sidestep the rectangular buffer zones, or "get into the area between the two rectangular zones by crossing Engle Street" (Def.Br.31), both of those activities are **illegal** under New Jersey law. *See* N.J.S.A. § 39:4-34 ("Where sidewalks are provided it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway."); *id*. ("pedestrians shall cross the roadway within a crosswalk or, in the absence of a crosswalk . . . at right angles to the roadway."). Suggesting that the buffer zones do not impose any burden on Turco because she can always violate state laws to try and reach her audience widely misses the mark of how a narrow tailoring analysis should be conducted.

In addition, while the City may wish to think that the "few seconds" Turco loses because of the buffer zones are "of little moment," that contradicts the testimony of Turco and the law. (Def.Br.29.) Turco testified that, with the buffer zones in place, she has "very little time to communicate," describing the extra "10 or 15 or 20 seconds" when the Ordinance was invalidated as "extra precious." Appx101 (Turco, 29:3–5). In fact, the seconds Turco loses, on account of the buffer zones, are the ability to communicate any final words just before the woman enters the clinic's front door. As Justice Scalia observed, "the most effective place, if not the only place," where sidewalk counseling "can occur, is outside the entrances to abortion facilities." *Hill*, 530 U.S. at 763 (Scalia, J., dissenting). Few statements of the Supreme Court are as frequently quoted as this from *Elrod v. Burns*: "The loss of First Amendment freedoms, for **even minimal periods of time**, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976) (emphasis supplied).

Indeed, prior to the buffer zones being created, Turco would be able to meet women being dropped off on the sidewalk immediately in front of the clinic entrance and "speak with them right in that area and even right in front of the door until they went into the clinic." Appx86 (Turco, 14:6–9). Sometimes, Turco would stand right by the front door itself. Appx86–87 (Turco, 14:23–15:1). As Turco has explained, while standing at the front door is something she cannot do under the Ordinance, it is something she could have done under the law challenged in *Hill*. 530 U.S. at 730

(suggesting that sidewalk counselors "might easily stand on the sidewalk at entrances" to hand out literature). The burden on Turco is clear.[4]

Finally, with respect to the size of the zones themselves, it simply is not true **in this case** that the 8-foot buffer zones create no impact on Turco's efforts to address her intended audience. In addition to what has just been said about the obstacle course that Turco must navigate, Turco testified that it is "very important" for her to use a "soft tone of voice" when counseling women and "to be right next to them." Appx99. It is "not always" the case that Turco could use "a conversational tone" when speaking eight feet away. Appx121 (Turco, 49:20-240).

As Turco explained, ignored by the City, *Bruni II* made clear that if Pittsburgh wanted to amend its ordinance banning protesting, etc. (construed by the Court **not** to include sidewalk counseling) to restrict "one-on-one conversations," it would have to satisfy the narrow tailoring demands as articulated in "*McCullen* and *Bruni I*." *Bruni II*, 941 F.3d at 95 n.22. As the Sixth Circuit recently observed:

> Once a buffer zone burdens speech, *McCullen* demands narrow tailoring. *Id.* at 489 (explaining that narrow tailoring takes effect "[w]hen the government makes it more difficult to engage in" speech). Subsequent cases confirm the point: **Narrow tailoring turns on whether a law sweeps more broadly than necessary, not on whether its yoke is heavy or light**. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384-85 (2021).

---

[4] The fact that Rosemary Garrett may choose to counsel MMA patients at a different location than Turco, "on the corner far away from the Clinic building" (Def.Br.30), is irrelevant as to whether the buffer zones, where Turco wishes to counsel, make it more difficult for Turco to do so.

*Sisters For Life, Inc.*, 56 F.4th at 407 (emphasis supplied).

There is no dispute that the Ordinance restricts Turco's speech. And, based on the record, there can be no serious dispute that those restrictions burden Turco's speech by making it "more difficult" for her to engage in core protected speech in a traditional public forum. The City's efforts to argue otherwise, and the district court's ruling to the contrary, are erroneous as a matter of law.

### D.    Less Restrictive Means

The City claims that the problems faced by the City were different from those faced by Massachusetts in *McCullen*. (Def.Br.34.) But what the City has described in its responsive brief as the governmental interests behind the Ordinance, i.e., ensuring safe and unobstructed to health care facilities, is exactly the same problem Massachusetts tried to meet when it created its buffer zone law. The difference between *McCullen* and this case is the excuses proffered by the City as to why it could not pursue alternatives to suppressing speech, such as the ones identified in *McCullen*. And those excuses—fear of reprisal and financial restraints—are unavailing as a matter of law.

### 1.    Fear of Reprisal

Turco does not dispute the testimony that clinic escorts were hesitant to file complaints against protestors for allegedly violating the law—even though some did so and even though escorts could use the address of the clinic. Appx6. The City

14

ignores, however, that its remedy for dealing with that hesitation was not only to silence the speech of those whose conduct created no problems for the City, i.e., sidewalk counselors such as Turco, but to create a law whose enforcement mechanism is exactly the same as laws involving more serious crimes allegedly taking place outside MMA, e.g., laws against harassment, etc. Many criminal laws, including the Ordinance, are most often enforced because a victim or witness is willing to step forward to file a complaint. The hesitancy of escorts and patients to do so regarding the Bread of Life protestors does not give the City a green light to adopt prophylactic measures against protected speech.

Regarding abortion providers, the testimony of City Manager Dacey that the City spoke with physicians about the possibility of an injunction, but that they were "leery" of doing so because of retribution, is simply not credible. (Def.Br.36.) The Parties' Statement of Undisputed Facts is clear that MMA physicians addressed the City Council, using their personal names, to complain about the Bread of Life protestors. (Pl.Br.45-46.) The City does not explain why MMA physicians would be so open in complaining about the protestors to the City Council but were "leery" in doing something about it by way of an injunction or a formal complaint filed with the police.

In addition, the City does not acknowledge, let alone respond to, the fact that when Dacey answered interrogatories on behalf of the City (the same year Turco

filed suit, in 2015), he nowhere indicated that the City considered pursuing an injunction as a way of dealing with the Bread of Life protestors. (Pl.Br.14.) Had the City or the clinic sought and obtained an injunction against the protestors, based on the voluminous records compiled by Ashley Gray, the conduct of the bad actors would have been enjoined and Turco permitted to speak. Targeted injunctions against bad actors are obviously a more narrowly tailored solution than silencing the speech of all law-abiding citizens. *See McCullen*, 573 U.S. at 492.

Regarding New Jersey's Address Confidentiality Program Act, N.J.S.A. § 47:4-1, et seq., the City states that "the statute helps escorts only if they need to use an anonymous address in the case of off-site harassment." (Def.Br.36.) Assuming that to be the case, in situations involving **on-site** harassment, escorts could use the clinic's address. Andrea Long testified that if she needed to file a complaint in her role as a clinic escort, "I can use the clinic's address." Appx404 (Long, 332:19-20.) While an escort's name may not be protected, as the City mentions, neither are the names of victims of "domestic violence, sexual assault, or stalking." N.J.S.A. § 47:4-3.

### 2.    Financial Restraints

The City claims the district court held it was sufficient that the City did not conduct a formal cost analysis regarding the City's ability to enforce laws on the books at MMA for three hours on one day of the week. (Def.Br.37.) That is exactly right. But the City does not mention why it did not conduct a formal cost analysis.

City Manager Dacey testified "it would contravene public policy" for the City to ensure that police officers keep the peace on the public sidewalk outside MMA. Appx257 (Dacey, 185:20–21). While schools, synagogues, and other entities may wish to hire off-duty police officers to provide additional security at their places of operation, it is a fundamental responsibility of the government, as Turco has explained (Pl.Br.42-43), to maintain the public peace, especially in traditional public forums. The City's decision to foist the duty on MMA for keeping the peace on the public sidewalk **outside** the clinic—which apparently chose not to hire additional security for itself—renders its financial restraints argument unavailing. The City cannot justify its excuse for a lack of manpower when Dacey testified that he "would not have considered placing them there" in the first place. Appx258 (Dacey, 186:5–8).

While it is true *McCullen* did not explicitly consider a limitation on manpower as part of its narrow tailoring analysis (Def.Br.38), it did consider other alternatives, such as injunctions, which necessarily require enforcement. Based on its lengthy discussion of the virtues of targeted injunctions, it is doubtful that the Supreme Court would have agreed with any argument that Massachusetts could not enforce such injunctions based on a lack of manpower.

If the City does not have the finances or manpower to police every law on the books, there is little logic to creating an additional law, i.e., the Ordinance, that

would also require enforcement. Moreover, as has been explained, the only locale where buffer zones would require enforcement, and only for a few hours on one day of the week, is 40 Engle Street.

### 3.    Adoption of the Ordinance and its Implementation

The City apparently takes issue with how the district court had previously calculated the area of the sidewalk off limits to Turco. (Def.Br.40.) However, based on the map of 40 Engle Street, copied into the trial opinion, Appx8, a mathematical calculation of the zones reveals far more expansive no-speech areas than the district court previously found. The area of the buffer zones outside the entrance **alone** is 195.21 total square feet—not 24 feet as the district court suggested.[5] In addition, there is no disputing the fact that at 40 Engle Street there are **two sets** of **three overlapping buffer zones**: one set outside the entrance, and one set outside the driveway, *Turco I*, 935 F.3d at 159; Appx8, both of which are off-limits to Turco and others similarly situated.

The City claims that this dissection of the public sidewalk into no-speech zones was the result of "thoughtful balancing of the interests of all involved." (Def.Br.41.) In support, the City quotes City Council President Algrant as testifying the zones were a way "to protect the employees and the patients of the clinic while

---

[5] The rectangular zone is 94.67 square feet (8' x 11' 10") and the area of each of the two arcs is 50.27 square feet ($\pi$ x 8' x 8' x 1/4).

still protecting the ability of the people to protest." (*Id.*) The critical problem with Algrant's balancing of interests is that sidewalk counseling, such as Turco's, was left out of the equation.

Turco is not a protestor, demonstrator, or picketer. Appx84 (Turco, 12:10–17). Like the sidewalk counselors in *McCullen*, Turco believes that the most effective way to interact with women approaching an abortion clinic is "to maintain a caring demeanor, a calm tone of voice, and direct eye contact." 573 U.S. at 473; Appx10. Sidewalk counselors believe that "confrontational methods such as shouting or brandishing signs . . . only serve to antagonize their intended audience." *Id.*; Appx10. While using bullhorns, holding signs, and yelling can all carry a message beyond 8 feet, "close, personal conversations . . . essential to 'sidewalk counseling'" cannot. *Id.* at 487.

Thus, notwithstanding the City's claim to the contrary, the City *did* choose the easy way out. (Def.Br.41.) In trying to eradicate the arguably unlawful conduct of the alleged bad actors, the City did not take into consideration the lawful speech activities of those such as Turco, activities that this Court has held are "entitled to the maximum protection afforded by the First Amendment." *Bruni II*, 941 F.3d at 85.

The City further claims that the reason the City did not later amend its Ordinance was that it was "generally quite successful." (Def.Br.49.) But the

"success" of the Ordinance in furthering the City's interests is not the measure of narrow tailoring. A ban on pamphleteering in a public park might be successful in reducing litter, but such a measure could not be described as being narrowly tailored. *McCullen* did not take into account whether the Massachusetts law was "successful" in meeting the state's interests. Indeed, *McCullen* specifically rejects ease of enforcement as a criterion in deciding whether a law that restricts speech is narrowly tailored. "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *McCullen*, 573 U.S. at 495.

## III.   The Law Fails Under the Overbreadth Doctrine

At the outset, and as discussed above, the City conflates (1) Turco's overinclusiveness argument, grounded squarely in *McCullen*, with (2) overbreadth. Turco **nowhere** relies on "*McCullen* in support of its overbreadth argument," as the City claims (Def.Br.47)—except to note that "[b]ecause the *McCullen* Court found that the law was not narrowly tailored, it did not need to consider the petitioners' overbreadth challenge." (Pl.Br.49 n.6.)

Second, Turco does **not** cite *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) or *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) in its overbreadth argument. Those cases are cited in Turco's overinclusiveness argument, which as discussed, is premised, not on overbreadth, but on *McCullen*'s ruling that "[f]or a problem shown to arise only once a week in

one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is **hardly a narrowly tailored solution**." *Id.* (emphasis added).

The City treats *Turco I* as having effectively ruled on the merits in favor of the City on overbreadth. It did not. As discussed, *Turco I* held that because the record was "devoid of any factual development concerning the 'legitimate sweep' of the buffer zones," summary judgment was inappropriate. 935 F.3d at 172.

Two factual developments on remand reveal that the Ordinance fails overbreadth. First, unlike in *Bruni II*, where Pittsburgh had only enforced its ordinance at "two facilities, both of which [had] suffered from violence and obstruction in the past," 941 F.3d at 91, it was a stipulated fact at trial in this case that "[p]ursuant to the Ordinance, and shortly after it was adopted in March 2014, city officials began marking out buffer zones in front of **covered facilities** throughout the City." Appx528-529 (PSUF #8) (emphasis added). The City does not explain—it cannot explain—the district court's clearly erroneous statement of fact that "Plaintiff has not submitted evidence of its application at any transitional facilities." Appx21. Under the Ordinance, transitional facilities are "covered facilities." The City's attempt to deflect this argument with the remark that, "plaintiff only points to a stipulation by the parties relating to the marking and posting at 'medical facilities,'" falls flat on its face. (Def.Br.49.)

Second, in countering Turco's argument that the Ordinance fails overbreadth, the City cites City Council President Algrant's testimony "that the City did not want protestors 'making it difficult for people to get in and out of the transitional facilities.'" (Def.Br.49.) What protestors? The City does not point to any portion of the record—because there is none—of protests taking place outside transitional facilities. Algrant's (and the City's) defense of including transitional facilities is based entirely on a hypothesis, a hypothesis without any factual basis. Even if creating buffer zones outside *all health care* facilities is permissible under *Hill*— despite being premised on the pure speculation that "protests can pop up any day for any reason anywhere," Appx251 (Dacey, 179:5–6)—banning speech outside all transitional facilities sweeps too far.

Third, and finally, the law in *Hill* applied "only to passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." 530 U.S. at 707. It did not, as here, apply to all protected speech. In *Hill*, a person could approach a woman accessing a health care facility to discuss the weather, sports, television, etc., whereas, here, a non-exempt person cannot enter and remain in one of the City's overlapping buffer zones and discuss *anything*— unless he or she falls within one of the Ordinance's narrow exemptions. In banning all categories of speech within the buffer zones (instead of prohibiting certain types of speech activities, as in *Hill*), the Ordinance "sweep[s] unnecessarily broadly and

thereby invade[s] the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964) (internal citations omitted).

As Turco has pointed out, this Court need not reach Plaintiff's overbreadth argument if it holds (as it should) that the Ordinance fails narrow tailoring. As explained, that is what the Court did in *McCullen*.

## IV.    Constitutional Avoidance

Turco does not urge this Court to adopt any narrowing construction of the Ordinance, as the City suggests. (Def.Br.52.) What Turco suggested in her opening brief is that the City could have adopted an Ordinance similar to the one at issue in *Bruni II*, as construed by this Court, as a way of satisfying its interests without squelching Turco's speech—whose conduct created no problems for the City. Such a legislative measure would have kept the Bread of Life group away from the entrance and driveway of MMA, while allowing the protected activities of sidewalk counselors, such as Turco, to remain protected. This would be a more narrowly tailored approach than categorically silencing the speech of all persons.

The City's argument that this Court can construe the Ordinance to mean that Turco can cross through the buffer zones to get to the other side is meritless for three reasons. First, assuming that Turco would not be permitted to speak, i.e., not sidewalk counsel, while crossing through the zones, the Ordinance would still silence her speech, and such suppression of speech in a traditional public forum must

meet the demands of narrow tailoring, which, as explained above, the City cannot satisfy. Indeed, the City's suggested interpretation of the Ordinance would do nothing to change the clearly overinclusive nature of the Ordinance.

Second, while clinic escorts may have opined that Turco could walk through the buffer zones (Def.Br.53), those observations contradict the testimony of City Council President Algrant, who stated that a non-exempt person cannot walk through the buffer zones but must go out into the street. Appx230 (Algrant, 132:2–133:15); Appx204–205 (Algrant, 129:22 to 133:15).[6]

Indeed, if Turco crosses through a buffer zone to counsel a woman on the other side, it cannot be said that she is entering the zone "**solely** for the purpose of reaching a destination other than such facility." (Appx618–19.)

Third, the City's proposed construction would not narrow the scope of the Ordinance, but *broaden* it, imposing a restriction on speech nowhere set forth in the text of the Ordinance. *See McCullen*, 573 U.S. at 512 n.3. Persons falling within one of the three other exemptions (those entering/leaving the facility, first responders,

---

[6] In an August 28, 2015, letter to the district court, counsel for the City represented that while Turco and similarly situated persons could "quietly traverse (but not loiter in) the driveway buffer zone for the sole purpose of reaching the area adjacent to the buffer zone north of the entrance to the clinic," they could not "traverse the buffer zone in front of the clinic entrance." [ECF Doc. 18 at 1.] Counsel's stipulation that Turco may "traverse (but not loiter in) the driveway buffer zone," of course, assumes that without this stipulation—offered merely as an accommodation—the Ordinance does not in fact permit such traversing. Nonetheless, counsel was clear that Turco could not cross the buffer zones in front of MMA's entrance.

and agents of the facility) are not required to remain silent while in a buffer zone, and this Court has no authority to rewrite the Ordinance to impose a speech restriction on those who fall within the fourth exemption, whether that includes one person (Turco), a class of persons (sidewalk counselors), or all persons who cross through a buffer zone seeking to reach a destination other than the facility covered by such a zone. For these reasons, the Ordinance is far from susceptible to the narrowing construction the City proposes; nor does it demand that construction on its face. *See Bruni II*, 941 F.3d at 87–88. What the City "desires requires rewriting, not just reinterpretation," *United States v. Stevens*, 559 U.S. 460, 481 (2010), and construing the Ordinance in a manner proposed by the City would not avoid constitutional problems, it would only compound them.

## CONCLUSION

For the foregoing reasons, Jeryl Turco respectfully asks the Court to reverse the order and judgment of the district court.

Dated: January 26, 2023

Respectfully submitted,

*/s/ Francis J. Manion*

By:   FRANCIS J. MANION*
        *Lead Counsel*

JAY ALAN SEKULOW**
JORDAN SEKULOW**
STUART J. ROTH*
AMERICAN CENTER FOR LAW
AND JUSTICE
201 Maryland Avenue, N.E.
Washington, D.C. 20002
Tel.: 202-546-8890

GEOFFREY R. SURTEES**
AMERICAN CENTER FOR LAW
AND JUSTICE
6375 New Hope Road
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

25

EDWARD L. WHITE III*
AMERICAN CENTER FOR LAW
AND JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007

* Admitted to Third Circuit Bar
** Not admitted in this jurisdiction

## **CERTIFICATION OF ADMISSION TO BAR**

I, Francis J. Manion, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: January 26, 2023

Respectfully submitted,

*/s/ Francis J. Manion*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 6,334 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: January 26, 2023

Respectfully submitted,

*/s/ Francis J. Manion*

## CERTIFICATE OF FILING AND SERVICE

I, Noel Reyes, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

January 26, 2023, the foregoing Reply Brief for Plaintiff-Appellant was filed

through the CM/ECF system and served electronically.

Dated: January 26, 2023

Respectfully submitted,

*/s/ Francis J. Manion*